# Judge Hellerstein

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

## 08 CV 02211

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GEORGESON INC. f/k/a/ GEORGESON     :     Civil Action No._____
SHAREHOLDER COMMUNICATIONS, INC. and   :
GEORGESON SECURITIES CORPORATION f/k/a  :     JURY TRIAL DEMANDED
GEORGESON SHAREHOLDER SECURITIES    :
CORPORATION,                             :     **COMPLAINT**

                            Plaintiffs,   :

               -against-                          :

WESTCHESTER SURPLUS LINES INSURANCE    :
COMPANY,                                          :
                      Defendant.   :

                                            :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

(stamp) RECEIVED MAR 05 2008 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiffs Georgeson Inc., f/k/a Georgeson Shareholder Communications, Inc.

("Georgeson Shareholder"), and Georgeson Securities Corporation, f/k/a Georgeson Shareholder

Securities Corporation ("Georgeson Securities") (collectively, "Georgeson"), for their complaint

against Westchester Surplus Lines Insurance Company ("Westchester"), allege as follows:

## NATURE OF THE ACTION

1.       This insurance coverage dispute arises out of Westchester's unreasonable failure

to defend and indemnify Georgeson under two Westchester insurance policies (the "Policies")

for two underlying lawsuits against Georgeson related to purported Wrongful Acts in connection

with Georgeson's "PostMerger CleanUp" (or "PMC") services that it provided to certain

companies in late 2000 and 2001. The claims for which Georgeson seeks coverage fall squarely

within the Policies' insuring agreements. Because Westchester has refused to meet its

obligations to defend and indemnify defense costs for the underlying actions, Georgeson brings

this action to recover its defense costs and to obtain declaratory relief as to Westchester's coverage obligations.

## PARTIES

2.      Georgeson Shareholder is a Delaware corporation with its principal place of business in New York, New York.  Georgeson Shareholder is part of one of the largest and oldest shareholder communication firms in the world.

3.      Georgeson Securities, an affiliate of Georgeson Shareholder, is a Delaware corporation with its principal place of business in New York, New York.  Georgeson Securities is a registered broker-dealer.  Georgeson Securities provides services related to Georgeson's PostMerger CleanUp program, such as selling shares and delivering shares and/or cash to shareholders who participate in the PostMerger CleanUp.

4.      Westchester is a Georgia corporation with its principal place of business in Roswell, Georgia.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Westchester is a corporation subject to personal jurisdiction within this district.

7.      There is an actual and justiciable controversy between the parties.

## FACTUAL BACKGROUND

**Georgeson's Business**

8.      This case involves Georgeson's PostMerger CleanUp services that it provides to companies following a merger or another change in corporate control.  For example, following a

merger, the newly formed company usually sends one or more notices to shareholders of the "old" company to instruct them to exchange their "old" share certificates for shares in the new company. Shareholders who do not exchange their shares will not be able to vote in the new company or obtain dividends and other distributions from the new company. Despite a company's efforts to notify their shareholders, some number of shareholders usually will not respond and will continue to hold defunct shares in the "old" company. That is where Georgeson's PostMerger CleanUp service comes in. Companies hire Georgeson to try to reach the unexchanged certificate holders who did not respond to the company's prior efforts to get shareholders to exchange their shares. As part of its PostMerger CleanUp service, Georgeson sends follow-up notices to shareholders on behalf of the newly formed or newly merged company. Georgeson's PMC notice offers to help shareholders receive the new shares and any cash that they are entitled to receive as a result of the merger. The notice describes how shareholders may use Georgeson's service to exchange or sell their shares. Georgeson discloses its fee, states that participation is voluntary, and provides a telephone number to call with any questions.

9.    In this Complaint, Georgeson seeks insurance coverage for certain lawsuits that have alleged that Georgeson Shareholder and Georgeson Securities made errors, omissions, and misleading statements in connection with PostMerger CleanUp services that Georgeson Shareholder and Georgeson Securities provided in late 2000 and 2001, during the period covered by the Policies.

**The E&O Policy**

10.    Georgeson purchased from Westchester a Miscellaneous Errors and Omissions insurance policy, Policy No. EON 680 554, for the period December 21, 2000 to December 21,

2001 ("E&O Policy") under which Georgeson Shareholder is a named insured. A copy of the E&O Policy is attached to this Complaint as Exhibit A. The E&O Policy requires Westchester to pay "Damages" and "Claims Expenses" on behalf of Georgeson Shareholder for Claims alleging Wrongful Acts in the performance of Professional Services during the policy period.

11.    The E&O Policy covers a wide range of Georgeson Shareholder's business activities and Professional Services, including: "Proxy solicitation and shareholder response services"; "Reviewing, processing and remitting of unclaimed assets which have been accumulated by holder entities to 54 jurisdictions (50 states plus Guam, Puerto Rico, the Virgin Islands and the District of Columbia)"; "Electronic Data Processing Shareholder Communication Services and Tender Offer Depository Processing Services for others, including activities as a broker for trucking services"; and "Publishing and printing services."

12.    Westchester defined "Wrongful Act" in the E&O Policy broadly to include "any actual or alleged act, error, omission, misstatement, misleading statement, Personal Injury, neglect or breach of duty by the Insured in their capacity as such or by any other person or entity for whom the Insured is legally liable." Thus, the E&O Policy is specifically designed to protect Georgeson Shareholder from errors, omissions or misleading statements made in connection with providing its PostMerger CleanUp service.

13.    The E&O Policy requires Westchester to defend Georgeson Shareholder against any covered Claim "even if the Claim is groundless, false or fraudulent." "Claims Expenses" is defined in the E&O Policy as including "attorneys' fees, expert witness fees and other reasonable fees and costs incurred by the Company, or by the Insured with the Company's prior written consent, in the investigation and defense of covered Claims."

14.    The limit of liability of the E&O Policy is $10,000,000.

15.     All conditions and requirements imposed upon Georgeson Shareholder by the

E&O Policy, including payment of premiums and notice of claims, have been satisfied and/or

waived, or are subject to an estoppel against Westchester.

**The Broker Policy**

16.     Georgeson also purchased from Westchester a Management Protection Insurance

Policy, Policy No. DON 648405 ("Broker Policy") for the period December 21, 2000 to

December 21, 2001, under which Georgeson Securities is a named insured. A copy of the

Broker Policy is attached to this Complaint as Exhibit B. The Broker Policy defines "Insured

Broker Dealer" as including "any Company that is a (i) 'broker' or 'dealer' in securities as those

terms are defined in Sections 3(a)(4) and 3(a)(5), respectively, of the Securities Exchange Act of

1934, as amended." Georgeson Securities is an Insured Broker Dealer under the Broker Policy.

17.     The Broker Policy provides coverage for a wide range of Georgeson Securities'

business activities and Professional Services, including "giving financial economic or investment

advice, including performing investment management services, regarding investments in

securities, providing proxy solicitation services, or acting as an information agent on behalf of a

client, if such advice or services are provided by or on behalf of the Company pursuant to a

written contract defining the consideration for and the scope of such advice or services."

18.     Westchester defined "Wrongful Act" in the Broker Policy to include "any actual

or alleged error, misstatement, misleading statement, act, omissions, neglect or breach of duty by

the Insureds in their capacity as such." Thus, the Broker Policy requires Westchester to pay any

Loss that Georgeson Securities becomes obligated to pay by reason of any Claim alleging

Wrongful Acts in rendering or failing to render Professional Services as an Insured Broker-

Dealer during the policy period.

19.     The Broker Policy includes "Defense Costs" within the definition of "Loss." Defense Costs are defined as "reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Company) incurred by the Insureds in defending or investigating Claims and the premium for appeal, attachment or similar bonds."

20.     The limit of liability of the Broker Policy is $5,000,000.

21.     All conditions and requirements imposed upon Georgeson Securities by the Broker Policy, including payment of premiums and notice of claims, have been satisfied and/or waived or are subject to an estoppel against Westchester.

22.     Georgeson has paid Westchester over $368,500 in premiums for the E&O and Broker Policies.

**The Gavin Action**

23.     Georgeson Shareholder was named as a defendant in a putative class action filed on February 9, 2001 in the Circuit Court of Cook County, Illinois, Chancery Division, entitled *Lila T. Gavin, on behalf of herself and all others similarly situated v. AT&T Corp., and Georgeson Shareholder Communications, Inc.*, 01 CH 02297 (the "*Gavin* Action"). Copies of the Complaint and First Amended Complaint in the *Gavin* action are attached to this Complaint as Exhibits C and D, respectively.

24.     The *Gavin* action alleges that Georgeson Shareholder engaged in Wrongful Acts in connection with PostMerger CleanUp services that Georgeson Shareholder provided to shareholders on behalf of AT&T and other issuing companies. For example, Georgeson Shareholder's notice for AT&T invited holders of unexchanged Media Group and MediaOne share certificates to exchange those old certificates for new shares of AT&T. At the heart of the

*Gavin* action are allegations that Georgeson Shareholder's notices sent on behalf of AT&T and other issuers were misleading because they did not inform the certificate holders that they could exchange their share certificates through the issuer's transfer agent without incurring Georgeson Shareholder's fee.

25.    Gavin's initial Complaint alleged, among other things, that Georgeson Shareholder misled shareholders to believe that they "had to send in their U.S. West Media Group shares in response to their solicitation or face losing their investment entirely." The initial Complaint in the *Gavin* action asserted causes of action for common law fraud, a violation of the Illinois Consumer Fraud Act, and "Breach of Fiduciary Duty and Constructive Fraud." Gavin alleged that by reviewing the investments of the shareholders, a fiduciary relationship was established and breached when Georgeson Shareholder made "misrepresentations and omissions of material fact" in the PostMerger CleanUp notice.

26.    The *Gavin* action alleges that Gavin and other putative class members were induced into exchanging their shares through Georgeson based on the misstatements and omissions in Georgeson Shareholder's PostMerger CleanUp notice. This alleged fraudulent inducement occurred after the Retroactive Date and within the Policy Period. The *Gavin* action also involves purported Wrongful Acts by Georgeson representatives during certain telephone calls that occurred after the Retroactive Date and within the Policy Period.

27.    The defendants removed the initial *Gavin* action to the United States District Court for the Northern District of Illinois under the Securities Litigation Uniform Standards Act ("SLUSA"). In 2005, the district court granted partial summary judgment in favor of Georgeson Shareholder. On appeal, the United States Court of Appeals for the Seventh Circuit ruled that the *Gavin* action should not have been removed under SLUSA because Georgeson's notice was

not in connection with the purchase or sale of securities, and remanded the case back to Illinois state court. In Illinois state court, Gavin filed a First Amended Complaint that reasserted Gavin's prior claims of fraud and Illinois Consumer Fraud Act claims, and added a federal RICO claim, a claim under the New York consumer protection statute (§ 349), a claim for breach of fiduciary duty against AT&T, and a claim for aiding and abetting breach of fiduciary duty against Georgeson Shareholder. The First Amended Complaint also added allegations against "Doe" defendants related to Georgeson's PostMerger CleanUp services provided to those "Doe" corporations besides AT&T. Those allegations encompass services Georgeson provided after the Retroactive Date and during the Policy Period.

28.    The defendants again removed the amended *Gavin* action to the United States District Court for the Northern District of Illinois, where it remains pending. Like Gavin's initial Complaint, her First Amended Complaint asserts that Georgeson Shareholder's notice was misleading because it "omitted the material fact that the $7 per-share charge" could be avoided by exchanging shares directly through the issuer's transfer agent.

29.    To date, Georgeson has incurred over $1.6 million in legal fees and defense costs, none of which has been advanced or reimbursed by Westchester.

**The Starr Action**

30.    While the initial *Gavin* action was pending in Illinois, Georgeson Shareholder and Georgeson Securities were named as defendants in two similar putative class actions filed in the United States District Court for the Southern District of New York. The first was entitled *Allan H. Starr, Executor of the Estate of Elizabeth Sampson, individually and on behalf of all others similarly situated v. Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc., Georgeson Shareholder Securities Corp. and Vodafone Group, PLC*, 02 Civ. 8921 (LLS)

("Vodafone"). The second was entitled *Allan H. Starr, Executor of the Estate of Elizabeth Sampson, individually and on behalf of all others similarly situated v. Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc., Georgeson Shareholder Securities Corp. and AT&T Corp.*, 03 Civ. 1163 (LLS) ("AT&T") (the Vodafone and AT&T cases are referred to collectively as the "*Starr* action"). Copies of the Vodafone complaint and the initial and amended AT&T complaints from the *Starr* action are attached to this Complaint as Exhibits E, F, and G, respectively.

31.    In the *Starr* action, Mr. Starr alleged that Georgeson Shareholder and Georgeson Securities committed various errors, omissions, and misleading statements in connection with the PostMerger CleanUp services and notices they provided for Vodafone and AT&T. For example, Starr also alleged that Georgeson's notices were "highly misleading" by giving shareholders the "intended impression that they have no alternative but to promptly exchange their shares through Georgeson." Mr. Starr further alleged that Georgeson's notices were "designed to create a false urgency to act" and the notices would "mislead the reasonable shareholder into believing that [Georgeson's] fee . . . was related to the actual costs of the share exchange." Starr also contended that Georgeson failed to "inform the shareholders that they could altogether avoid any Georgeson fee by exchanging their shares for free by sending their shares directly to the issuer's transfer agent, or, in the alternative, that the shareholders could pay a minimal fee far less than Georgeson's." These purported misleading statements and omissions are covered Wrongful Acts under the E&O Policy.

32.    Starr also asserted that Georgeson Securities was a "registered broker dealer" and that "Georgeson (especially [Georgeson Securities], a registered broker-dealer) was on notice of the deceptive and wrongful nature of its conduct by virtue of various NASD rules of conduct for

brokers. . . ." Starr further asserted that "[w]hen a broker-dealer such as Georgeson [Securities] charges an excessive markup on the price of stock, the broker-dealer has a duty to disclose the markup and any other material information needed to permit the customer to make an informed judgment upon whether or not he will complete the transaction." These allegations trigger coverage for Georgeson Securities under the Broker Policy.

33.    The district court dismissed the *Starr* action with prejudice in a combined opinion that addressed both the Vodafone and AT&T complaints. The district court held that there was no material misstatement or omission because shareholders had been previously informed of the option to exchange their shares through the transfer agent. The court also found that Georgeson's fees were disclosed in the notice. The Second Circuit affirmed the dismissal of the *Starr* action.

34.    Georgeson incurred over $571,000 in legal fees and costs, none of which has been advanced or reimbursed by Westchester.

**Georgeson's Effort to Obtain Insurance Coverage**

35.    The allegations in the *Gavin* and *Starr* actions fall squarely within the insuring agreement of the E&O Policy. In both cases, Georgeson purportedly made errors, omissions, and/or misleading statements in connection with the PostMerger CleanUp service it provided to AT&T and other issuer companies. The PostMerger CleanUp service is a fundamental part of Georgeson's business operations, and falls within the definition of "Professional Services."

36.    Georgeson provided Westchester timely notice of the *Gavin* action and the *Starr* action under the E&O Policy. After Gavin filed her First Amended Complaint, Georgeson again requested that Westchester live up to its contractual obligations and accept the defense of Georgeson Shareholder in the *Gavin* action. Westchester denied coverage under the E&O Policy

for the *Gavin* action on May 30, 2001 and again on September 19, 2007. Westchester denied coverage under the E&O Policy for the *Starr* action on September 23, 2003.

37.    Westchester's denials of coverage under the E&O Policy are without merit and are contrary to the E&O Policy language and the allegations made in the *Gavin* and *Starr* actions. Westchester denied coverage for the *Gavin* action under the E&O Policy on the grounds that the Wrongful Acts alleged in the *Gavin* action allegedly fall outside the Policy Period and before the Retroactive Date. Westchester is wrong because both the *Gavin* and the *Starr* actions are predicated on alleged Wrongful Acts that purportedly occurred after the Retroactive Date and during the Policy Period. Westchester also denied coverage based on certain exclusions. But no exclusions justify Westchester's failure to defend Georgeson in the *Gavin* action.

38.    Westchester's denial of coverage for the *Starr* action under the E&O Policy relied on two exclusions: Exclusion I for securities claims, and Exclusion J, as amended by Endorsement No. 2, which relates to the gaining in fact of a profit or advantage to which Georgeson was allegedly not entitled. These exclusions do not apply. The *Starr* action initially asserted state-law claims for unjust enrichment and a violation of New York consumer protection law as well as a federal securities law claim. Exclusion I does not apply because the *Starr* action did not allege a viable securities fraud case. Also, the Seventh Circuit Court of Appeals has held that Georgeson's PostMerger CleanUp notice, which follows a merger, is not in connection with the purchase or sale of securities. Exclusion J, as amended by Endorsement No. 2, also does not apply because Georgeson did not gain any profit or advantage to which it was not entitled.

39.    Georgeson provided Westchester timely notice of the *Starr* action under the Broker Policy. Westchester denied coverage for the *Starr* action under the Broker Policy on August 28, 2003.

40.     Westchester improperly denied coverage for the *Starr* action under the Broker Policy. Westchester based its denial on the ground that the *Starr* action did not assert that Georgeson was acting as a "broker" or "dealer." The allegations of the *Starr* action, however, unambiguously assert that Georgeson Securities was providing covered Professional Services as a broker or dealer. The *Starr* action alleged specifically that Georgeson Securities was a "registered broker dealer" that made errors, omissions, and misleading statements in connection with the PostMerger CleanUp services it provided to shareholders. Thus, the Broker Policy squarely covers Georgeson Securities for the Defense Costs incurred in the *Starr* action.

## COUNT I
### Declaratory Judgment
### Westchester's Duty under the E&O Policy
### to Defend Georgeson Shareholder in the *Gavin* Action

41.     Georgeson incorporates by reference and realleges the allegations of paragraphs 1-40, inclusive, as though fully set forth herein.

42.     Pursuant to 28 U.S.C. § 2201, Georgeson Shareholder is entitled to a declaratory judgment that, pursuant to terms of the E&O Policy, Westchester owes Georgeson Shareholder a duty to defend the *Gavin* action.

43.     An actual and justiciable controversy exists between Georgeson Shareholder and Westchester as to the obligations of Westchester concerning the amounts Georgeson Shareholder is currently paying in defense of the *Gavin* action and the sums it has already expended in defending the *Gavin* action.

WHEREFORE, Georgeson Shareholder respectfully requests that this Court enter judgment on Count I against Westchester:

**Case 1:08-cv-02211-AKH    Document 1    Filed 03/05/2008    Page 13 of 17**

(A)     Declaring that Westchester owes Georgeson Shareholder a duty to defend it for Claim Expenses and any future Loss arising from the *Gavin* action;

(B)     Requiring that Westchester immediately accept the tender of the defense of the *Gavin* action;

(C)     Requiring Westchester to reimburse Georgeson Shareholder for the sums incurred in defense of the *Gavin* action;

(D)     Award Georgeson Shareholder its reasonable attorneys' fees, costs and expenses incurred in bringing this action and such other relief as the Court may deem just and appropriate.

## COUNT II
### Declaratory Judgment
### Westchester's Duty under the E&O Policy
### to Indemnify Georgeson Shareholder in the *Gavin* Action

44.     Georgeson Shareholder incorporates by reference and realleges the allegations of paragraphs 1-40 inclusive, as though fully set forth herein.

45.     Pursuant to 28 U.S.C. § 2201, Georgeson Shareholder is entitled to a declaratory judgment that, pursuant to terms of the E&O Policy, Westchester owes Georgeson Shareholder a duty to indemnify any Loss resulting from the *Gavin* action.

46.     An actual and justiciable controversy exists between Georgeson Shareholder and Westchester as to the obligations of Westchester concerning the amounts Westchester is obligated to indemnify Georgeson Shareholder for any Loss resulting from the *Gavin* action.

WHEREFORE, Georgeson Shareholder respectfully request that this Court enter judgment on Count II against Westchester:

(A)     Declaring that Westchester owes Georgeson Shareholder a duty to indemnify it for any Loss arising from the *Gavin* action;

(B)    Award Georgeson Shareholder its reasonable attorneys' fees, costs and expenses incurred in bringing this action and such other relief as the Court may deem just and appropriate.

## COUNT III
### Declaratory Judgment
### Westchester's Duty under the E&O Policy
### to Indemnify Georgeson Shareholder in the *Starr* Action

47.    Georgeson Shareholder incorporates by reference and realleges the allegations of paragraphs 1-40, inclusive, as though fully set forth herein.

48.    Pursuant to 28 U.S.C. § 2201, Georgeson Shareholder is entitled to a declaratory judgment that, pursuant to terms of the E&O Policy, Westchester owes Georgeson a duty indemnify Georgeson Shareholder for Claim Expenses paid to defend the *Starr* action.

49.    An actual and justiciable controversy exists between Georgeson Shareholder and Westchester concerning the rights and obligations of the parties with respect to the sums already spent by Georgeson Shareholder and the sums Westchester owes Georgeson under the E&O Policy.

WHEREFORE, Georgeson Shareholder respectfully requests that this Court enter judgment on Count III against Westchester:

(A)    Declaring that Westchester owes Georgeson Shareholder a duty to indemnify Georgeson for Claim Expenses paid in connection with the *Starr* action;

(B)    Requiring that Westchester immediately reimburse Georgeson Shareholder for the sums incurred in defending the *Starr* action;

(C)    Award Georgeson Shareholder the reasonable attorneys' fees, costs and expenses incurred in bringing this action and such other relief as the Court may deem just and appropriate.

## COUNT IV

### Breach of Contract -- E&O Policy in *Starr* Action

50.      Georgeson Shareholder incorporates by reference and realleges the allegations of paragraphs 1-40, inclusive, as though fully set forth herein.

51.      Westchester has failed to perform its contractual obligation under the E&O Policy to pay Georgeson Shareholder the Claim Expenses paid in connection with the *Starr* action and has wrongfully denied coverage for those losses.  Westchester is in breach of contract.

52.      Georgeson Shareholder has been damaged by Westchester's breach, in that Georgeson Shareholder has been denied the benefits of the insurance coverage for which Georgeson Shareholder contracted and for which Westchester collected a premium.

WHEREFORE, Georgeson Shareholder respectfully requests that this Court enter judgment on Count IV against Westchester:

(A)      Granting an award of actual and consequential damages Georgeson Shareholder has sustained as a result of Westchester's breach an amount exceeding $571,171;

(B)      Awarding Georgeson its reasonable attorney's fees, costs and expenses incurred in bringing this action and such other relief as the Court may deem just and appropriate.

## COUNT V

### Declaratory Judgment

### Westchester's Duty under the Broker Policy to Indemnify Georgeson Securities in the *Starr* Action

53.      Georgeson Securities incorporates by reference and realleges the allegations of paragraphs 1-40, inclusive, as though fully set forth herein.

54.    Pursuant to 28 U.S.C. § 2201, Georgeson Securities is entitled to a declaratory judgment that, pursuant to terms of the Broker Policy, Westchester owes Georgeson Securities a duty indemnify Georgeson for Defense Costs to defend the *Starr* action.

55.    An actual and justiciable controversy exists between Georgeson Securities and Westchester concerning the rights and obligations of the parties with respect to the sums already spent by Georgeson and the sums Westchester owes under the Broker Policy.

WHEREFORE, Georgeson Securities respectfully requests that this Court enter judgment on Count V against Westchester:

(A)    Declaring that Westchester owes Georgeson Securities a duty to indemnify it for Defense Costs in connection with the *Starr* action;

(B)    Requiring that Westchester immediately reimburse Georgeson for the sums incurred in defending the *Starr* action on behalf of Georgeson Securities;

(C)    Award Georgeson reasonable attorney's fees, costs and expenses incurred in bringing this action and such other relief as the Court may deem just and appropriate.

## COUNT VI
### Breach of Contract -- Broker Policy in the *Starr* Action

56.    Georgeson Securities incorporates by reference and realleges the allegations of paragraphs 1-40, inclusive, as though fully set forth herein.

57.    Westchester has failed to perform its contractual obligation under the Broker Policy to pay Georgeson Securities the Claim Expenses in connection with the *Starr* action and has wrongfully denied coverage for those losses.  Westchester is in breach of contract.

58.    Georgeson has been damaged by Westchester's breach, in that Georgeson Securities has been denied the benefits of the insurance coverage for which Georgeson Securities contracted and for which Westchester collected a premium.

WHEREFORE, Georgeson Securities respectfully requests that this Court enter judgment on Count IV against Westchester:

(A)     Granting an award of actual and consequential damages Georgeson has sustained as a result of Westchester's breach, an amount exceeding $571,000;

(B)     Awarding Georgeson its reasonable attorneys' fees, costs and expenses incurred in bringing this action and such other relief as the Court may deem just and appropriate.

Dated: March 5, 2008

THELEN REID BROWN RAYSMAN
& STEINER LLP

By: _____
        Eli R. Mattioli
        Hermann Ferré
875 Third Avenue
New York, NY 10022
(212) 603-2000

Ross B. Bricker
Douglas Rees
Megan A. Byrnes
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
(312) 222-9350

Attorneys for Plaintiffs

# EXHIBIT A



## ace usa

## Miscellaneous Errors and Omissions Declarations

NOTICE: THIS IS A CLAIMS MADE POLICY.  THIS POLICY ONLY APPLIES TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND ARE THE RESULT OF WRONGFUL ACTS COMMITTED ON OR SUBSEQUENT TO THE RETROACTIVE DATE SPECIFIED IN ITEM 6.  OF THE DECLARATIONS AND BEFORE THE END OF THE POLICY PERIOD.  PLEASE REVIEW THIS POLICY CAREFULLY AND DISCUSS THIS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

| Company | Producer |
|---|---|
| Westchester Surplus Lines Insurance Company | ARC Excess & Surplus, LLC<br>300 Old Country Road<br>Mineola, NY  11501 |

| Policy No.     EON 680 554 | Renewal of     NEW |
|---|---|

Item 1.  Named Insured and Mailing Address:     Georgeson Shareholder Communications, Inc.;
Corporate Investor Communications, Inc.;
The National Abandoned Property Processing Corporation (NAPPCO)
17 State Street
New York, NY  10004

Item 2.  Policy Period:   December 21, 2000  to  December 21, 2001
(at 12:01 AM local time at the address of the Named Insured as stated Item 1. above)

Item 3.  Limits of Liability (inclusive of Claims Expenses):
A.  $10,000,000        Each Claim
B.  $10,000,000        Policy Period Aggregate

Item 4.  Deductible (inclusive of Claims Expenses):
$150,000        Each Claim

Item 5.  Premium:
$52,800

Item 6.  Retroactive Date (if applicable):

| | |
|---|---|
| Georgeson Shareholder Communications | December 21, 2000 |
| Corporate Investor Communications | March 10, 1997 |
| The National Abandoned Property Processing Corp. | March 12, 1992 |

Item 7.  Professional Services:  
1)  Proxy solicitation and shareholder response services.  
2)  Electronic Data Processing Shareholder Communication Services and Tender Offer Depository Processing Services for others, including activities as a broker for trucking services.  
3)  Reviewing, processing and remitting of unclaimed assets which have been accumulated by holder entities to 54 jurisdictions (50 states plus Guam, Puerto Rico, the Virgin Islands and the District of Columbia).  
4)  Publishing and printing services.  
5)  Translation services.



**ace usa**

Miscellaneous Errors and Omissions Declarations

Page Two

Item 8.  Claims Notifications:
           ACE USA, 1133 Avenue of the Americas, 32nd Floor, New York, NY  10036 (Attn: Misc. E&O Department)

Item 9.  Extended Reporting Period
           A.   Additional Premium: <u>100%</u> of annual Policy premium
           B.   Additional Period <u>12 months</u>

Item 10.          Endorsements attached at Policy effective date:
           Endorsement Nos.:  1, 2

DATE:     <u>1/8/01</u>
           Mo./Day/Yr.

AUTHORIZED REPRESENTATIVE

**NAMED INSURED:**     Georgeson Shareholder Communications, Inc.;
Corporate Investor Communications, Inc.;
The National Abandoned Property Processing
Corporation (NAPPCO)


**POLICY NUMBER:**     EON 680 554



**SURPLUS LINES INFORMATION:**


"THIS IS NOT AN INSURANCE POLICY AND THE INSURER (INSURERS)
HEREIN REFERRED TO IS (ARE) NOT LICENSED BY THE STATE OF NEW
YORK AND NOT SUBJECT TO ITS SUPERVISION. THE INSURANCE
CONFIRMED HEREIN, IN THE EVENT OF THE INSOLVENCY OF THE
INSURER (INSURERS), IS NOT PROTECTED BY THE NEW YORK STATE
SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE
REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO
POLICY FORMS."

# Miscellaneous Errors and Omissions Liability Insurance

**NOTICE: THIS IS A CLAIMS MADE POLICY. THIS POLICY APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND ARE THE RESULT OF WRONGFUL ACTS COMMITTED ON OR SUBSEQUENT TO THE RETROACTIVE DATE SPECIFIED IN ITEM 6. OF THE DECLARATIONS AND BEFORE THE END OF THE POLICY PERIOD. PLEASE REVIEW THIS POLICY CAREFULLY AND DISCUSS THIS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**ALL WORDS OR PHRASES THAT ARE IN BOLD FACE TYPE, OTHER THAN THE CAPTION TITLES, HAVE THE SPECIAL MEANING SET FORTH IN SECTION II, DEFINITIONS.**

In consideration of the payment of the premium and in reliance upon the statements made in the Application, which is made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions and other terms of the Policy, the Company named in the Declarations and the Insureds agree as follows:

**I.    Insuring Agreements**

**Errors and Omissions Coverage**

A.  The Company will pay on behalf of the Insured all sums in excess of the Deductible that the Insured shall become legally obligated to pay as **Damages** and **Claims Expenses** because of a **Claim** first made against the Insured during the **Policy Period** by reason of a **Wrongful Act** in the performance of or failure to perform **Professional Services** by the Insured or by any other person or entity for whom the Insured is legally liable. The **Wrongful Acts** must have been committed on or subsequent to the Retroactive Date specified in Item 6. of the Declarations and before the end of the **Policy Period**.

B.  **Defense and Claims Expenses**

The Company shall have the right and duty to defend any covered **Claim** brought against the Insured even if the **Claim** is groundless, false or fraudulent. The Insured shall not admit or assume liability or settle or negotiate to settle any **Claim** or incur any **Claims Expenses** without the prior written consent of the Company and the Company shall have the right to appoint counsel and to make such investigation and defense of a **Claim** as it deems necessary.

The Company shall not settle any **Claim** without the written consent of the Named Insured. If the Named Insured refuses to consent to a settlement or a compromise recommended by the Company and acceptable to the Claimant, then the Company's Limit of Liability under this Policy with respect to such **Claim** shall be reduced to the amount of **Damages** for which the **Claim** could have been settled plus all **Claims Expenses** incurred up to the time the Company made its recommendation to the Named Insured, which amount shall not exceed the unexhausted Limit of Liability specified in Item 3. of the Declarations.

The Company shall not be obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle any **Claim** after the applicable Limit of Liability specified in Item 3. of the Declarations has been exhausted by payment of **Damages** and **Claims Expenses**, or any combination thereof, or after the Company has deposited the remaining available Limit of Liability into a court of competent jurisdiction. In such case, the Company shall have the right to withdraw from the further investigation, defense, payment or settlement of such **Claim** by tendering control of such **Claim** to the Insured.

**Claims Expenses** are part of and not in addition to the Company's Limit of Liability, and the payment by the Company of **Claims Expenses** reduces the applicable Limit of Liability.

If the Insureds attend hearings, depositions or trials at the request of the Company, the Company shall reimburse the Insured's actual loss of earnings and reasonable expenses due to such attendance up to $250 per day subject to a maximum amount of $5,000 for all Claims covered by this Policy. Such reimbursement payments by the Company to the Insured are not subject to the Deductible and shall not reduce the applicable Limit of Liability.

### C.  Disciplinary Proceeding Coverage

If an Insured's Wrongful Act results in the commencement during the Policy Period of a Disciplinary Proceeding against an Insured, the Company will reimburse the Insured for Claims Expenses incurred in responding to such Disciplinary Proceeding. The maximum payment by the Company pursuant to this extension of coverage shall be $5,000 for each Policy Period regardless of the number of Disciplinary Proceedings or Insureds. Any payment by the Company pursuant to this extension of coverage shall not apply to the Deductible, but shall reduce and be subject to the Limit of Liability. The Company shall not pay Damages pursuant to this extension of coverage.

## II.    Definitions

A.  **Bodily Injury** means injury to the body, sickness, or disease , including death resulting from such injuries. **Bodily Injury** also means mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock, whether or not resulting from injury to the body, sickness, disease or death of any person.

B.  **Claim** means a written demand for money, including any civil proceeding against the Insured for a **Wrongful Act**, in the performance of or failure to perform **Professional Services**. **Claim** shall not include any **Disciplinary Proceeding**.

C.  **Claims Expenses means:**

   a.  attorneys' fees, expert witness fees and other reasonable fees and costs incurred by the Company, or by the Insured with the Company's prior written consent, in the investigation and defense of covered **Claims**;
   b.  premiums for any appeal bond, attachment bond or similar bond, provided the Company shall have no obligation to apply for or furnish such bond; and
   c.  prejudgment and post judgment interest awarded in any **Claim**.

   **Claims Expenses** shall not include wages, salaries, fees or costs of directors, officers or employees of the Company or the Insured.

D.  **Damages** means any compensatory amount which the Insured becomes legally obligated to pay on account of a covered **Claim**, including judgments, awards and settlements. All settlements must be negotiated and agreed upon with the prior written consent of the Company.

   **Damages** shall not include:
   a.  civil or criminal fines, penalties, or sanctions, whether pursuant to law, statute, regulation or court rule;
   b.  punitive and exemplary damages and the multiple portion of multiplied damages;
   c.  any matter, sum or award that is uninsurable under the law pursuant to which this Policy shall be construed; and
   d.  the cost to comply with any injunctive or other non-monetary or declaratory relief or any agreement to provide such relief.

E.  **Disciplinary Proceeding** means any proceeding by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct in the performance of **Professional Services**.

F.  **Insured** means the Named Insured and:

    a.  any past, present or future principal, partner, officer, director, stockholder, trustee or employee of the Named Insured but only with respect to Professional Services performed on behalf of the Named Insured;

    b.  independent contractors who are natural persons, but only with respect to Professional Services performed on behalf of the Named Insured; and

    c.  the estate, heirs, executors, administrators or legal representatives of any Insured described in subpart (a) or (b) above in the event of such Insured's death, incapacity, insolvency, or bankruptcy but only to the extent that such Insured would otherwise be provided coverage under this Policy.

G.  **Mediation** means a non- binding process in which a neutral panel or individual assists the parties in reaching their own settlement. To be considered Mediation under this Policy the process must be as set forth in the Commercial Mediation Rules of the American Arbitration Association or such other process as the Company may in its sole option approve.

H.  **Named Insured** means the entity or person specified in Item 1. of the Declarations.

I.  **Personal Injury** means injury arising out of one or more of the following offenses:
    a.  false arrest, detention or imprisonment;
    b.  malicious prosecution;
    c.  libel, slander or other defamatory or disparaging material;
    d.  publication or an utterance in violation of an individual's right to privacy; and
    e.  wrongful entry or eviction, or other invasion of the right to private occupancy.

J.  **Policy Period** means the period of time between the effective date stated in Item 2. of the Declarations and the termination, expiration or cancellation date of this Policy, plus any Extended Reporting Period if elected.

K.  **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and "waste". "Waste" includes materials to be recycled, reconditioned or reClaimed.

L.  **Professional Services** means only those services specified in Item 7. of the Declarations and performed for others for a fee by an Insured or by any person or entity for whom the Insured is legally liable.

M.  **Property Damage** means:

    a.  physical injury to, or loss or destruction of, tangible property, including the loss of use thereof; and

    b.  loss of use of tangible property which has not been physically injured or destroyed.

N.  **Related Claims** mean all Claims arising out of a single Wrongful Act or a series of Related Wrongful Acts in the performance of or failure to perform Professional Services.

O.  **Related Wrongful Acts** mean all Wrongful Acts that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

P.  **Retroactive Date** means the date specified in Item 6. of the Declarations.

Q.  **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, Personal Injury, neglect or breach of duty by the Insured in their capacity as such or by any other person or entity for whom the Insured is legally liable.

III.    Limits of Liability and Deductible

1.    Limit of Liability - Each Claim

The Limit of Liability stated in Item 3. (A) of the Declarations is the Company's maximum liability for all Damages and Claims Expenses because of a single Claim or Related Claims.

Limit of Liability - Aggregate

The Limit of Liability stated in Item 3. (B) of the Declarations is the Company's maximum liability for all Damages and Claims Expenses because of all Claims for which this Policy applies regardless of the number of Insureds, Claims made or persons or entities making Claims.

The Company shall not be obligated to pay any Damages or Claims Expenses or to defend any Claim after the applicable Limit of Liability has been exhausted by payment of Damages or Claims Expenses.

2.    Deductible

The Deductible amount stated in Item 4. of the Declarations is applicable to each Claim and applies to both Damages and Claims Expenses combined. The Deductible shall be paid by the Named Insured and shall be uninsured and shall remain uninsured during the Policy Period. The Limits of Liability set forth in Item 3. of the Declarations are in addition to and in excess of the Deductible.

3.    Multiple Claims

All Related Claims shall be deemed a single Claim, and such Claim shall be deemed to be first made on the date the earliest such Related Claims is first made against the Insured, regardless of whether such date is before or during the Policy Period.

IV.    Exclusions

This policy does not apply to any Claim against the Insured:

A.    based on or arising out of any actual dishonest, fraudulent, criminal or malicious act or omission by an Insured, however, this exclusion shall not apply to Claims Expenses or the Company's duty to defend any such Claim;

B.    based on or arising out of any actual or alleged Bodily Injury or Property Damage;

C.    based on or arising out of any actual or alleged liability assumed by the Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract;

D.    based on or arising out of any actual or alleged breach of any contract, warranty, guarantee or promise unless such liability would have attached to the Insured even in the absence of such contract, warranty, guarantee or promise;

E.    based on or arising out of Professional Services performed for any entity if at the time the Professional Services were performed:

a.    any Insured operated or managed such entity;
b.    any Insured was a partner, director, officer or employee of such entity;
c.    any Insured owned, directly or indirectly, 10% or more of any such entity that is a publicly held company, or 30% or more of any such entity that is a privately held company;

F.   by or on behalf of another Insured, in any capacity;

G.   based on or arising out of any actual or alleged:
    a.   illegal discrimination of any kind, or
    b.   humiliation, harassment, or misconduct arising out of or related to any such discrimination;
    however, this exclusion shall not apply to Claims Expenses or the Company's duty to defend any such Claim;

H.   based on or arising out of any actual or alleged violation of any anti-trust, restraint of trade or other law, rule or regulation which protects competition;

I.   based on or arising out of any actual or alleged violation of:

    a.   Employee Retirement Income Security Act of 1974;
    b.   Securities Act of 1933;
    c.   Securities Exchange Act of 1934;
    d.   State Securities Law;
    e.   any rules or regulations promulgated thereunder or any other similar federal, state or common law; or
    f.   any amendments thereof;

J.   based on or arising out of the gaining in fact of any profit or advantage to which the Insured is not legally entitled or any dispute involving fees, expenses or costs paid to or charged by the Insured;

K.   based on or arising out of a Wrongful Act actually or allegedly committed prior to the beginning of the Policy Period, if, on or before the earlier of the effective date of this Policy or the effective date of any Policy issued by the Company to which this Policy is a continuous renewal or replacement, the Insured knew or reasonably could have foreseen that the Wrongful Act did or could lead to a Claim;

L.   based on or arising out of a Wrongful Act, fact or circumstance which before the effective date of the Policy was reported to the Company or any other Insurer;

M.   based on or arising out of:
    a.   any actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants at any time; or
    b.   any request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants; including without limitation any Claim, suit or proceeding by or on behalf of a governmental authority, a potentially responsible party or any other person or entity for Damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of Pollutants.

V.   **Conditions**

A.   **Notice of Claims**

The Insured, as a condition precedent to the obligations of the Company under this Policy, shall give written notice to the Company immediately, but in no event later than 60 days after the end of the Policy Period of any Claim made against the Insured.

The Insured shall immediately forward to the Company, at the address indicated in Item 8. of the Declarations, every demand, notice, summons, or other process or pleadings received by the Insured or its representatives.

B.   **Notice of Potential Claims**

If, during the Policy Period, any Insured becomes aware of any Wrongful Act which may reasonably be expected to be the basis of a Claim against the Insured, and during the Policy Period gives written notice thereof to the Company with all available particulars, including but not limited to:

1. the specific Wrongful Act;
2. the dates and persons involved;
3. the identity of anticipated or possible Claimants;
4. the circumstances by which the Insured first became aware of the possible Claim, then any Claim, which is subsequently made against the Insured arising from such Wrongful Act and properly reported to the Company, shall be deemed to have been made at the time such written notice is given to the Company.

C.  Assistance and Cooperation

The Insured shall cooperate with the Company, and provide to the Company all information and assistance which the Company reasonably requests including without limitation attending hearings, depositions and trials and assisting in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any Claim covered by this Policy. The Insured shall do nothing that may prejudice the Company's position.

D.  Action Against the Company

No action shall be brought against the Company, unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this Policy, and the amount of the Insured's obligation to pay shall have been fully determined either by judgment against the Insured after actual trial and appeal or by written agreement of the Insured, the Claimant and the Company.

E.  Other Insurance

This Policy shall be excess over any other valid and collectible insurance, self-insurance or indemnification available to the Insured, whether such other insurance or indemnification is stated to be primary, contributory, excess, contingent, self-insured or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability of this Policy.

F.  Changes

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or prevent the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed except by endorsement issued to form a part of this Policy and signed by an authorized representative of the Company.

G.  Mediation of Claims

If a Claim is fully and finally resolved to the satisfaction of all parties, including the Company, through Mediation, the Insureds' Deductible obligation for such Claim shall be reduced by fifty (50) percent up to a maximum reduction of $25,000. If Claims Expenses at the time of commencement of such Mediation do not exceed the Deductible, all Claims Expenses incurred in the Mediation shall be borne by the Company.

H.  Territory

This Policy applies to Wrongful Acts taking place anywhere in the world provided that the Claim is made against the Insured within the United States of America, its territories or possessions.

I.  Subrogation

In the event of any payment under this Policy, the Company shall be subrogated in the amount of such payment to the Insured's rights of recovery therefore against any person or entity. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing to prejudice such rights.

J.   Bankruptcy

Bankruptcy or insolvency of the Insured or the Insured's estate shall not relieve the Company of any obligations hereunder.

K.   Assignment

No assignment of interest of the Insured under this Policy shall be valid unless the written consent of the Company is endorsed hereon.

L.   Named Insured sole agent

The entity or person first named in Item 1. of the Declarations shall be the sole agent of all Insureds hereunder for the purpose of effecting or accepting any notices hereunder, any amendments to or cancellations of this Policy, for the completing of any Applications and the making of any statements, representations or warranties, for the payment of any premium and the receipt of any return premium that may become due under this Policy, and the exercising or declining to exercise any right under this Policy.

M.   Cancellation/Non Renewal

This Policy may be cancelled by the Named Insured by surrender of this Policy to the Company or by giving written notice to the Company stating when thereafter such cancellation shall be effective. This Policy may also be cancelled or non renewed by the Company by sending written notice to the Named Insured, at the address last known to the Company, at least 60 days before such cancellation or non renewal is effective; however, if the Company cancels this Policy because the Insured has failed to pay amounts due under this Policy, this Policy may be cancelled by the Company by sending written notice stating when, not less than 10 days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender, or the effective date and hour of cancellation stated in the notice, shall become the end of the Policy Period subject to any elected Extended Reporting Period.

If this Policy is cancelled by the Named Insured, the Company shall retain the customary short rate proportion of the premium hereon. If this Policy is cancelled by the Company, the Company shall retain the pro-rata proportion of the premium hereon.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

N.   Application

By acceptance of this Policy the Insured agrees that:
1.   all the information and statements provided to the Company by the Insured which are contained herein, attached to or incorporated in the Application for this Policy are true, accurate and complete and shall be deemed to constitute material representations made by the Insured;
2.   this Policy is issued in reliance upon such Insured's representations;
3.   this Policy, including all endorsements hereto, and the completed and signed Application and any and all supplementary information and statements provided by the Insured to the Company (all of which are deemed to be incorporated herein) embody all of the agreements existing between the Insured and the Company and shall constitute the entire contract between the Insured and the Company; and

4.  if such representations are not true, accurate and complete, this Policy shall be null and void in its entirety and the Company shall have no liability hereunder.

VI.  **Extended Reporting Period**

In case of cancellation or non renewal of this Policy, by either the Named Insured or the Company, for reason other than the Named Insured's non payment of amount due under this Policy or non compliance with the terms and conditions of this Policy, the Named Insured shall have the right to an Extended Reporting Period as follows:

a.  Automatic Extended Reporting Period

Coverage as provided under this Policy shall automatically continue for a period of sixty (60) days following the effective date of such cancellation or non renewal, but only with respect to Claims for Wrongful Acts committed before the effective date of such cancellation or non renewal.

b.  Optional Extended Reporting Period

The Named Insured shall have the right, upon payment of the additional premium set forth in Item 9(A) of the Declarations, to an extension of the coverage provided under this Policy for the period set forth in Item 9(B) of the Declarations following the effective date of such cancellation or non renewal, but only with respect to Claims for Wrongful Acts committed before the effective date of such cancellation or non renewal.

This right shall terminate, however, unless written notice of such election and payment of the additional premium is received by the Company not later than sixty (60) days after the effective date of cancellation or non-renewal. A change in policy terms, conditions, exclusions and/or premiums shall not be considered a non-renewal for purposes of triggering the rights to the Automatic or Optional Extended Reporting Period.

The first sixty (60) days of the Optional Extended Reporting Period, if it becomes effective, shall run concurrently with the Automatic Extended Reporting Period.

There is no separate or additional Limit of Liability for Claims first made during the Extended Reporting Period.

IN WITNESS WHEREOF, the Company has caused this Policy to be executed by its President and Secretary, but this Policy shall not be binding upon the Company unless completed by the attachment of the Declarations and signed by a duly Authorized Representative of the Company.

_Richard T. Giergyn J_
Secretary

_Dennis B Reding_
President

EO.0197(9/98)
WSLIC

**This endorsement effective December 21, 2000**                    Endorsement No. 1
**Forms part of policy number EON 680 554**

Issued to Georgeson Shareholder Communications, Inc.;
      Corporate Investor Communications, Inc.;
      The National Abandoned Property Processing Corporation (NAPPCO)

**By Westchester Surplus Lines Insurance Company**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### SERVICE OF SUIT CLAUSE

Information about service of "suits" upon us is given below.  Service of process of "suits" against us may be made upon the following person, or another person we may designate:

      Joy Bernstein, Assistant General Counsel, Business Litigation
      ACE USA Companies
      Two Liberty Place – TL21K
      1601 Chestnut Street
      Philadelphia, PA 19103

The person named above is authorized and directed to accept service of process on our behalf in any action, "suit" or proceeding instituted against us.  If you request, we will give you a written promise that a general appearance will be entered on our behalf if a "suit" is brought.

If you request, we will submit to the jurisdiction of any court of competent jurisdiction.  We will accept the final decision of that court or any Appellate Court in the event of an appeal.

The law of some jurisdictions of the United States of America require that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as our agent for service of process.  In these jurisdictions, we designate the Director of Insurance as our true and lawful attorney upon whom service of process on our behalf may be made.  We also authorize the Director of Insurance to mail process received on our behalf to the company person named above.

If you are a resident of Canada, you may also serve "suit"upon us by serving the government official designated by the law of your province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

                                   _____
                                     Authorized Representative

This endorsement effective December 21, 2000                    Endorsement No. 2
Forms part of policy number EON 680 554

Issued to Georgeson Shareholder Communications, Inc.;
       Corporate Investor Communications, Inc.;
       The National Abandoned Property Processing Corporation (NAPPCO)

By Westchester Surplus Lines Insurance Company


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**


## POLICY COVERAGE ENHANCEMENTS

It is hereby understood and agreed that **Insuring Agreement L,** is amended to include the following:

**Spousal Extension**

If a covered  **Claim** against an **Insured** includes a **Claim** against the lawful spouse of such **Insured** solely by reason of
   (a) such spouse's status; or
   (b) such spouse's ownership interest in property or assets that are sought as recovery for
      such covered **Claim,**

any sums for which such spouse becomes legally obligated to pay on account of such covered Claim shall be deemed **Damages.**

All terms and conditions of this policy, including the **Deductible,** applicable to **Damages** and **Claims Expenses** sustained by an **Insured** in the covered **Claim** shall also apply to such spousal loss.

This extension shall not apply to the extent the **Claim** alleges any **Wrongful Act** by such spouse.


It is hereby understood and agreed **Insuring Agreements C. Disciplinary Proceeding Coverage** shall be deleted in its entirety and replaced with the following:

C.  **Disciplinary Proceeding Coverage**

If an **Insured's Wrongful Act** results in the commencement during the **Policy Period** of a **Disciplinary Proceeding** against an **Insured,** the Company will reimburse the **Insured** for

Claims Expenses incurred in responding to such Disciplinary Proceeding. The maximum payment by the Company pursuant to this extension of coverage shall be $10,000 for each Policy Period regardless of the number of Disciplinary Proceedings or Insureds. Any payment by the Company pursuant to this extension of coverage shall not apply to the Deductible, but shall reduce and be subject to the Limit of Liability. The Company shall not pay Damages pursuant to this extension of coverage.

It is hereby understood and agreed that Section II. (Definitions) B. Claim shall be deleted in its entirety and replaced with the following:

B.     Claim means a written demand seeking Damages, Professional Services, money, action, equitable relief (which means a remedy not involving the payment of money damages), including any civil proceeding against the Insured for a Wrongful Act, in the performance of or failure to perform Professional Services.

It is hereby understood and agreed that Section II. (Definitions) D. Damages shall be deleted in its entirety and replaced with the following:

D.     Damages means any compensatory amount which the Insured becomes legally obligated to pay on account of a covered Claim, including judgments, awards and settlements and punitive and exemplary damages and the multiple portion of multiplied damages where permitted by law. All settlements must be negotiated and agreed upon with the prior written consent of the Company.

       Damages shall not include:

a.     civil or criminal fines, penalties, or sanctions, whether pursuant to law, statute, regulation or court rule;

b.     any matter, sum or award that is uninsurable under the law pursuant to which this Policy shall be construed;

       Solely with respect to Printing Services, the Definition of Damages is amended to include the following:

       Damages does not include disputes over fees, deposits, commissions, charges for goods or services, or costs of correcting, performing or re-performing Professional Services by the Insured or another party when the Insured had the capability to correct, perform, or re-perform the service that generated the costs prior to delivery to the customer.

It is hereby understood and agreed that Section II. (Definitions) F. Insured shall be deleted in its entirety and replaced with the following:

F.     Insured means the Named Insured and:

       a.  any past, present or future principal, partner, officer, director, stockholder, trustee or employee of the Named Insured but only with respect to Professional Services

performed on behalf of the **Named Insured**;

b.  independent contractors who are natural persons, temporary or leased personnel or retired personnel but only with respect to **Professional Services** performed on behalf of the **Named Insured**;

c.  the estate, heirs, executors, administrators or legal representatives of any **Insured** described in subpart (a) or (b) above in the event of such **Insured's** death, incapacity, insolvency, or bankruptcy but only to the extent that such **Insured** would otherwise be provided coverage under this **Policy**;

d.  any subsidiary acquired, created or formed by the **Named Insured** during the **Policy Period** provided the **Named Insured** gives written notice to the **Company** within 60 days. The **Named Insured** shall pay any reasonable additional premium required by the **Company**. Notwithstanding the foregoing, coverage is automatically afforded by this **Policy** for such additional entities or interests whose annual gross revenues are ten percent or less than that of the **Named Insured's** gross revenues as stated in the application submitted to the **Company**;

e.  any joint venture but only for the legal liability of the **Named Insured** in rendering of or failure to render **Professional Services** which may result from the **Named Insured's** participation in the joint venture; and

f.  any **Predecessor Firm** (which means any entity (i) to whose financial assets and/or liabilities the **Named Insured** is majority Successor in Interest; (ii) which has undergone dissolution; and (iii) which is listed on the application for this policy.

It is hereby understood and agreed that Section II. (Definitions) L. **Professional Services** shall be deleted in its entirety and replaced with the following:

L.  **Professional Services** means only those services specified in Item 7. of the Declarations, including those services performed electronically over the Internet or a network of two or more computers and performed for others for a fee by an **Insured** or by any person or entity for whom the **Insured** is legally liable.

It is hereby understood and agreed that Section II. (Definitions) Q. **Wrongful Act** shall be deleted in its entirety and replaced with the following:

Q.  **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, **Personal Injury**, unintentional disclosure of confidential or proprietary information, neglect or breach of duty by the **Insured** in their capacity as such or by any other person or entity for whom the **Insured** is legally liable.

**Wrongful Act** shall also mean:

- Infringement of copyright, plagiarism, piracy or misappropriation of ideas;
- Infringement of title, slogan, trademark, trade name, trade dress, service mark or service name;
- Oral or written publication of material that violates a person's right of privacy;
- Invasion, infringement or interference with rights of privacy or publicity, including false light, public disclosure of private facts, intrusion and commercial appropriation

of name or likeness;

- Unfair competition involving the misuse of matter, dilution, deceptive trade practices, civil actions for consumer fraud, false advertising or misrepresentation in Multi-media activities, and claims under Section 43(a) of the Lanham Act or similar state statutes;
- Unintentional misuse of confidential information;
- Unauthorized use of titles, formats, ideas, characters, plots, performances of artists or other performers, or other program material embodied in the **Insured's** work but only for **Claims** based upon matters alleging plagiarism, unfair competition, piracy, copyright infringement, or violation of common law property rights in literary or music material;

It is hereby understood and agreed that **Section III. (Limit of Liability and Deductible) 2. Deductible** shall be deleted in its entirety and replaced with the following:

2. **Deductible**

The Deductible amount stated in Item 4. of the Declarations is applicable to each **Claim** and applies to both **Damages and Claims Expenses** combined.  The Deductible shall be paid by the Named Insured and shall be uninsured and shall remain uninsured during the **Policy Period.**  The Limits of Liability set forth in Item 3. of the Declarations are in addition to and in excess of the Deductible.

In the event that all defendant **Insureds** involved in a covered **Claim** obtain by reason of a motion to dismiss, motion for summary judgment, arbitration or trial,  final non-appealable judgment or order of no liability in their favor, no Deductible shall apply to any **Claims Expenses** incurred relative to such **Claim**, and any **Claims Expenses** paid by the **Insured** shall be reimbursed by the Company subject to the Limits of Liability set forth in Item 3. of the Declarations.

It is hereby understood and agreed that **Section IV. (Exclusions) A., I. and J.** shall be deleted in their entirety and replaced with the following:

A.    based on or arising out of any actual dishonest, fraudulent, criminal or malicious act or omission by an Insured, however, this exclusion shall not apply to **Claims Expenses** or the Company's duty to defend any such **Claim** unless or until a judgment or a final adjudication adverse to such **Insured** establishes the **Insured** committed such dishonest, fraudulent, criminal or malicious act or omission;

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of Exclusion A.

I.    for any actual or alleged violation of:

    a.    Employee Retirement Income Security Act of 1974;
    b.    Securities Act of 1933;

       c.      Securities Exchange Act of 1934;

       d.      State Securities Law;

       e.      any rules or regulations promulgated thereunder or any other similar federal, state or common law; or

       f.      any amendments thereof;

J.      based on or arising out of the gaining in fact of any profit or advantage to which the Insured is not legally entitled;

It is hereby understood and agreed that Section IV. Exclusions C. and H. shall be deleted in their entirety.

It is hereby understood and agreed that Section V. (Conditions) A. Notice of Claims shall be deleted in its entirety and replaced with the following:

A.      **Notice of Claims**

The Insured, as a condition precedent to the obligations of the Company under this Policy, shall give written notice to the Company as soon as practicable, but in no event later than 60 days after the end of the Policy Period of any Claim made against the Insured.

The Insured shall as soon as practicable forward to the Company, at the address indicated in Item 8. of the Declarations, every demand, notice, summons, or other process or pleadings received by the Insured or its representatives.

It is hereby understood and agreed that Section V. (Conditions) H. Territory shall be deleted in its entirety and replaced with the following:

H.      **Territory**

This Policy applies to Wrongful Acts taking place and Claims made against the Insured anywhere in the world.

It is hereby understood and agreed that Section V. (Conditions) I. Subrogation shall be deleted in its entirety and replaced with the following:

I.      **Subrogation**

In the event of any payment under this Policy, the Company shall be subrogated in the amount of such payment to the Insured's rights of recovery therefore against any person or entity. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing to prejudice such rights.

Any amounts recovered by the Company through subrogation shall first be applied toward reimbursement of any payment made by the Insured pursuant to the Insured's Deductible and the remaining balance shall be the Company's.

It is hereby understood and agreed that the following Condition O. is added to **Section V. (Conditions):**

**O.  Pre – Claims Assistance**

An Insured may provide notice to the Company of a **Wrongful Act**, committed subsequent to the **Retroactive Date**, and prior to the policy expiration, and which the **Insured** reasonably expects may give rise to a **Claim** otherwise covered by the policy.  Upon receipt of such notice, the Company may undertake an investigation of such **Wrongful Act** as it deems appropriate.  In the event that the Company undertakes an investigation, costs paid by the Company up to $10,000 shall not reduce the Limits of Liability available under this Policy, provided, however, that in the event that a **Claim** is asserted under this Policy, the costs incurred in such investigation shall be treated as **Claims Expenses** incurred in regard to such **Claim.**

It is hereby understood and agreed that the following additional exclusions are hereby added to this policy:

This policy does not apply to any **Claim** against the **Insured:**

- based on or arising out of any mechanical or electrical failure, breakdown or defect of any hardware, however, this exclusion shall not apply to **Claims** or **Claims Expenses** when the failure, breakdown or defect is solely the result of the **Insured's Wrongful Act;**

- based on or arising out of breach of security, unauthorized access or use of or tampering with data or systems;

- based on or arising out of any printed materials for contests, lotteries, games of chance or promotional games;

- brought by any regulatory authority;

- based on or arising out of the **Insured's** performance or failure to perform services as a Broker/Dealer of Securities;

- based on or arising out of loss alleged to have been sustained through fluctuation in the market value of any security;

# EXHIBIT B



## ace usa

### WESTCHESTER SURPLUS LINES INSURANCE COMPANY
### MANAGEMENT PROTECTION INSURANCE POLICY

**This Policy is issued by the stock insurance company listed above (herein "Insurer").**

**THIS POLICY IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.**

### DECLARATIONS

| | | | |
|---|---|---|---|
| **Policy No.** | **DON 648405** | | |
| **Item 1.** | Company<br>Principal Address: | Georgeson Shareholder Securities Corporation<br>17 State Street<br>New York, New York 10004 | RECORDED<br>NOV 29 2001<br>OF NEW YORK |

**Item 2.A.** Policy Period:
From 12:01A.M. **December 21, 2000** To 12:01 A.M. **December 21, 2001**
(Local time at the address shown in Item 1)

**B.** Limit Period: 1. Same as Policy period — Yes
2. One Year within Policy Period — Yes

**Item 3.** Limit of Liability:

| | | Granted | Amount |
|---|---|---|---|
| A. | Single Aggregate Limit of Liability<br>for all Coverage Parts, combined | Yes | $5,000,000 |
| B. | Separate Limits of Liability<br>**Coverage Part(s)** | No | **Limit of Liability** |

"THIS INSURANCE POLICY IS WRITTEN BY AN INSURER(S) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND NOT PROTECTED IN THE EVENT OF THE INSOLVENCY OF THE INSURER BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS."

Item 4. Coverage Parts Purch...
        Mutual Fund, ...stment Adviser, Service Provider Professional Liability

Item 5.
        Policy Premium:    $40,500
        Annual Premium:    $40,500

        Discovery Period:
        A.    Additional Premium: 75% of Annual Premium
        B.    Additional Period:    One (1) Year

Item 6. Notice to Insurer:

        A.    Notice of Claim, Wrongful Act or Loss:
              Director of D&O Claims

              Professional Liability Claims Unit
              National Claims Facility
              55 Haddonfield Road —Suite 210
              Cherry Hill, NJ  08053

        B.    All other notices:
              Westchester Surplus Lines Insurance Company
              140 Broadway
              40th Floor
              New York, NY  10005

Item 7.    Endorsements to the General Conditions and Limitations Effective at Inception:

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary
and countersigned by a duly authorized representative of the Insurer.

*Dennis B Reding*

Dennis B. Reding, President

*George D Mulligan*

GEORGE D. MULLIGAN, Secretary

DATE: _____

_____
**AUTHORIZED REPRESENTATIVE**



**ace usa**

## MUTUAL FUND, INVESTMENT ADVISER AND SERVICE PROVIDER PROFESSIONAL LIABILITY COVERAGE PART

### DECLARATIONS

| Policy No. | DON 648405 | |
|---|---|---|
| Item 1. | Coverages Purchased:<br><br>A.    Mutual Fund Professional Liability<br>B.    Investment Advisor Professional Liability<br>C.    Service Provider Professional Liability | NO<br>NO<br>YES |
| Item 2. | Retention for Indemnified Loss:<br><br>A.    Each Claim under Insuring Clause A:<br><br>B.    Each Claim under Insuring Clause B:<br><br>C.    Each Claim under Insuring Clause C: | $N/A<br><br>$N/A<br><br>$50,000 |
| Item 3. | Prior Litigation Date: | 12/21/00 |
| Item 4. | Endorsements to this Coverage Part Effective at Inception:<br><br>See attached | |

MPAE001(5/99)

**MUTUAL FUND AND INVESTMENT ADVISER AND SERVICE PROVIDER PROFESSIONAL
LIABILITY COVERAGE PART**

I.     <u>INSURING CLAUSES</u>

     A.     <u>Mutual Fund Liability</u>

        If Insuring Clause A coverage is granted pursuant to Item 1 of the Declarations for this Coverage Part, the Insurer shall pay on behalf of the Insured Mutual Fund Loss which the Insured Mutual Fund becomes legally obligated to pay by reason of any Claim first made against the Insured Mutual Fund during the Policy Period or any applicable Discovery Period for any Wrongful Acts by the Insured Mutual Fund or by a person or entity for whom the Insured Mutual Fund is legally responsible in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

     B.     <u>Investment Adviser Liability</u>

        If Insuring Clause B coverage is granted pursuant to Item 1 of the Declarations for this Coverage Part, the Insurer shall pay on behalf of the Insured Adviser Loss which the Insured Adviser becomes legally obligated to pay by reason of any Claim first made against the Insured Adviser during the Policy Period or any applicable Discovery Period for any Wrongful Acts by the Insured Advisor or by a person or entity for whom the Insured Advisor is legally responsible in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

     C.     <u>Service Provider Liability</u>

        If Insuring Clause C coverage is granted pursuant to Item 1 of the Declarations for this Coverage Part, the Insurer shall pay on behalf of the Insured Service Provider Loss which the Insured Service Provider becomes legally obligated to pay by reason of any Claim first made against the Insured Service Provider during the Policy Period or any applicable Discovery Period for any Wrongful Acts by the Insured Service Provider or by a person or entity for whom the Insured Service Provider is legally responsible in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

II.     <u>DEFINITIONS</u>

     For purposes of coverage under this Coverage Part:

     **Claim** means:

        1.     a written demand for monetary damages,

        2.     a civil proceeding commenced by the service of a complaint or similar pleading,

        3.     an arbitration proceeding,

        4.     a criminal proceeding commenced by a return of an indictment, or

5.  a formal administrative or regulatory adjudicatory or investigative proceeding commenced by the filing of a notice of charge, formal investigative order or similar document,

against any Insured, including any appeal therefrom.

**Company** means, collectively:

1.  any organization included in the definition of "Company" in Subsection 2(c) of the General Conditions and Limitations of this Policy, and

2.  any other organization or mutual fund specifically added by endorsement to this Coverage Part as an Insured hereunder.

**Insureds,** either in the singular or plural, means:

1.  with respect to Insuring Clause A, the Insured Mutual Funds,

2.  with respect to Insuring Clause B, the Insured Advisers, and

3.  with respect to Insuring Clause C, the Insured Service Providers.

**Independent Security Holder** means any security holder of any Company if such security holder is not an Insured and is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of, any of the Insureds.

**Insured Adviser** means:

1.  any Company that (i) is an investment adviser as defined in Section 2(a)(20) of the Investment Company Act of 1940, as amended, (ii) is registered under the Investment Advisers Act of 1940, or (iii) is specifically named as an Insured Adviser in an endorsement to this Coverage Part; but solely with respect to such Company's activities as an investment adviser on behalf of an Insured Mutual Fund, and

2.  any one or more persons who were, now are or shall become duly elected or appointed directors, trustees or officers of, or employees of, such Company or, with respect to a Company incorporated outside the United States, their functional equivalent.

**Insured Mutual Fund** means:

1.  any Company registered as an investment company under the Investment Company Act of 1940, as amended, including any portfolio of any such Company, if such Company or portfolio is an Insured on inception of this Coverage Part or thereafter becomes an Insured pursuant to Section III of this Coverage Part; and

2.  any one or more persons who were, now are or shall become duly elected or appointed directors, trustees or officers of, or employees of, such Company or, with respect to a Company incorporated outside the United States, their functional equivalent,

**Insured Service Provider** means:

1. any Company specifically named as an Insured Service Provider in an endorsement to this Coverage Part, and

2. any one or more persons who were, now are or shall become duly elected or appointed directors, trustees or officers of, or employees of, such Company or, with respect to a Company incorporated outside the United States, their functional equivalent,

but solely with respect to the Company's activities in the insured capacity specifically identified in such endorsement to this Coverage Part.

**Loss** means the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims in the Policy Period and the Discovery Period, if exercised, made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, any award of pre-judgment and post-judgment interest, settlements and Defense Costs. Loss does not include (1) any amount for which the Insureds are absolved from payment, (2) taxes, fines or penalties imposed by law other than the 5% or less, or the 20% or less, civil penalties imposed upon an Insured under § 502(i) or (l) of ERISA respectively, (3) matters uninsurable under the law pursuant to which this Policy is construed. This definition does not exclude punitive, exemplary or multiple damages to the extent such damages are insurable under the internal laws of any jurisdiction which has a substantial relationship to the Insureds, the Insurer, this Policy or such Claim.

**Professional Services** means:

1. with respect to Insuring Clause A, services performed by or on behalf of the Company solely in the course of managing and/or operating an Insured Mutual Fund;

2. with respect to Insuring Clause B, giving financial, economic or investment advice, including performing investment management services, regarding investments in securities, if such advice or services are provided by or on behalf of the Company pursuant to a written contract defining the consideration for and the scope of such advice or services; and

3. with respect to Insuring Clause C, services performed by or on behalf of the Company for a third party client of the Company pursuant to a written contract with such client for consideration inuring to the benefit of the Company.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty by the Insureds in their capacity as such.

III.    COVERAGE FOR NEWLY CREATED, ACQUIRED OR SPONSORED FUNDS

If, after the inception of this Coverage Part, any Company creates, acquires or begins sponsoring a registered investment company or portfolio which would otherwise be covered under this Coverage Part, then such registered investment company or portfolio shall automatically be an Insured Mutual Fund for ninety (90) days after such creation, acquisition or sponsorship, but only with respect to covered Wrongful Acts taking place after such creation, acquisition or sponsorship.

The coverage afforded by reason of this Section III with respect to any newly created, acquired or sponsored registered investment company or portfolio shall automatically expire with respect to such registered investment company or portfolio at the end of such 90 day period unless the

Insurer, at its sole option and upon submission of such information as it may require, specifically agrees by endorsement to this Coverage Part to extend coverage with respect to such registered investment company or portfolio.

IV.    **EXCLUSIONS**

A.    The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1.    based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a renewal or replacement;

2.    based upon, arising out of, or attributable to any prior or pending litigation against any Insured filed on or before the applicable Prior Litigation Date set forth in Item 3 of the Declarations for this Coverage Part, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

3.    for bodily injury, emotional distress, mental anguish, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof;

4.    based upon, arising out of, or attributable to (a) the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of Pollutants into or on real or personal property, water or the atmosphere; or (b) any direction or request that the Insureds test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or any voluntary decision to do so; including without limitation any actual or alleged property damage or financial loss incurred by, or bodily injury, sickness, disease or death of, any Insured or any client or other person or organization resulting from the matters described in (a) or (b) of this exclusion;

5.    for an actual or alleged violation of the responsibilities, obligations or duties imposed by ERISA upon fiduciaries of any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the Company;

6.    for Wrongful Acts actually or allegedly committed or attempted by a Subsidiary or its Insureds before the date such Subsidiary became an Insured;

7.    based upon, arising out of, or attributable to any Wrongful Act committed by such Insured with actual knowledge of its wrongful nature or with intent to cause damage if a final and non-appealable judgment or adjudication adverse to such Insured establishes that such Insured committed such a Wrongful Act;

8.    based upon, arising out of, or attributable to such Insured gaining in fact any profit, remuneration or financial advantage to which such Insured was not legally entitled;

9.    brought or maintained by or on behalf of any Insured in any capacity, except a Claim brought or maintained by any natural person Insured for contribution or indemnity if the Claim directly results from another Claim covered under this Coverage Part;

10. brought or maintained by or on behalf of any security holder of the Company, whether directly or derivatively, except a Claim brought and maintained by an Independent Security Holder;

11. for the actual or alleged breach of any oral, written or implied contract or agreement; but this exclusion shall not apply if and to the extent that liability would have attached to the Insureds in the absence of such contract or agreement;

12. for Wrongful Acts in connection with the Insureds:

  (i) giving advice or performing services with respect to any aspect of mergers, acquisitions, leveraged buy-outs, tender offers, proxy contests, recapitalizations, financial restructurings, divestitures or investment banking activities; provided, however, this exclusion shall not apply with respect to (a) shares issued by an Insured Mutual Fund, (b) a restructuring of an Insured Mutual Fund, or (c) voting of shares held by or in portfolios of an Insured Mutual Fund or under management by the Insured Adviser;

  (ii) forming, syndicating, operating, administering, advising, or rolling up a limited partnership or real estate investment trust; provided, however, this exclusion shall not apply to the advising of a limited partnership, other than a real estate limited partnership, where the Insureds do not act as a general partner to the limited partnership and such limited partnership is not otherwise owned, managed, operated or in any way affiliated with the Insureds; or

  (iii) acting as a "broker" or "dealer" in securities, as those terms are defined in Sections 3(a)(4) and 3(a)(5), respectively, of the Securities Exchange Act of 1934, as amended; provided, however, this exclusion shall not apply to the distribution, underwriting or resale of securities purchased directly from the Insured Mutual Fund by a distributor for resale to any broker or dealer.

13. based upon, arising out of, or attributable to any actual or alleged investment in securities issued by the Company or any affiliate thereof; provided, however, this exclusion shall not apply to an investment in securities issued by a Company that is a registered investment company, as that term is defined in the Investment Company Act of 1940, as amended;

14. asserting liability under any federal or state securities laws arising from the selling of the securities of any Insured Mutual Fund in a particular jurisdiction without registering or in excess of the number registered for sale in such jurisdiction; provided, however, this exclusion shall not be applicable to the difference between the net asset value at which the securities of any such Insured Mutual Fund were sold and the net asset value of such securities at the time of their repurchase; or

15. if such Loss constitutes:

  a. the cost of any remedial, preventive or other non-monetary relief including without limitation any costs associated with compliance with

any such relief of any kind or nature imposed by any judgment, settlement, or governmental authority; or

b.    compensation paid to or claimed by the Company for Professional Services, unless such compensation is used as a measure of damages incurred by the claimant;

but this exclusion shall not apply to Defense Costs.

B.    <u>Severability of Exclusions</u>

For the purpose of determining the applicability of any Exclusions set forth in this Section IV:

1.    the Wrongful Act of any Insured Person shall not be imputed to the other natural person Insureds; and

2.    only the Wrongful Act of any Executive Officer shall be imputed to the Company.

V.    <u>COORDINATION AMONG COVERAGE PARTS</u>

That portion of any Loss covered by both this Coverage Part and the Mutual Fund Directors and Officers Liability Coverage Part, if purchased, shall be first covered as provided in, and subject to the Limit of Liability and Retention (if any) applicable to this Coverage Part. If the Limit of Liability applicable to this Coverage Part is exhausted, any remaining portion of such Loss shall be then covered as provided in, and subject to the Limit of Liability and Retention (if any) applicable to, such other Coverage Part, if purchased.



## ace usa

## MANAGEMENT PROTECTION INSURANCE POLICY

In consideration of the payment of the premium and in reliance on all statements made and information furnished by the Company to the Insurer in the Application, which is hereby made a part hereof, and subject to the foregoing Declarations and to all other terms of this Policy, the Company, the Insureds, and the Insurer agree as follows:

## GENERAL CONDITIONS AND LIMITATIONS

**1.    TERMS AND CONDITIONS**

Except for the General Conditions and Limitations or unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part of this Policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this Policy. Any term referenced in the General Conditions and Limitations which is defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part. If any provision in the General Conditions and Limitations is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

**2.    DEFINITIONS**

When used in this Policy:

A.    **Annual Premium** means the original annualized premium and the fully annualized amount of any additional premiums charged by the Insurer for or during the Policy Period.

B.    **Application** means all signed applications, including attachments and materials submitted therewith, for this Policy or for any policy issued by the Insurer of which this Policy is a direct or indirect renewal or replacement. All such applications, attachments and materials are deemed attached to and incorporated into this Policy.

C.    **Company** means, collectively, the Parent Company and the Subsidiaries, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

D.    **Defense Costs** means reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Company) incurred by the Insureds in defending or investigating Claims and the premium for appeal, attachment or similar bonds.

E.    **Discovery Period** means the period for the extension of coverage, if exercised, described in Subsection 4 or 10(b) of these General Conditions and Limitations.

F.    **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar state or local common or statutory law and any rules and regulations promulgated thereunder.

G.    **Executive Officers**, either in the singular or plural, means with respect to any Company its chairperson, president, chief executive officer, chief financial officer, in-house general counsel and, solely with respect to the Employment Practices Coverage Part if granted, the director of human resources or equivalent position.

H.  **Financial Impairment** means the status of the Company resulting from **(1)** the appointment by any state or federal _____ cial, agency or court of any receiver, con_____ ator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the Company, or **(2)** the Company becoming a debtor in possession.

I.  **Insureds** means, with respect to any Coverage Part, all organizations, plans and natural persons defined as Insureds thereunder.

J.  **Interrelated Wrongful Acts** means all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

K.  **Liability Coverage Part(s)** means any Coverage Part of this Policy other than any Commercial Crime or Bond Coverage Part, if purchased.

L.  **Limit Period** means the period described in Item 2(B) of the Declarations, subject to prior termination in accordance with Subsection 12 of these General Conditions and Limitations.

M.  **Parent Company** means the organization first named in Item 1 of the Declarations.

N.  **Policy** means, collectively, the Declarations, the Application, this policy form (including all attached Coverage Parts) and any endorsements hereto.

O.  **Policy Period** means the period of time specified in Item 2(A) of the Declarations, subject to prior termination in accordance with Subsection 12 of these General Conditions and Limitations.

P.  **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. Pollutants shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, and electric or magnetic or electromagnetic field.

Q.  **Subsidiary**, either in the singular or plural, means:

   1.  any company in which more than 50% of the outstanding voting securities representing the present right to vote for election of directors is owned, directly or indirectly, in any combination, by one or more Companies, and

   2.  any foundation, charitable trust or political action committee controlled by one or more Companies.

3.  **ESTATES, LEGAL REPRESENTATIVES AND SPOUSES**

The estates, heirs, legal representatives, assigns and spouses of Insured Persons shall be considered an Insured under any Liability Coverage Part; but coverage is afforded to such estates, heirs, legal representatives, assigns and spouses only for a Claim arising solely out of their status as such and, in the case of a spouse, where such Claim seeks damages from marital community property, jointly held property or property transferred from the Insured Person to the spouse. No coverage is provided for any Wrongful Act of an estate, heir, legal representative, assign or spouse. All terms and conditions of this Policy, including without limitation the Retention, applicable to Loss incurred by the Insured Person shall also apply to loss incurred by such estates, heirs, legal representatives, assigns and spouses.

4.  **DISCOVERY PERIOD**

If the Insurer or the Insureds do not renew any Liability Coverage Part or if the Parent Company terminates any Liability Coverage Part, (  ) Insureds shall have the right, upon pay(  )t of the additional premium described below, to an extension or the coverage granted by such Liability Coverage Part for the Discovery Period set forth in Item 5(B) of the Declarations following the effective date of such nonrenewal or termination, but only with respect to a covered Wrongful Act taking place prior to the effective date of such nonrenewal or termination. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the Insureds to the Insurer within thirty (30) days following the effective date of termination or nonrenewal.

The premium due for such Discovery Period with respect to any Liability Coverage Part shall equal that percent set forth in Item 5(A) of the Declarations of the Annual Premium for such Liability Coverage Part. The entire premium for such Discovery Period shall be deemed fully earned and non-refundable upon payment.

The Insureds shall not be entitled to elect the Discovery Period under this Subsection 4 with respect to any Liability Coverage Part if a Discovery Period for such Liability Coverage Part is elected pursuant to Subsection 10(b) of these General Conditions and Limitations.

5.    **LIMIT OF LIABILITY AND RETENTION**

For the purposes of this Policy, all Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed one Claim, and such Claim shall be deemed to be first made on the date the earliest of such Claims is first made against them, regardless of whether such date is before or during the Policy Period. All Loss resulting from a single Claim shall be deemed a single Loss.

If a single aggregate Limit of Liability for all Coverage Parts is granted as provided in Item 3(A) of the Declarations, the amount stated in Item 3(A) of the Declarations shall be the maximum aggregate liability of the Insurer under all Coverage Parts, combined, for each Limit Period, regardless of the number of Claims or losses or the time of payment by the Insurer.

If separate Limits of Liability are granted as provided in Item 3(B) of the Declarations:

A.     the maximum aggregate liability of the Insurer under each Liability Coverage Part for all covered Loss resulting from all Claims first made during each Limit Period shall be the respective Limit(s) of Liability for such Coverage Part as set forth in Item 3(B) of the Declarations, regardless of the time of payment by the Insurer; and

B.     the maximum aggregate liability of the Insurer for all Loss during the Limit Period under all Insuring Clauses of the Commercial Crime or Bond Coverage Part shall be the aggregate Limit of Liability for such Coverage Part as set forth in the Declarations for such Coverage Part, regardless of the time of payment by the Insurer, provided:

i.      the maximum liability of the Insurer for each Single Loss under any Insuring Clause of such Coverage Part shall be the respective Limit of Liability for such Insuring Clause as set forth in the Declarations for such Coverage Part; and

ii.     if more than one Insuring Clause applies to a Single Loss, the maximum liability of the Insurer under all such Insuring Clauses, combined, with respect to such Single Loss shall be the largest of such applicable Limits of Liability.

The Limits of Liability described in subparagraphs (i) and (ii) above are sublimits which further limit and do not increase the Insurer's maximum liability under such Coverage Part.

The Limit of Liability for the Discovery Period, if exercised, shall be part of and not in addition to the Limit of Liability for the Limit Period. The purchase of the Discovery Period shall not increase or reinstate the applicable Limit of Liability, which shall be the maximum liability of the Insurer for such Limit Period and Discovery Period, combined.

Defense Costs shall be part of and not in addition to the applicable Limits of Liability set forth in the Declarations, and Defe.    Costs shall reduce such Limit of Liability:    the Limit of Liability with respect to the entire Policy or any Coverage Part is exhausted by payment of Loss, the Insurer's obligations under the entire Policy or such Coverage Part, respectively, shall be completely fulfilled and extinguished. The Insurer is entitled to pay Loss as it becomes due and payable by the Insureds, without consideration of other future payment obligations.

Except as otherwise provided in this Subsection 5, the Insurer's liability with respect to Loss arising from each Claim covered under one or more Liability Coverage Parts, and each Single Loss covered under the Commercial Crime or Bond Coverage Part, if purchased, shall apply only to that part of Loss which is excess of the applicable Retention Amount set forth in the Declarations for such Coverage Part(s), and such Retention Amount shall be borne by the Insureds uninsured and at their own risk. If different parts of a single Claim or Single Loss are subject to different Retentions, the applicable Retentions will be applied separately to each part of such Loss, but the sum of such Retentions shall not exceed the largest applicable Retention.

Any Retention for Indemnified Loss under a Liability Coverage Part shall apply only to (i) Loss which is incurred by Insured Persons and is indemnified by the Company, and (ii) Loss which is incurred by all other Insureds. No Retention shall apply to Loss which is incurred by Insured Persons and is not indemnified by the Company.

If the Company is permitted or required by common or statutory law to ultimately indemnify the Insured Persons for any Loss, or to advance Defense Costs on their behalf, under any Liability Coverage Part and does not in fact do so other than for reasons of Financial Impairment, then the Company shall reimburse and hold harmless the Insurer for the Insurer's payment or advancement of such Loss up to the amount of the Retention for Indemnified Loss under the applicable Liability Coverage Part.

6.    **NOTICE**

The Insureds shall, as a condition precedent to their rights under any Liability Coverage Part, give to the Insurer written notice of any Claim made against the Insureds as soon as practicable after any Executive Officer or the Company's risk manager first learns of such Claim, but in no event later than ninety (90) days after expiration of the Policy Period or, if exercised, during the Discovery Period.

The Insureds shall, as a condition precedent to their rights under the Commercial Crime or Bond Coverage Part, give to the Insurer written notice of any Loss within 90 days after such Loss is first discovered by any Executive Officer or the Company's risk manager.

If during the Policy Period or the Discovery Period, if exercised, the Insureds first become aware of a specific Wrongful Act which may reasonably give rise to a future Claim covered under a Liability Coverage Part and during such Policy Period or Discovery Period give written notice to the Insurer of:

a.    the names of the potential claimants and a description of the specific Wrongful Act which forms the basis of their potential claim,

b.    the identity of the specific Insureds allegedly responsible for such specific Wrongful Act,

c.    the consequences which have resulted or may result from such specific Wrongful Act,

d.    the nature of the potential monetary damages or non-monetary relief which may be sought in consequence of such specific Wrongful Act, and

e.    the circumstances by which the Insureds first became aware of such specific Wrongful Act,

then any Claim which arises out of such Wrongful Act shall be deemed to have been first made during the Limit Period or Discovery Period, if exercised, in which such written notice was received by the Insurer. No coverage is provided for fees and expenses incurred prior to the time such notice results in a Claim.

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail or fax properly ad.       sed to the appropriate party.  Notice to .  ) Insureds may be given to the Parent Company at the address as shown in Item 1 of the Declarations.  Notice to the Insurer of any Claim, Wrongful Act or Loss shall be given to the Insurer at the address set forth in Item 6(A) of the Declarations.  All other notices to the Insurer under this Policy shall be given to the  Insurer at the address set forth in Item 6(B) of the Declarations.  Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

Any notice to the Insurer of any Claim, Wrongful Act or Loss shall designate the Coverage Part(s) under which the notice is being given and shall be treated as notice under only the Coverage Part(s) so designated.

7.     **DEFENSE AND SETTLEMENT**

Subject to this Subsection 7, it shall be the duty of the Insureds and not the duty of the Insurer to defend any Claim.

The Insureds agree not to settle or offer to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Insurer's written consent.  The Insurer shall not be liable for any settlement, Defense Costs, assumed obligation or admission to which it has not consented.  The Insureds shall promptly send to the Insurer all settlement demands or offers received by the Insureds from the claimant(s).  However, if the Insureds are able to settle all Claims which are subject to a single Retention for an aggregate amount, including Defense Costs, not exceeding such Retention., the Insurer's consent shall not be required for the settlement of such Claims.

With respect to any Claim submitted for coverage under this Policy, the Insurer shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the Insureds regarding (1) the selection of appropriate defense counsel, (2) substantive defense strategies, including without limitation decisions regarding the filing and content of substantive motions, and (3) settlement negotiations.

The Insureds agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that in the event of a Claim or Loss the Insureds will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery.  The Insurer may make any investigation it deems necessary.

Subject to Subsection 8 of these General Conditions and Limitations, the Insurer shall advance on behalf of the Insureds covered Defense Costs which the Insureds have incurred in connection with Claims made against them, prior to disposition of such Claims, provided that to the extent it is finally established that any such Defense Costs are not covered under this Policy, the Insureds, severally according to their interests, agree to repay the Insurer such Defense Costs.

The Insurer and the Insureds shall not unreasonably withhold any consent referenced in this Subsection 7.

8.     **ALLOCATION**

If in any Claim under a Liability Coverage Part the Insureds who are afforded coverage for such Claim incur Loss jointly with others (including Insureds) who are not afforded coverage for such Claim, or incur an amount consisting of both Loss covered by this Policy and loss not covered by this Policy because such Claim includes both covered and uncovered matters, then the Insureds and the Insurer shall allocate such amount between covered Loss and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters.

If there can be an agreement on an allocation of Defense Costs, the Insurer shall advance on a current basis Defense Costs allocated to covered Loss.  If there can be no agreement on an allocation of Defense Costs, the Insurer shall advance on a current basis Defense Costs which the Insurer believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined.  Any advancement of Defense Costs shall be subject to, and conditioned upon receipt by the Insurer of, a written undertaking by the

MPGT001(2/99)                                    5

Insureds that such advanced amounts shall be repaid to the Insurer by the Insureds severally according to their respective interest     and to the extent the Insureds shall not l      ntitled under the terms and conditions of this Policy to coverage for such Defense Costs.

Any negotiated, arbitrated or judicially determined allocation of Defense Costs on account of a Claim shall be applied retroactively to all Defense Costs on account of such Claim, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of Defense Costs on account of a Claim shall not apply to or create any presumption with respect to the allocation of other Loss on account of such Claim or any other Claim.

9.   **OTHER INSURANCE**

If any Loss under this Policy is insured under any other valid and collectible policy(ies), prior or current, then this Policy shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this Policy.

10.   **TRANSACTIONS CHANGING COVERAGE**

a.   Acquisition or Creation of Another Organization or Plan

If, during the Policy Period, the Company:

i.   acquires voting securities in another organization or creates another organization, which as a result of such acquisition or creation becomes a Subsidiary;

ii.   acquires any organization by merger into or consolidation with the Company; or

iii.   with respect to the Fiduciary Liability Coverage Part if purchased, creates a Plan,

then, subject to all terms and conditions of this Policy, such organization, Plan and its Insureds shall be covered under this Policy but only with respect to covered Wrongful Acts (under a Liability Coverage Part) taking place or covered Loss (under the Commercial Crime or Bond Coverage Part, if purchased) sustained after such acquisition or creation unless the Insurer agrees to provide coverage by endorsement for Wrongful Acts taking place or Loss sustained prior to such acquisition or creation.

If the total assets of such acquired organization as reflected in the organization's then most recent consolidated financial statements exceeds twenty-five percent (25%) of the total assets of the Parent Company as reflected in the Parent Company's then most recent consolidated financial statements, the Parent Company, as a condition precedent to coverage with respect to such Insureds, shall give written notice of such acquisition or creation to the Insurer as soon as practicable and shall pay any reasonable additional premium required by the Insurer.

b.   Acquisition of Parent Company

If, during the Policy Period, any of the following events occurs:

i.   the acquisition of the Parent Company, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the Parent Company into or with another entity such that the Parent Company is not the surviving entity; or

ii.   the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the Parent Company;

then coverage under this Policy will continue in full force and effect until termination of this Policy, but only with respect to Claims for covered Wrongful Acts (under a Liability Coverage Part) taking place or

covered Loss (under the Commercial Crime or Bond Coverage Part, if purchased) sustained before such event.  C.    age under this Policy will cease as of the  ective date of such event with respect to Claims for Wrongful Acts (under a Liability Coverage Part) taking place and Loss (under the Commercial Crime or Bond Coverage Part, if purchased) sustained after such event.

If such event occurs, the Insureds shall have the right, upon payment of the additional premium described below, to an extension of the coverage described in the preceding paragraph for either a 1 year, 3 year, or 6 year Discovery Period following the termination of the Policy Period; but the Insurer may, in its sole discretion and subject to any additional terms, conditions and premiums required by the Insurer, agree by written endorsement to this Policy to any other Discovery Period requested by the Insureds.  This extension of coverage shall apply to those Coverage Parts with respect to which the Insureds elect the coverage extension.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the Insureds to the Insurer within forty-five (45) days following the effective date of such event.

Upon request from any Insured, the Insurer shall notify such Insured of the additional premium amount for this extension of coverage.

The Insureds shall not be entitled to elect this extension of coverage if a Discovery Period is elected pursuant to Subsection 4 of these General Conditions and Limitations.

c.    Cessation of Subsidiaries

If before or during the Policy Period an organization ceases to be a Subsidiary, coverage with respect to such Subsidiary and its Insureds shall continue until termination of this Policy.  Such coverage continuation shall apply only with respect to Claims for covered Wrongful Acts (under a Liability Coverage Part) taking place and covered Loss (under the Commercial Crime or Bond Coverage Part, if purchased) sustained prior to the date such organization ceased to be a Subsidiary.

d.    Termination of Plan

If before or during the Policy Period a Plan is terminated, coverage with respect to such Plan and its Insureds under the Fiduciary Liability Coverage Part (if purchased) shall continue until termination of this Policy.  Such coverage continuation shall apply with respect to Claims for Wrongful Acts taking place prior to or after the date the Plan was terminated.

11.    **REPRESENTATIONS AND SEVERABILITY**

The Insureds represent and acknowledge that the statements contained in the Application and any materials submitted or required to be submitted therewith (all of which shall be maintained on file by the Insurer and be deemed attached to and incorporated into this Policy as if physically attached), are true and: (i) are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; and (ii) shall be deemed material to the acceptance of this risk or the hazard assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.

In the event the Application, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission:

a.    made with the intent to deceive, or

b.    which materially affects either the acceptance of the risk or the hazard assumed by the Insurer under this Policy;

this Policy shall be void ab initio as to (i) any Company and any Plan if any Executive Officer knew the facts that were not truthfully disclosed in the Applications, and (ii) any Insured Persons who knew the facts that were not truthfully disclosed in the Application, whether or not such Executive Officer or Insured Person knew the

Application contained such misrepresentation or omission. Such knowledge shall not be imputed to any other Insured Persons.

12.  **TERMINATION OF POLICY**

This Policy shall terminate at the earliest of the following times:

a.  the effective date of termination specified in a prior written notice by the Parent Company to the Insurer, provided this Policy may not be terminated by the Parent Company (I) after the effective date of an event described in Subsection 10(b) of these General Conditions and Limitations, or (II) if the Policy Period is longer than one (1) year;

b.  upon expiration of the Policy Period as set forth in Item 2(A) of the Declarations;

c.  twenty (20) days after receipt by the Parent Company of a written notice of termination from the Insurer for failure to pay a premium when due, unless the premium is paid within such twenty (20) days period; or

d.  at such other time as may be agreed upon by the Insurer and the Parent Company.

The Insurer may not terminate this Policy prior to expiration of the Policy Period, except as provided above for non-payment of a premium. The Insurer shall refund the unearned premium computed pro rata. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

13.  **TERRITORY AND VALUATION**

All premiums, limits, retentions, Loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of Loss under any Liability Coverage Part is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange as of 12:01 A.M. on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of Loss is due, respectively.

Coverage under this Policy shall extend to Wrongful Acts taking place or Claims made or Loss sustained anywhere in the world.

14.  **SUBROGATION**

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the Insureds' rights of recovery, including without limitation the Insured Persons' rights to indemnification or advancement from the Company. The Insureds shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit or otherwise pursue subrogation rights in the name of the Insureds.

15.  **ACTION AGAINST THE INSURER**

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or organization shall have any right under this Policy to join the Insurer as a party to any action against Insureds to determine the Insured's liability nor shall the Insurer be impleaded by the Insureds or their legal representatives. Bankruptcy or insolvency of an Insured or of the estate of any Insured Person shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

16.  **AUTHORIZATION CLAUSE**

MPGT001 (2/99)                                          8

By acceptance of this Policy, the Parent Company agrees to act on behalf of the Insureds with respect to the giving and receiving of ... ce of Claim or Loss or termination, the p    ient of premiums and the receiving of any return premiums that may become due under this Policy, the agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for the Discovery Period), and the Insureds agree that the Parent Company shall act on their behalf.

17.    **ALTERATION, ASSIGNMENT AND HEADINGS**

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by an authorized representative of the Insurer.

The titles and headings to the various parts, sections, subsections and endorsements of the Policy are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such parts, sections, subsections or endorsements.

18.    **ARBITRATION**

Only if requested by the Insureds, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree, the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel shall consist of one arbitrator selected by the Insureds, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

## Endorsement #1

This endorsement, effective 12:01 AM **December 21, 2000** forms a part of Policy Number **DON 648405** issued to **Georgeson Shareholders Securities Corp.** by **Westchester Surplus Lines Insurance Company**

### SECURITIES BROKER-DEALER E&O COVERAGE EXTENSION

I.  In consideration of the premium paid, it is hereby understood and agreed Insuring Clause C, Service Provider Liability, of the Mutual Fund, Investment Adviser, Service Provider Professional Liability Coverage Part is deleted in its entirety and replaced with the following:

   **C.  Broker-Dealer Liability**

   If Insuring Clause C coverage is granted pursuant to Item 1 of the Declarations for this Coverage Part, the Insurer shall pay on behalf of the Insured Broker-Dealer Loss which the Insured Broker-Dealer becomes legally obligated to pay by reason of any Claim first made against the Insured Broker-Dealer during the Policy Period or any applicable Discovery Period for any Wrongful Acts by the Insured Broker-Dealer or by a person or entity for whom the Insured Broker-Dealer is legally responsible in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

II.  It is further agreed that the following definition is added to Mutual Fund, Investment Adviser, Service Provider Professional Liability Coverage Part:

   **Insured Broker-Dealer means:**

   1.  any Company that is a (i) "broker" or "dealer" in securities, as those terms are defined in Sections 3(a)(4) and 3(a)(5), respectively, of the Securities Exchange Act of 1934, as amended; (ii) is specifically named as an Insured Broker-Dealer in an endorsement to this Coverage Part;

   2.  any one or more persons who were, now are or shall become duly elected or appointed directors, trustees or officers of, or employees of, such Company or, with respect to a Company incorporated outside the United States, their functional equivalent.

III.  It is further agreed that definition of "Insured" in the Mutual Fund, Investment Adviser, Service Provider Professional Liability Coverage Part is deleted in its entirety and replaced with the following:

   **Insureds, either in the singular or plural, means:**

   1.  with respect to Insuring Clause A, the Insured Mutual Funds,

   2.  with respect to Insuring Clause B, the Insured Advisers, and

   3.  with respect to Insuring Clause C, the Insured Broker-Dealer.

IV.   It is further agreed that the definition, Professional Services of the Mutual Fund, Investment Adviser, Service Provider Professional Liability Coverage Part is deleted in its entirety and replaced with the following:

**Professional Services** means

1.   the sale, attempted sale or servicing of:

   a)   mutual funds registered with the Securities and Exchange Commission;

   b)   Securities for which a Company acts as a Securities Broker/Dealer and which Securities are approved by such Company; or

   c)   Certificates of Deposit;

2.   giving financial, economic or investment advice, including performing investment management services, regarding investments in securities, providing proxy solicitation services, or acting as an information agent on behalf of a client, if such advice or services are provided by or on behalf of the Company pursuant to a written contract defining the consideration for and the scope of such advice or services;

V.   It is further understood that Exclusion 12(i) and (iii) are deleted in their entirety.

VI.   It is further understood that in addition to the exclusions contained in the Mutual Fund, Investment Advisor, Service Provider Coverage Part, the Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1.   based upon, arising out of, or attributable to the rendering or failure to render professional services by the Insured as an actuary, accountant, attorney, real estate agent, real estate broker, property and/or casualty insurance agent, or third party claims administrator;

2.   brought by or on behalf of any clearing agency, or based upon, arising out of, or attributable to any function of any Insured as a clearing agent;

3.   based upon, arising out of, or attributable to tax advice provided by the Insured, except to the extent such tax advice is an incidental part of Professional Services rendered by the Insured and is accompanied by a written disclaimer advising the client to seek the advise of a tax professional;

4.   based upon, arising out of, or attributable to a dispute over fees, commissions, charges, or other compensation, including without limitation the structure or reasonableness of any compensation, or client lists or entitlements;

5.   based upon, arising out of, or attributable to any activities related to the exercise of discretionary authority with regard to the management or disposition of assets, whether for individuals, groups, employee benefit plans, or other entities of any legal form or character, but this exclusion shall not apply to the activities of the Insured as a registered Investment Adviser under the Investment Advisers Act of 1940 while exercising discretionary authority with respect to mutual funds, variable annuities or variable life products;

2

6.    based upon, arising out of, or attributable to the insolvency, receivership, bankruptcy, conservatorship, liquidation or inability or refusal to pay of any broker or dealer in securities or commodities, clearing agency, bank or banking firm, or any insurance or reinsurance entity or any Insured; provided, however, this exclusion does not apply to Wrongful Acts solely in connection with any Insured's investment on behalf of the claimant in any stock of any foregoing entity;

7.    based upon, arising out of, or attributable to the Insured's activities relating to computer programming or processing if the resulting programs are sold or distributed or if a fee is charged for use of the programs;

8.    brought or maintained in any capacity by or on behalf of any governmental or quasi-governmental official, agency or self-regulatory organization, including without limitation the Securities and Exchange Commission, the National Association of Securities Dealers, the Securities Investor Protection Corporation, or any state or federal securities or insurance commission, agency or official, but this exclusion shall not apply to any Claim by such official, agency or organization in its capacity as a direct client of an Insured;

9.    based upon, arising out of, or attributable to investment products partially or totally owned by the Insured;

10.    based upon, arising out of, or attributable to the management, operation, condition or activities of any pension, profit sharing, health and welfare or other employee benefit plan or trust sponsored by the Insured or any entity owned or controlled by the Insured or in which the Insured is a participant, trustee or named fiduciary, as defined under ERISA;

11.    based upon, arising out of, or attributable to the actual, alleged or attempted offering, sale or servicing of (a) structured settlements, or (b) coverage placed with any form of Multiple Employer Welfare Arrangement as defined by ERISA or any employee benefits plan involving self-funding in whole or in part by any employer;

12.    based upon, arising out of, or attributable to the sale, attempted sale, or servicing of:

(a)    commodities, commodity future contracts, any type of option contract or promissory notes;

(b)    any collectible, including, but not limited to, stamps, art, cards, jewelry, antiques or any other tangible personal property;

(c)    any equity Securities priced under $5.00, but this exclusion shall not apply if such Securities are registered or approved for registration upon notice of issuance on a national securities exchange, authorized or approved for authorization upon notice of issuance for quotation in the NASDAQ System, or issued by an investment company registered under the Investment Company Act of 1940 (as amended);

13.    for Wrongful Acts in connection with the Insureds giving advice or performing services with respect to any aspect of Securities underwriting or syndicating activities, investment banking activities, mergers, acquisitions, leveraged buy-

3

outs, tender offers, proxy contests, recapitalizations, financial restructurings, public or private offerings of securities, divestitures, or other efforts to raise or furnish capital or financing for any entity, but this exclusion shall not apply with respect to a Claim arising from

    (a)    the performing of services as they relate to proxy solicitation and acting as an information agent for any disclosure requirements in connection with any of the foregoing; or

    (b)    the offering or sale by the Insured of Securities where such Claim relates solely to conduct by the Insured which affects only particular clients of the Insured and does not affect the offering generally, such as, but not limited to, actual or alleged deficiencies or inaccuracies in the formal written offering materials; or

14.    based upon, arising out of, or attributable to use by an Insured of, or an Insured's disclosure to another person of, or actual or alleged participating after the fact by an Insured in the use of, non-public information in a manner prohibited by the laws of the United States, including without limitation Section 10(b) or 20(A) of the Securities Exchange Act of 1934 (as amended) and Rule 10b-5 thereunder, or the laws of any state, commonwealth, territory or subdivision thereof, or the laws of any other jurisdiction, or any rules or regulations promulgated under any of the foregoing;

15.    based upon, arising out of, or attributable to the rendering or failure to render Professional Services to any Securities Broker/Dealer other than a dealer who buys, sells, or trades in Securities exclusively as a principal for its own account;

16.    based upon, arising out of, or attributable to any activities of, or services provided by, the Insured Broker-Dealer other than a covered Professional Service, including, but not limited to "selling away";

All other terms and conditions remain the same.

_____
**AUTHORIZED SIGNATURE**

4

<u>Endorsement #2</u>

This endorsement, effective 12:01 AM December 21, 2000 forms a part of Policy Number DON 648405 issued to Georgeson Shareholders Securities Corp. by Westchester Surplus Lines Insurance Company

It is agreed:

1.    The Insurer shall not be liable for Loss on account of any Claim based upon, arising out of, or attributable to Wrongful Acts or Interrelated Wrongful Acts taking place in whole or in part prior to December 21, 2000.

2.    "Interrelated Wrongful Acts" means all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

All other terms and conditions remain the same.

**AUTHORIZED SIGNATURE**

<u>Endorsement #3</u>

This endorsement, effective 12:01 AM December 21, 2000 forms a part of Policy Number DON 648405 issued to Georgeson Shareholders Securities Corp. by Westchester Surplus Lines Insurance Company

<u>COMMON CLAIM CAPPING OF LIMITS</u>

It is agreed:

1.  The maximum liability of the Insurer and any of its affiliates under this Coverage Part and all other policies listed below or any renewal or replacement thereof ("Other Policies"), combined, with respect to any claim or series of claims that have as a common nexus any fact, circumstance, situation, event, transaction or cause or series of related facts, circumstances, situations, events, transactions or causes shall be $5,000,000.

<u>Other Policies</u>

| <u>Insurer</u> | <u>Named Insured</u> | <u>Policy No.</u> |
|---|---|---|
| Westchester Surplus Lines Insurance Company | Georgeson Shareholders Securities Corp. | EON 680554 |

2.  This endorsement creates a sublimit which further limits and does not increase the maximum liability of the Insurer and its affiliates under this Coverage Part or the Other Policies.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AUTHORIZED SIGNATURE

Endorsement #4

This endorsement, effective 12:01 AM December 21, 2000 forms a part of Policy Number DON 648405 issued to Georgeson Shareholders Securities Corp. by Westchester Surplus Lines Insurance Company

## PROFESSIONAL SERVICES EXCLUSION
### (Specific)

It is agreed that the Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to the rendering or failure to render the following professional services, when the Insured is not acting in the capacity as an Insured Broker-Dealer:

(1)    Proxy Solicitation and shareholder response services;
(2)    Electronic Data Processing Shareholder Communication Services and Tender Offer Depository Processing Services for others, including activities as a broker for trucking services;
(3)    Reviewing, processing and remitting of unclaimed assets which have been accumulated by holder entities to 54 jurisdictions (50 states plus Guam, Puerto Rico, the Virgin Islands and the District of Columbia);
(4)    Publishing and Printing Services; or
(5)    Translation Services.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____

AUTHORIZED SIGNATURE

### Endorsement #5

This endorsement, effective 12:01 AM December 21, 2000 forms a part of Policy Number DON 648405 issued to Georgeson Shareholders Securities Corp. by Westchester Surplus Lines Insurance Company

It is agreed that the Retention Amounts set forth in Item 2(C) of the Declarations for this Coverage Part is increased as follows:

|  | From | To |
|---|---|---|
| Item 2(C) | $50,000 | $100,000 |

Provided, however, that this increased Retention Amounts shall apply only to Claims first made against any Insured and based upon, arising out of, or attributable to the the over-or under-purchase and sales of of securities by any of the Insured's Registered Representatives or Broker-Dealers.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____

**AUTHORIZED SIGNATURE**

Endorsement #6

This endorsement, effective 12:01 AM December 21, 2000 forms a part of Policy Number DON 648405 issued to Georgeson Shareholders Securities Corp. by Westchester Surplus Lines Insurance Company

## SERVICE OF SUIT CLAUSE

Information about service of "suits" upon us is given below.  Service of process of "suits" against us may be made upon the following person, or another person we may designate:

Brian T. Guthrie, Chief Counsel, Business Litigation
ACE USA Companies
Two Liberty Place – TL 21D
1601 Chestnut Street
Philadelphia, PA 19192-2211

The person named above is authorized and directed to accept service of process on our behalf in any action, "suit" or proceeding instituted against us.  If you request, we will give you a written promise that a general appearance will be entered on our behlaf if a "suit" is brought.

If you request, we will submit to the jurisdiction of any court of competent jurisdiction.  We will accept the final decision of that court or an Appellate Court in the event of an appeal.

The law of some jurisdictions of the United States of America requires that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as our agent for service of process.  In these jurisdictions, we designate the Director of Insurance as our true and lawful attorney upon whom service of process on our behalf may be made.  We also authorize the Director of Insurance to mail process received on our behalf to the company person named above.

If you are a resident of Canada, you amy also serve "suit" upon us by serving the government official designated by the law of your province,

---

AUTHORIZED REPRESENTATIVE

<u>Endorsement #7</u>

This endorsement, effective 12:01 AM July 18, 2001 forms a part of Policy Number DON 648405 issued to **Georgeson Shareholders Securities Corp. by Westchester Surplus Lines Insurance Company.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

It is agreed that Item 1. of the Declarations Page is amended to include the following:

Item 1.        Company:    **Alpine Fiduciary Services, Inc.**

agree    Item 2. of the Service Provider Professional Liability Coverage Part is
                       only as respects to Alpine Fiduciary Services, Inc.:

                 on Date:   **3/19/1997**

Additio        n: $ 500

A.    ER TERMS AND CONDITIONS REMAIN UNCHANGED.

Authorized Representative

# EXHIBIT C

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| LILA T. GAVIN, on behalf of herself and all others similarly situated, | ) ) ) | No. |
| Plaintiff, | ) ) | **Class Action Complaint** |
| v. | ) ) | JURY TRIAL DEMANDED |
| AT&T CORP., a New York Corporation, and GEORGESON SHAREHOLDER COMMUNICATIONS, INC., a Delaware Corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### CLASS ACTION COMPLAINT

Plaintiff, Lila T. Gavin, individually and on behalf of the class of persons defined below, for her complaint alleges, upon knowledge as to herself and her own acts, and certain acts of others, and otherwise upon information and belief, as follows:

I. **NATURE OF THE CASE**

1. This case is brought on behalf of holders of unexchanged shares of U.S. West Media Group Common Stock, as set forth in detail in the class definition contained herein. As alleged herein, Defendants AT&T Corp. ("AT&T") and Georgeson Shareholder Communications, Inc. ("Georgeson"), knowingly and intentionally misrepresented or otherwise failed to disclose material facts including, inter alia, that Plaintiff and other holders of unexchanged shares of U.S. West Media Group could exchange their U.S. West Media Group shares for AT&T shares and cash at no cost, resulting in damage to Plaintiff and other shareholders who exchanged their shares in response to Defendants' false and misleading offer to exchange them for a fee of $7.00 a share. Defendants' wrongful conduct violates the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* and similar laws in the forty-nine other states and

the District of Columbia.

## II.     JURISDICTION AND VENUE

2.     *Jurisdiction.*  This Court has jurisdiction over this litigation pursuant to Illinois Code of Civil Procedure, 735 ILCS 5/2-209(b)(4).  Defendants AT&T and Georgeson, are corporations doing business in this State.

3.     *Venue.*  Venue is proper in this court under Illinois Code of Civil Procedure, 735 ILCS 5/2-101 and 5/2-202 because defendants AT&T and Georgeson, are both foreign corporations doing business in, and maintaining registered agents in, Cook County, Illinois.

## III.     PARTIES

4.     *Plaintiff.*

a.     Plaintiff Lila T. Gavin is a resident of Oak Lawn, Illinois.  Ms. Gavin owned at all relevant times hereto a total of 235 unexchanged U.S. West Media Group shares. Ms. Gavin exchanged her shares of U.S. West Media Group pursuant to the offer of defendant AT&T, through its authorized agent, Georgeson, for 0.95 AT&T shares per U.S. West Media Group share plus cash and was damaged thereby, including, <u>inter alia</u>, being charged a fee of $7 per AT&T share due her.

5.     *Defendants.*

a.     Defendant AT&T Corp. is a New York corporation with its principal place of business in New York, New York.

b.     Defendant Georgeson Shareholder Communications, Inc., is a Delaware corporation with its principal place of business in New York, New York.

## IV.    LIMITATION ON DAMAGES

6.      Plaintiff's claim is strictly for monetary damages.  Plaintiff does not seek individual damages in excess of $75,000, and Plaintiff expressly disavows any claim or combination or aggregation of claims asserted in her individual capacity for damages in any amount in excess of $75,000.  Plaintiff does not make a claim for any form of injunctive relief. Plaintiff makes no claim under that the acts and omissions of Defendants affected the share price of any registered security, nor does she claim any violation of the federal securities laws.

## V.    CLASS ALLEGATIONS

7.      This action is brought and properly maintained as a class action pursuant to the provisions of the Illinois Code of Civil Procedure 735 ILCS 5/2-801 *et seq*.  Plaintiff brings this action on behalf of themselves and a class of all others similarly situated, as defined herein.

8.      *Class Definition*.  Plaintiff requests certification of a nationwide class.  If, however, the Court determines that a nationwide class is not appropriate or otherwise cannot be maintained, then, alternatively, Plaintiff requests certification of a class including all consumers who have claims arising under Illinois Law.  Thus, Plaintiff requests certification of a class defined as either:

(a)     *Nationwide class*: "All residents, or persons or legal entities deemed to be residents, of the fifty states and the District of Columbia, other than employees, officers and directors of AT&T Corp. and Georgeson Shareholder Communications, Inc., who exchanged their shares of U.S. West Media Group for shares of AT&T and cash, and were charged a fee by Georgeson Shareholder Communications, Inc.

(b)    *Statewide class*:  "All residents, or persons or legal entities, who may properly

avail themselves of the Illinois Consumer Fraud Act, other than employees,

officers and directors of AT&T Corp. and Georgeson Shareholder

Communications, Inc., who exchanged their shares of U.S. West Media Group for

shares of AT&T and cash, and were charged a fee by Georgeson Shareholder

Communications, Inc.

9.    *Numerosity*.  Although the exact number is unknown to Plaintiff, there are

thousands of members of the Class residing throughout the United States, making joinder of all

class members impracticable.

10.    *Common Questions of Law and Fact*.  A multitude of questions of law and fact are

common to Plaintiff's claims and those of Class members.  These common questions

predominate over any questions affecting only individual class members and include, inter alia,

the following:

(a)    Whether Defendants intentionally concealed the fact that an exchange of U.S.

West Media Group shares could be made at no cost;

(b)    Whether Defendants misrepresented that shareholders need exchange their U.S.

Media Group shares through AT&T's authorized agent, Georgeson;

(c)    Whether Defendants misrepresented to U.S. West Media Group shareholders that

their only choice was to exchange their U.S. West Media Group shares through

Georgeson, while failure to exchange their shares through Georgeson would only

result in their shares being deemed abandoned and escheating to the State;

(d)    Whether Defendants' conduct violated the Illinois Consumer Fraud Act and

-4-

similar laws in forty-nine other states and the District of Columbia;

(e)    What is the proper amount and measure of damages awardable to Plaintiff and the

Class.

11.    *Typicality of Claims*.  Plaintiff's claims are typical of members of the Class.

Plaintiff and other Class members exchanged their shares in response to the false and misleading

offer of Defendants to exchange their shares of U.S. West Media Group for a fee of $7.00 per

share.  Each Plaintiff is a member of the proposed class.

12.    *Adequate Representation*.  Plaintiff will adequately, vigorously and fairly

represent and pursue the interests of the class members.  Plaintiff understands the nature of her

claims described herein.  Plaintiff's claims are consistent with, and not antagonistic to, the claims

of other members of the Class.  Plaintiff does not have any disqualifying conditions. Plaintiff's

counsel, Clinton A. Krislov and Krislov and Associates, Ltd., have vast experience in

representing consumers and investors in class actions.

13.    *Appropriateness of a Class Action*.  Litigation of this action on a classwide basis

is an appropriate method for the fair and efficient adjudication of the claims alleged herein.  Class

treatment is superior to other available methods for the fair and efficient adjudication of the

controversy alleged herein.  Allowing this action to proceed as a class action will permit a large

number of similarly situated persons and entities to prosecute their common claims in a single

forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and

expense that numerous individual actions would inevitably require.  Class action treatment will

also permit the adjudication of relatively small claims of Plaintiff and other Class members, who

could not individually afford to litigate a complex claim against well-heeled corporate defendants

such as those herein. Furthermore, even for those Class members who could afford to litigate such a claim, it would still be economically impractical, as the cost of litigation is almost certain to far exceed any recovery they might obtain.

14.    *Manageability.*  Plaintiff is unaware of any difficulty likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## VI.    SUBSTANTIVE ALLEGATIONS

15.    In 1998, U.S. West Media Group was split off from U.S. West. Shares of U.S. West Media Group were then exchangeable for Media One shares on a one-for-one basis.

16.    Subsequently, in June, 2000, Media One merged with AT&T. Following the merger, Plaintiff and other U.S. West Media Group shareholders were due 0.95 of a share of AT&T and a cash payment of $36.27 for every U.S. West Media Group share they held, plus all accrued dividends paid on these shares.

17.    On December 15, 2000, AT&T, through its authorized agent Georgeson, through the use of misrepresentations and/or omissions of material fact, solicited Plaintiff and other members of the Class to exchange their shares of U.S. West Media Group for shares of AT&T and cash as described above.

18.    Defendants falsely represented to Plaintiff and other members of the Class that they had to send in their U.S. West Media Group shares in response to their solicitation or face losing their investment entirely. The offer to purchase stated in relevant part:

### QUESTIONS AND ANSWERS

**1.  Why do I have to send in my U.S. WEST Media Group ("Media Group") stock certificate(s)?**

In 1998, **Media Group** was split off from **U.S. West, Inc.** and

exchanged into **MediaOne** on a one-for-one basis. Subsequently, in June 2000, **AT&T Corp.** acquired MediaOne. As a result, your old shares are no longer traded. You now need to send in your "old" **Media Group** certificate(s) for the **AT&T** shares due you, plus cash payment and back dividends. If you do not claim your AT&T stock and cash, eventually they will be turned over to state authorities under the abandoned property laws.

Important Notice for Holders of Unexchanged Share of U.S. West Media Group Common Stock (December 15, 2000) ("Notice").

19.     Defendants represented to Plaintiff and other members of the Class that, based upon AT&T's $22 price per share on December 14, 2000, each share of U.S. West Media Group would receive merger consideration of approximately $59 per share. The number of U.S. West Media Group shares owned by Plaintiff and other members of the Class and the number of AT&T shares and cash payment due them were recorded on the uniform solicitation sent to holders of unexchanged shares of U.S. West Media Group.

20.     The uniform solicitation sent to Plaintiff and other members of the Class was false and misleading insofar as it failed to disclose that the $7 per share charge was commercially unreasonable and could be avoided altogether if shareholders exchanged their shares directly through AT&T's Shareowner Services.

21.     The uniform solicitation was false and misleading in that it failed to disclose the confiscatory impact of the $7 service charge which, in the case of Plaintiff, cost her hundreds of dollars in cash due her by AT&T under the terms of the merger. Instead, Defendant used scare tactics to induce Plaintiff and other members of the Class to exchange their shares immediately, intending that they rely on their false and misleading statements that an exchange must be made immediately, or Plaintiff and other members of the Class faced losing their investment:

-7-

> We have retained Georgeson Shareholder Communications Inc. to
> assist you in claiming your shares and cash. We urge you to claim
> these shares now.
>
> * * *
>
> There is no benefit in continuing to hold your old shares.
> Eventually, if you continue to do nothing, your stock and
> underlying assets will be turned over to certain state authorities
> under the abandoned property laws.

Notice.

22.     Defendants' uniform solicitation was false and misleading insofar as it failed to

disclose the commercial unreasonableness of the $7 per share charged imposed by AT&T

through its authorized agent, Georgeson. The charge was represented as merely incidental to the

transaction and otherwise a necessary cost to shareholders who wished to "claim" their AT&T

shares and cash:

> We have retained Georgeson Shareholder Communications Inc. to
> assist you in claiming your shares and cash. We urge you to claim
> these shares now. You may choose to have the AT&T shares due
> you sold on the open market or have them sent to you. To defray
> the cost of providing you with this service, a processing fee of $7
> per AT&T share due you will be deducted from the additional cash
> payment of $36.27 per US WEST Media Group [sic] share you are
> due, and paid to Georgeson Shareholder Securities Corporation,
> member of NASD and SIPC.

Notice. Contrary to the affirmative representations of Defendants, the $7 per share "processing

fee" far exceeded the cost of providing this "service," which, unbeknownst to Plaintiff and other

members of the Class was available at no cost through AT&T's Shareowner Services.

23.     The confiscatory $7 per share fee withheld by Defendants was devastating to

Plaintiff and other members of the class, amounting to more than 19% of the $36.27 cash

payment due shareholders per U.S. West Media Group share exchanged. Despite their

-8-

representation that this was merely a "processing fee" necessary to "defray the cost" of service,

the $7 per share has been a tremendous source of revenue for Georgeson Shareholder

Communication, aided by the threats of AT&T and Georgeson that a failure to respond would

result in an greater loss: the complete loss of Plaintiff's and other Class members initial

investment and capital gains.

24.      Also of material importance, but which Defendants failed to disclose, is the fact

that even if Plaintiff and other members of the Class "continue[d] to do nothing," and their

"stock and underlying assets [were] turned over to certain state authorities under the abandoned

property laws," (Notice) the cost of reclaiming those assets would be far less, and perhaps

nothing.

## VII.    CAUSES OF ACTION

### COUNT I

### (Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and Similar Laws of Other States)

25.      Plaintiff repeats and realleges Paragraphs 1 through 23 supra, as if fully set forth

herein.

26.      At all relevant times hereto, there was in full force and effect an act known as the

Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505 et seq.) (the

"Act") and substantially similar acts prohibited deceptive acts and practices in trade commerce in

all 50 states and the District of Columbia.

27.      Plaintiff and other members of the Class are "consumers" within the meaning of

the Act (815 ILCS 505/2).

-9-

28.    Defendants' exchange, including the offer to exchange, the U.S. West Media Group shares held by Plaintiff and other members of the Class for shares of AT&T and cash is engaging in "trade" or "commerce" within the meaning of the Act (815 ILCS 505/1(f)).

29.    The Act, and similar acts in the 50 states and the District of Columbia, prohibits unfair and deceptive practices in trade and commerce. The Act places the following prohibitions, inter alia, on Defendants:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 in the conduct of any trade or commerce are hereby declared unlawful whether any person had in fact been misled, deceived or damaged thereby. In constituting this section consideration shall be given to the interpretations of the Federal Trade Commission and federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

30.    In executing the offer to exchange scheme described herein, Defendants misrepresented and/or failed to disclose material facts as described herein.

31.    The conduct of Defendants in connection with the offer to exchange scheme described herein constitutes an unfair or deceptive act or practice within the meaning of the Act and similar consumer protection statutes of other states. As intended by Defendants, Plaintiff and other members of the class were induced to exchange their shares of U.S. West Media Group for shares of AT&T and cash for commercially unreasonable and unnecessary fees.

32.    As a direct and proximate result the foregoing, Plaintiff and the other members of

-10-

the Class have suffered damages in an amount to be determined at trial.

## COUNT II

### (Fraud)

33.    Plaintiff repeats and realleges the allegations contained in the paragraphs 1 through 23 supra, as if fully set forth herein.

34.    Defendants, through the uniform offer to exchange shares of U.S. West Media Group described herein, knowingly, falsely and fraudulently misstated material facts to Plaintiff and other members of the Class as described more fully herein.

35.    Notwithstanding their duty to disclose such information, Defendants also knowingly, falsely and fraudulently concealed and/or intentionally omitted material facts that Plaintiff and Class members could not have discovered on their own, and which were necessary for Plaintiff and other members of the Class to make an informed decision regarding the exchange of their U.S. West Media Group shares.

36.    The false and misleading statements and representations described in detail herein were both material and false in the context of inducing Plaintiff and other members of the Class to exchange their shares of U.S. West Media Group for shares of AT&T and cash for a commercially unreasonable and unnecessary fee.  The omitted facts, set forth in detail herein, were necessary to make Defendants' offer to exchange share of U.S. West Media Group not materially false or misleading.

37.    These false statements and/or omissions of material fact were known by Defendants to be false when made and were made with the intent that Plaintiff and other members of the Class would rely on them.

-11-

38.     The omissions were known by Defendants to be necessary to make other representations not materially false or misleading, and were not disclosed with the intent that Plaintiff and other members of the Class would accept tender their shares for exchange.

39.     As a direct result of the misrepresentations and/or omissions of material facts, Plaintiff and other members of the Class were charged commercially unreasonable and unnecessary fees under the guise that an exchange must be made without delay in order to prevent their shares from escheating to the State.  In all instances, this fee exceeded 19% of the cash due Plaintiff and other members of the Class.

40.     Plaintiff and other members of the Class, unaware of the falsity of Defendants' statements and representations and/or the omission or suppression of material facts, reasonably relied upon the offer to exchange their shares of U.S. West Media Group.  Had Plaintiff and other members of the Class known the true facts, they would not have exchanged their shares.

41.     By reason of the foregoing, Plaintiff and other members of the Class have suffered damaged in an amount to be determined at trial on this action.

## COUNT III

### (Fraudulent Inducement)

42.     Plaintiff repeats and realleges the allegations contained in the Paragraphs 1 through 23 supra, as if fully set forth herein.

43.     As a direct and proximate result of the misrepresentations and/or omissions of material facts alleged herein, knowingly made by or made with reckless disregard for the truth by Defendants, Plaintiff and other members of the Class were fraudulently induced to exchange their shares of U.S. West Media Group for shares of AT&T and cash on terms that were commercially

-12-

unreasonable. Defendants made the material misrepresentations described herein intending that Plaintiff and other members of the Class would rely on the statements. Defendants also omitted disclosing material facts that were necessary to make other representations not materially false or misleading.

44.    As Defendants intended, Plaintiff and other members of the Class, unaware of their falsity, relied upon Defendants' material misrepresentations and/or acted without the benefit of the material facts as described herein. Plaintiff and other members of the Class did not know and in the exercise of reasonable care, could not have learned the truth prior to exchanging their shares of U.S. West Media Group for AT&T shares and cash on terms that were commercially unreasonable.

45.    As a direct and proximate result of the foregoing, Plaintiff and the other members of the Class have suffered damage in an amount to be determined at trial.

## COUNT IV

### (Breach of Fiduciary Duty and Constructive Fraud)

46.    Plaintiff repeats and realleges the allegations contained in the Paragraphs 1 through 23 supra, as if fully set forth herein.

47.    Defendants undertook to review the investments of, and to provide advice and counsel to, Plaintiff and other U.S. West Media Group shareholders regarding what would be in the shareholder's best interests.

48.    Plaintiff and other members of the Class generally had no prior training, expertise or knowledge concerning the exchange of stock pursuant to the terms of a merger and relied solely upon the advice and knowledge of Defendants.

-13-

49.    By virtue of the relationship of the parties hereto, coupled with the vastly superior knowledge and bargaining position of Defendants, a confidential or fiduciary relationship arose between Plaintiff and other members of the Class on the one hand and Defendants on the other.

50.    Plaintiff and other members of the Class reposed their trust and confidence in Defendants and relied on their advice and expertise.

51.    Defendants knew or should have known that Plaintiff and other members of the Class placed their trust and confidence in Defendants, who accepted the confidence and trust reposed in them by Plaintiff and other members of the Class.

52.    Plaintiff and other members of the Class were induced to exchange their shares of U.S. West Media Group for AT&T shares and cash on commercially unreasonable terms, when they otherwise would not have agreed to the proposed transaction had full and fair disclosure been made by Defendants.

53.    Defendants have breached their fiduciary duties to Plaintiff and other members of the Class by their misrepresentations and omissions of material fact described herein in connection with the offer to exchange their shares of U.S. West Media Group.

54.    As a direct and proximate result of the foregoing, Plaintiff and other members of the Class have suffered damage in an amount to be determined at trial.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, demands judgment against Defendants AT&T Corp. and Georgeson Shareholder Communications, Inc., as follows:

A.    Determining that this action is a proper Class action pursuant to 2-801 of

-14-

the Illinois Rules of Civil Procedure, certifying an appropriate plaintiff Class, and appointing

Plaintiff as Class representative and her counsel as counsel for the Class;

        B.     Awarding Plaintiff and other members of the Class their damages,

including punitive damages, for the wrongful acts complained of in an amount to be determined

at trial;

        C.     Directing the establishment of a Claims Resolution Facility for the

determination of any individual issues that may remain after trial of Classwide issues;

        D.     Awarding Plaintiff and other members of the Class their costs and

disbursements incurred in connection with this action, including reasonable attorneys' fees,

expert witness fees and other costs; and

        E.     Granting such other and further relief as this Court deems just and proper.

## IX.    JURY DEMAND

    Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 9, 2001

Respectfully submitted,

LILA T. GAVIN

By: _____

One of Her Attorneys

Clinton A. Krislov
William M. Sweetnam
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Tel.: (312) 606-0500
Fax: (312) 606-0207
Firm ID No.: 91198

*Attorneys for Plaintiff*

-15-

Case 1:08-cv-02211-AKH   Document 1-4   Filed 03/05/2008   Page 17 of 22

*Of Counsel:*

John T. Burke
55 West Van Buren Street, Suite 520
Chicago, Illinois  60605
Tel.:  (312) 566-0900
Fax:  (312) 360-0725
Atty ID No.:  01701

F:\CASES\AT&T\complaintfinal.wpd

-16-

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| LILA T. GAVIN, on behalf of herself and all others ) similarly situated, ) ) Plaintiff, ) ) v. ) ) AT&T CORP., a New York Corporation, and ) GEORGESON SHAREHOLDER ) COMMUNICATIONS, INC., a Delaware ) Corporation, ) ) Defendants. ) | No. 04 CH 00007 Motion for Class Certification |

## MOTION FOR CLASS CERTIFICATION

Plaintiff, Lila T. Gavin, moves pursuant to 735 ILCS 5/2-801 *et seq.* for certification of

the Class of persons described herein, and in support thereof states as follows:

1.    *Class Definition.*  Plaintiff requests certification of a nationwide class.  If,

however, the Court determines that a nationwide class is not appropriate or otherwise cannot be

maintained, then, alternatively, Plaintiff requests certification of a class including all consumers

who have claims arising under Illinois Law.  Thus, Plaintiff requests certification of a class

defined as either:

   (a)    *Nationwide class*: "All residents, or persons or legal entities deemed to be

          residents, of the fifty states and the District of Columbia, other than employees,

          officers and directors of AT&T Corp. and Georgeson Shareholder

          Communications, Inc., who exchanged their shares of U.S. West Media Group for

          shares of AT&T and cash, and were charged a fee by Georgeson Shareholder

          Communications, Inc.

   (b)    *Statewide class*:  "All residents, or persons or legal entities, who may properly

avail themselves of the Illinois Consumer Fraud Act, other than employees,

officers and directors of AT&T Corp. and Georgeson Shareholder

Communications, Inc., who exchanged their shares of U.S. West Media Group for

shares of AT&T and cash, and were charged a fee by Georgeson Shareholder

Communications, Inc.

See Class Action Complaint ("Compl't") (copy attached hereto), ¶ 8(a) and (b).

2.      *Numerosity.*  Although the exact number is unknown to Plaintiff, there are

thousands of members of the Class residing throughout the United States, making joinder of all

class members impracticable.  Compl't, ¶ 9.

3.      *Common Questions of Law and Fact.*  A multitude of questions of law and fact are

common to Plaintiff's claims and those of Class members.  These common questions

predominate over any questions affecting only individual class members and include, inter alia,

the following:

(a)      Whether Defendants intentionally concealed the fact that an exchange of U.S.

West Media Group shares could be made at no cost;

(b)      Whether Defendants misrepresented that shareholders need exchange their U.S.

Media Group shares through AT&T's authorized agent, Georgeson;

(c)      Whether Defendants misrepresented to U.S. West Media Group shareholders that

their only choice was to exchange their U.S. West Media Group shares through

Georgeson, while failure to exchange their shares through Georgeson would only

result in their shares being deemed abandoned and escheating to the State;

(d)      Whether Defendants' conduct violated the Illinois Consumer Fraud Act and

-2-

similar laws in forty-nine other states and the District of Columbia;

(e)    What is the proper amount and measure of damages awardable to Plaintiff and the

Class.

Compl't, ¶ 10.

4.    *Typicality of Claims.* Plaintiff's claims are typical of members of the Class.

Plaintiff and other Class members exchanged their shares in response to the false and misleading

offer of Defendants to exchange their shares of U.S. West Media Group for a fee of $7.00 per

share. Compl't, ¶ 11. Each Plaintiff is a member of the proposed class. *Id.*

5.    *Adequate Representation.* Plaintiff will adequately, vigorously and fairly

represent and pursue the interests of the class members. Compl't, ¶ 12. Plaintiff understands the

nature of her claims described herein. *Id.* Plaintiff's claims are consistent with, and not

antagonistic to, the claims of other members of the Class. *Id.* Plaintiff does not have any

disqualifying conditions. *Id.* Plaintiff's counsel, Clinton A. Krislov and Krislov and Associates,

Ltd., have vast experience in representing consumers and investors in class actions. *Id.*

6.    *Appropriateness of a Class Action.* Litigation of this action on a classwide basis

is an appropriate method for the fair and efficient adjudication of the claims alleged herein.

Compl't, ¶ 13. Class treatment is superior to other available methods for the fair and efficient

adjudication of the controversy alleged herein. *Id.* Allowing this action to proceed as a class

action will permit a large number of similarly situated persons and entities to prosecute their

common claims in a single forum simultaneously, efficiently and without the unnecessary

duplication of evidence, effort and expense that numerous individual actions would inevitably

require. *Id.* Class action treatment will also permit the adjudication of relatively small claims of

Plaintiff and other Class members, who could not individually afford to litigate a complex claim against well-heeled corporate defendants such as those herein. *Id.* Furthermore, even for those Class members who could afford to litigate such a claim, it would still be economically impractical, as the cost of litigation is almost certain to far exceed any recovery they might obtain. *Id.*

       7.   *Manageability.* Plaintiff is unaware of any difficulty likely to be encountered in the management of this case that would preclude its maintenance as a class action. Compl't, ¶ 14.

       WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for an Order determining that this action is a proper Class action pursuant to 2-801 of the Illinois Rules of Civil Procedure, certifying an appropriate plaintiff Class, and appointing Plaintiff as Class representative and her counsel as counsel for the Class.

Dated: February 9, 2001             Respectfully submitted,

                                     LILA T. GAVIN

                                     By: _____
                                         One of Her Attorneys

Clinton A. Krislov
William M. Sweetnam
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207
Firm ID No.: 91198

*Attorneys for Plaintiff*

*Of Counsel:*

John T. Burke
55 West Van Buren Street, Suite 520
Chicago, Illinois 60605
Tel.: (312) 566-0900
Fax: (312) 360-0725
Atty ID No.: 01701

F:\CASES\AT&T\classcertmot.wpd

# EXHIBIT D

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| LILA T. GAVIN,<br>on behalf of herself and all others<br>similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>AT&T CORP., a New York Corporation,<br>GEORGESON SHAREHOLDER<br>COMMUNICATIONS, INC., a Delaware<br>Corporation, and DOE CORPORATIONS 1<br>to 1000,<br><br>    Defendants. | No.: 01-CH-2297<br><br>**Class Action Complaint**<br><br>JURY TRIAL DEMANDED<br><br>Calendar No. 8<br><br>Hon. Mary Anne Mason |

## FIRST AMENDED CLASS ACTION COMPLAINT

### I.    PROCEDURAL POSTURE

Plaintiff Lila T. Gavin originally filed this action in the Circuit Court of Cook County on February 9, 2001. Defendants removed Plaintiff's state court claims to the United States District Court for the Northern District of Illinois, arguing that Plaintiff's complaint actually alleged violations of the federal securities laws, and therefore the state court's jurisdiction was preempted by the Securities Litigation Uniform Standards Act. Subsequently, the Seventh Circuit Court of Appeals held that Plaintiff's complaint had "nothing to do" with the federal securities laws, and remanded this matter back to state court, on September 6, 2006. Defendants petitioned the United States Supreme Court for a writ of certiorari, which was denied on March 5, 2006.

Plaintiff, Gavin, individually and on behalf of the class of persons defined below, for her complaint alleges, upon knowledge as to herself and her own acts, and certain acts of others, and otherwise upon information and belief, as follows:

1

II.    **NATURE OF THE CASE**

1.    This case is brought on behalf of persons who were holders of unexchanged paper stock certificates, who were fraudulently induced to turn in their certificates through Georgeson Shareholder Communications, Inc.'s ("Georgeson") PostMerger Cleanup[sm] service and incurred a substantial uncapped per-share charge for having such certificates reissued through Georgeson, but were not informed that the certificates could be reissued without charge through the issuer's regular transfer agent.  As alleged herein, Defendants Georgeson, AT&T Corp. ("AT&T") (who retained Georgeson), and every other company that contracted for Georgeson's PostMerger Cleanup[sm] service ("Issuing Companies" or "Doe Corporations") knowingly and intentionally misrepresented or otherwise failed to disclose material facts including, *inter alia*, that Plaintiff and other class members could exchange their old stock certificates for new certificates from their issuing company at no cost.

2.    Defendants' material misrepresentation resulted in damage to Plaintiff and other certificate holders who exchanged their shares in response to Georgeson's solicitation, generally done under the issuer's letterhead.  Defendants' wrongful conduct associated with Georgeson's PostMerger Cleanup[sm] service violated the issuers' fiduciary duty to their shareholders (under the laws of the issuer's state of incorporation); the New York consumer protection statute (Georgeson's principal place of business), New York General Business Law § 349; and the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961.

3.    This action is brought as a bilateral class action.  The plaintiff classes, as defined below, are represented by Lila T. Gavin and consist of all certificate holders (of any issuer) who were induced to redeem their stock certificates through Georgeson's PostMerger Cleanup[sm] service, and were charged a per-share fee by Georgeson Shareholder Communications, Inc.,

2

which exceeded $20.00 for the transaction. The Defendant Class is represented by Georgeson and AT&T, and comprises all entities that retained Georgeson's PostMerger Cleanup[sm] service to redeem certificates for an uncapped per-share charge.

## III.    JURISDICTION AND VENUE

4.    *Jurisdiction.* This Court has jurisdiction over this litigation pursuant to 735 ILCS 5/2-209(a)(1) (transaction of any business within the state) and (c) (to the extent allowed by the Illinois Constitution and the Constitution of the United States). This Court has concurrent jurisdiction over Plaintiff's federal RICO claims.

5.    *Venue.* Venue is proper in this court under Illinois Code of Civil Procedure, 735 ILCS 5/2-101, because defendants AT&T and Georgeson, are both foreign corporations doing business in, and maintaining registered agents in, Cook County, Illinois.

## IV.    PARTIES

6.    *Plaintiff.* Plaintiff Lila T. Gavin is a resident of Oak Lawn, Illinois. Ms. Gavin owned, at all relevant times hereto, 235 unexchanged certificates of U.S. West Media Group ("U.S. West") common stock. Following a merger which closed in June 2000, Ms. Gavin's U.S. West certificates automatically became converted into 0.95 AT&T shares per U.S. West share, plus cash. Ms. Gavin's US West stock ownership was evidenced by a paper certificate, similar to many other U.S. West shareholders. As the result of Georgeson's deceptive letter, which induced her to exchange her certificates through Georgeson's PostMerger Cleanup[sm] service, Plaintiff was damaged thereby, being charged a fee of $7 per AT&T share – at total of $1,645.00 – for the purely ministerial transaction of reissuing one stock certificate and one check due her.

3

7.  *Defendants.*

(a)  Defendant AT&T Corp. ("AT&T") is a New York corporation with its principal place of business in New York, New York.

(b)  Defendant Georgeson Shareholder Communications, Inc. ("Georgeson"), is a Delaware corporation with its principal place of business in New York, New York.

(c)  Defendants "Doe Corporations 1 to 1000" are all entities who retained Georgeson to perform the same deceptive service that Georgeson performed for AT&T.

## V.  FACTUAL ALLEGATIONS

### A.  Georgeson's PostMerger Cleanup$^{sm}$ Service

8.  Georgeson Shareholder Communications provides the PostMerger Cleanup$^{sm}$ service, whereby companies with outstanding certificates for pre-merger shares of stock can clean those certificates off their books.

9.  According to Georgeson's website, the PostMerger Cleanup$^{sm}$ service provides value to companies because:

> Following a merger, acquisition or demutualisation there are always shareholders who fail to exchange or claim shares or cash due to them (dissenting shareholders).

> Most companies waste money maintaining dormant accounts, and strict regulations can create new compliance problems.

> Many firms lack the in-house resources to reach thousands of unexchanged shareholders. Registrars and Transfer Agents have no real experience in such communication programmes.

Georgeson Shareholder, *PostMerger Cleanup$^{sm}$*, http://www.georgesonshareholder.co.uk/public/services/redirect.asp?id=pmc (March 16, 2007).

10.  Georgeson's PostMerger Cleanup$^{sm}$ service (1) finds holders of pre-merger certificates of company stock, (2) contacts these certificate holders by mail, and then (3) induces

4

the pre-merger certificate holders to turn in their certificates to Georgeson for new stock certificates of the post-merger, issuing company.

11.     Georgeson's PostMerger Cleanup[sm] service (also referred to Georgeson's "Asset Reunification[TM]" service) is a largely profitable portion of Georgeson's business, touted as having been "invented" by Georgeson "to reunite as many as 90% of unexchanged shareholders with their rightful assets; all at no cost to our clients," (i.e., no cost to the issuer corporations). http://www.gsccanada.com/public/services/redirect.asp?id=2 (March 16, 2007).

12.     According to Georgeson's website, Georgeson has "carried out over 850" PostMerger Cleanup[sm] programs. http://www.georgesonshareholder.co.uk/public/services/redirect.asp?id=pmc (March 16, 2007).

13.     Georgeson's service provides no value to certificate holders because at the time the merger closes, they are already deemed a shareholder of the merged company. The ministerial act that Georgeson performs, of exchanging paper certificates, is unnecessary for establishing ownership. More importantly, and what Defendants fail to disclose when Georgeson peddles its service under the issuer's letterhead, Plaintiff and class members are entitled to exchange their certificates at no cost directly with the issuing company or its transfer agent.

14.     The communication of Georgeson's PostMerger Cleanup[sm] service to Plaintiff and class members is explicitly done under the issuer's letterhead and indicates that the issuer has engaged Georgeson to perform this service for a per-share fee paid by the certificate holder. The communication suggests that Plaintiff and class members only option is to redeem through Georgeson, or else lose their shares, and does not disclose that any other options are available to the certificate holders. Omitted from this communication is the fact that Plaintiff and class

5

members are entitled to exchange their paper certificates at no cost through either the issuer or

the issuer's transfer agent. Exacerbating the deception, the notices sent to holders directs them to

call a number that is Georgeson's call center, which omits to disclose the ability to have the

redemption done for free.

**B.    Facts Specific to U.S. West Mediate Group Certificate Holders**

15.    In 1998, U.S. West was split off from its parent, U.S. West, Inc. Certificates for

U.S. West common stock were then exchangeable for Media One shares on a one-for-one basis.

16.    Subsequently, in June, 2000, Media One merged with AT&T. Upon the merger

closing, each of the U.S. West certificate holders' shares were converted to beneficial ownership

of 0.95 shares of AT&T and a cash payment of $36.27, plus all accrued dividends paid on these

shares following the merger.

17.    On December 15, 2000, AT&T retained Georgeson to perform the PostMerger

Cleanup of old U.S. West certificates. Under their agreement, Georgeson, as agent, was

authorized to use AT&T's letterhead when contacting certificate holders of U.S. West to

persuade them to exchange their old certificates for new certificates reflecting AT&T shares,

plus cash, as described above.

18.    Given the provenance, holders of paper certificates, whether U.S. West or other

companies, are believed to be predominately elderly individuals, since that was the common

mode of stock ownership long ago. Share ownership today is typically recorded in street name,

with shares held by their broker who turns them in through a transfer agent, in AT&T's case,

EquiServe.

19.    Defendants perpetuated their fraudulent scheme by falsely representing to

Plaintiff and other U.S. West certificate holders that they *must* send in their old paper certificates

in response to Georgeson's solicitation or face losing their investment entirely.  In a December

15, 200 Notice to Plaintiff, Defendants stated:

### QUESTIONS AND ANSWERS

**1.  Why do I have to send in my U.S. WEST Media Group ("Media Group") stock certificate(s)?**

In 1998, **Media Group** was split off from **U.S. West, Inc.** and exchanged into **MediaOne** on a one-for-one basis.  Subsequently, in June 2000, **AT&T Corp.** acquired **MediaOne**.  As a result, your old shares are no longer traded.  You now need to send in your "old" **Media Group** certificate(s) for the **AT&T** shares due you, plus cash payment and back dividends.  If you do not claim your AT&T stock and cash, eventually they will be turned over to state authorities under the abandoned property laws.

Important Notice for Holders of Unexchanged Share of U.S. West Media Group Common Stock

(December 15, 2000) ("Notice" attached as "Exhibit A").

20.      The Notice was a form letter that was sent to Plaintiff and all other outstanding

U.S. West certificate holders was unfair because it was commercially unreasonable to charge $7

per-share for a ministerial certificate reissuance that was already due her by AT&T under the

terms of the merger.  Additionally, the Notice was false and misleading because it omitted the

material fact that the $7 per-share charge could be avoided altogether if shareholders exchanged

their certificates directly through AT&T's Shareowner Services.

21.      Defendants intentionally labeled the letter as a communication from AT&T rather

than Georgeson, and used scare tactics to induce Plaintiff and other class members to exchange

their certificates immediately and exclusively through Georgeson, intending that they rely on the

false and misleading statements that an exchange must be made immediately and exclusively

through Georgeson, to avoid losing their investment:

> We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now.
>
> * * *
>
> There is no benefit in continuing to hold your old shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.

Notice, Exhibit A.

22.    Defendants' uniform solicitation also falsely misled Plaintiff and class members to believe that the $7 per-share charge for its exchange service was a necessary cost to shareholders who wished to "claim" their AT&T shares and cash, and was in an amount related to the actual cost of providing the service:

> We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. <u>To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per US WEST Media Group [sic] share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC.</u>

Notice, Exhibit A.

23.    Contrary to the affirmative representations of Defendants, the $7 per-share "processing fee" far exceeded the actual cost of providing this "service." In fact, the "cost" of providing this service is only the cost to administratively process the receipt and reissuance of each certificate (a service no different from reissuing a lost check or stock certificate), and has no connection with the amount of shares or dollars exchanged. For example, it would cost no more administratively to reissue a certificate evidencing 100 shares than it does for one evidencing 1,000 shares. But, under Defendants' scheme, they received $700 to reissue the 100 share certificate and $7,000 to reissue the 1,000 share certificate. Either of these prices is

8

unconscionable for the reissuance of a single certificate, and the $6,300 differential in fees for

reissuing the latter is unjustified because it is the same ministerial service without any additional

processing or risk.

24.    Given that Defendant processed approximately 44,000 U.S. West certificates,

Georgeson is believed to have fraudulently obtained approximately $30 million from just the

AT&T/U.S. West certificate reissuance.

25.    The excessiveness and unfairness of the charges to Plaintiff and class members is

shown by AT&T's own communication to Georgeson.  In an email to Georgeson, dated January

9, 2001, AT&T's employee told Georgeson that the per-share fee could be done at a lower

amount:

> In my opinion, based on the experience at the old company, the program could still be
> profitable to [Georgeson] for a smaller per share fee (say $5 instead of $7).  At the end of
> the program, we want to discuss the financial results with you to make sure the program
> was profitable for [Georgeson] while still keeping the fee as low as possible for future
> programs.  I told your husband that we appreciate [Georgeson's] willingness to discuss
> the detailed financial results of the programs so that future programs can be designed to
> be both profitable and shareholder friendly.

Attached as "Exhibit B".

26.    Despite AT&T's reservations about the high cost to shareholders, AT&T took no

action to force Georgeson to reduce the charge.

27.    The confiscatory $7 per-share fee withheld by Defendants was devastating to

Plaintiff and other class members, amounting to more than 19% of the $36.27 cash payment due

U.S. West shareholders.

28.    Also of material importance, but which Defendants failed to disclose, is the fact

that even if Plaintiff and other members of the Class "continue[d] to do nothing," and their

"stock and underlying assets [were] turned over to certain state authorities under the abandoned

9

property laws," (Notice, Exhibit A) the cost of reclaiming those assets would be far less, and generally free, as well.

29.    The letter's misrepresentations were exacerbated by its directing all certificate holders' questions to Georgeson's own call center.  When persons called to inquire about the PostMerger Cleanup[sm] service, they were almost never told that the service was available for free.  Only those holders who held a small number shares (less than ten), which made it an unprofitable transaction for Georgeson, were informed that the service was available for free. Although AT&T's agreement with Georgeson obligated Georgeson to advise callers who asked of the free redemption, AT&T did not monitor this and it was almost never done.

## V.    CLASS ALLEGATIONS

30.    This action is brought and properly maintained as a class action pursuant to the provisions of the Illinois Code of Civil Procedure 735 ILCS 5/2-801 *et seq*.  Plaintiff brings this action on behalf of themselves and a class of all others similarly situated, as defined herein, and against a class of defendants represented by Georgeson and AT&T.

31.    *Plaintiffs Class Definition*.  Plaintiff sets forth three plaintiff classes represented by  Named Plaintiff Lila T. Gavin, and of which the Plaintiff is a member of all three, defined as:

(1)    *The Georgeson PostMerger Cleanup[sm] Service Victims Class* ("Georgeson Class"). All certificate holders of any company who were induced to redeem their stock certificates through Georgeson's PostMerger Cleanup[sm] service, and were charged a per-share fee by Georgeson Shareholder Communications, Inc., which exceeded $20.00 for the transaction.

(2)    *The AT&T/U.S. West Merger Sub-Class*.  All persons who exchanged their shares of U.S. West for shares of AT&T and cash, and were charged a per-share fee by Georgeson Shareholder Communications, Inc., which exceeded $20.00 for the transaction.

(3)    *The Illinois Sub-Class*. Illinois resident members of either the Georgeson Class or the AT&T/U.S. West Merger Sub-Class.

32.     _Defendant Class_.  Georgeson and AT&T, as defendant class representatives of the Issuer Class:  All companies who engaged Georgeson's PostMerger Cleanup[sm] service for whom Georgeson charged an uncapped per-share fee to certificate holders.

33.     _Plaintiff Class Numerosity_.  Although the exact number is unknown to Plaintiff, members of each class exceed 500 persons, making joinder of all class members impracticable. On information and belief, the Georgeson Class exceeds 100,000 persons, the AT&T/U.S. West Merger Sub-Class exceeds 10,000 persons, and the Illinois Sub-Class exceeds 500 persons.

34.     _Common Questions of Law and Fact (for both defendant and plaintiff classes)_.  A multitude of questions of law and fact are common to Plaintiff's claims, those of class members, and members of the defendant class.  These common questions towards all classes predominate over any questions affecting only individual class members and include, _inter alia_, the following:

Fact Issues:

(i)     Whether Georgeson's PostMerger Cleanup[sm] service misleads or misled consumers who used the service to exchange their old stock certificates;

(ii)    Whether Defendants intentionally concealed the fact that an exchange of U.S. West certificates, or exchange of shares involving other companies, could be made at no cost.

(iii)   Whether Defendants misrepresented that certificate holders need to exchange their old certificates through the Issuing Company's agent, Georgeson.

(iv)    Whether Defendants misrepresented to U.S. West certificate holders, or holders of other stock certificates that were contacted through Georgeson's PostMerger Cleanup[sm] service, that their only choice was to exchange their old certificates through Georgeson, while failure to exchange their old certificates through

11

Georgeson would only result in their shares being deemed abandoned and escheating to the State.

Legal Issues:

(i)     The applicable law to each transaction (believed to be the law of the issuer's state of incorporation – New York for AT&T, Delaware for most other issuers).

(ii)    Whether AT&T's conduct, and the conduct of the other Issuing Companies, breached their fiduciary duty owed to their shareholders under the law of their state of incorporation, being New York law for AT&T and Delaware law for most others.

(iii)   Whether Defendants' conduct renders them liable under New York's consumer protection statute, GBL § 349, the State from which Georgeson's deceptive contacts emanated.

Mixed Issue of Law and Fact:

(i)     What is the proper amount and measure of damages awardable to Plaintiff and class members?

35.     *Adequate Representation for Plaintiff Classes*.  Plaintiff will adequately, vigorously and fairly represent and pursue the interests of the plaintiff class members.  Plaintiff understands the nature of her claims described herein.  Plaintiff's claims are consistent with, and not antagonistic to, the claims of other members of the Class.  Plaintiff does not have any disqualifying conditions. Plaintiff's counsel, Clinton A. Krislov and Krislov and Associates, Ltd., have vast experience in representing consumers and investors in class actions, and co-counsel John Burke has similarly great experience in litigation generally.

12

36.    *Typicality of Plaintiff Class Claims*.  Plaintiff's claims are typical of members of

the Class.  Plaintiff and other class members exchanged their old certificates through Georgeson

for an uncapped per-share fee, $7.00 per-share in the case of the AT&T sub-class, in response to

the false and misleading representations of Defendants.  Plaintiff is a member of all proposed

classes.

37.    *Defendant Class Numerosity*.  Although the number of Issuer Companies that

engaged Georgeson is not known, they number at least 850, as reported in Georgeson's website,

http://www.georgesonshareholder.co.uk/public/services/redirect.asp?id=pmc (March 16, 2007),

making it impractical and inconvenient to sue each Issuing Company separately.

38.    *Defendant Class Representatives*.  AT&T and Georgeson may be expected to

vigorously assert the defendant class members' interests.  Throughout this litigation, which spans

six years (much of which occurred in federal court, as the Procedural Posture section herein

indicates), AT&T has vigorously defended its own interest.  Georgeson is the engaged agent for

all contracting issuer class members and is liable for its conduct by way of agreement with the

Issuer Companies, wherein it has agreed to indemnify them for this type of liability.

39.    *Defendant Class Typicality*.  The claims against defendants AT&T and Georgeson

are typical of members of the Defendant Class.  All defendant class members, the Issuing

Companies, contracted Georgeson for its PostMerger Cleanup[sm] service, like AT&T, and the

claims alleged in this complaint uniformly apply to the respective Defendant Class members, as

they apply to AT&T and Georgeson.  Defendants AT&T and Georgeson are members of the

Defendant Class.

40.    *Appropriateness/Superiority of a Class Action*.  Litigation of this action on a

class-wide basis is an appropriate method for the fair and efficient adjudication of the claims

13

alleged herein.  Class treatment is superior to other available methods for the fair and efficient

adjudication of the controversy alleged herein.  Allowing this action to proceed as a class action

will permit a large number of similarly situated persons and entities to prosecute their common

claims in a single forum simultaneously, efficiently and without the unnecessary duplication of

evidence, effort and expense that numerous individual actions would inevitably require.  Class

action treatment will also permit the adjudication of relatively small claims of Plaintiff and other

Class members, who could not individually afford to litigate a complex claim against well-heeled

corporate defendants such as those herein.  Furthermore, even for those Class members who

could afford to litigate such a claim, it would still be economically impractical, as the cost of

litigation is almost certain to far exceed any recovery they might obtain.  Accordingly, under 735

ILCS 5/2-801, while class action is the appropriate vehicle to resolve these claims, under federal

rules, it would be certified as a money damages class under FRCP 23(b)(3).

     41.   *Manageability.*  Plaintiff is unaware of any difficulty likely to be encountered in

the management of this case that would preclude its maintenance as a class action.  Indeed, the

class is especially easily managed and administered because Georgeson necessarily has records

of the name, addresses, and amounts of shares and charges for each plaintiff class member,

which may be used for notice and distribution of money.

## VII.   CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duty
### (Against AT&T and the Issuing Companies)

    42.   Plaintiff repeats and realleges Paragraphs 1 through 41, as if fully set forth herein.

    43.   Defendant AT&T, and every Issuing Company that contracted with Georgeson

for the PostMerger Cleanup[sm] service, owed its shareholders the highest duties of loyalty,

honesty and care in conducting its affairs, which includes an obligation to be complete and

accurate in AT&T's and other Issuing Companies' communications to their shareholders, as well

as the communications of their agents to their shareholders, in soliciting the redemption of their

outstanding certificates.

44.    Defendant AT&T and the Issuing Companies caused materially misleading and

incomplete information to be disseminated to Plaintiff and the class members, who are

shareholders of AT&T and the Issuing Companies.

45.    At a minimum, to discharge these duties, AT&T and the Issuing Companies

should have exercised reasonable and prudent supervision over their agent, Georgeson.  By

virtue of these obligations, AT&T and the Issuing Companies were required, *inter alia*, to:

(a)    exercise reasonable control and supervision over their agent, Georgeson;

(b)    be and remain informed as to the actions undertaken by Georgeson's PostMerger

Cleanup[sm] service, toward AT&T's and the Issuing Companies' shareholders; and

(c)    be fairly and fully informative in their dealings with their shareholders.

46.    AT&T and the Issuing Companies knowingly, intentionally or recklessly,

breached their fiduciary duties by, *inter alia*:

(a)    allowing their agent, Georgeson, to falsely represent a ministerial service which

had the sole purpose of damaging their own shareholders by communicating

information that omitted the material fact that Plaintiff and other holders of

unexchanged stock certificates could exchange their unexchanged certificates for

shares of AT&T, and the Issuing Companies, at no cost through the Issuing

Companies' or their transfer agents;

15

    (b)    misleading Plaintiff and other unexchanged certificate holders that their certificates would be turned over to state authorities under the abandoned property laws;

    (c)    mislead Plaintiffing and other unexchanged certificate holders into believing the confiscatory per-share "processing fee" merely defrayed the cost of the PostMerger Cleanup[sm] service, thereby deceptively concealing the commercial unreasonableness of the fee; and

    (d)    engaging in unlawful activity to benefit themselves and Georgeson.

47.    Because of AT&T's, the other Issuing Companies', and their agent's misleading and deceptive communications to its shareholders, Plaintiff and class members suffered substantial damage.

48.    Accordingly, Plaintiff and class members seek monetary damages and other appropriate remedies, together with punitive damages and attorneys fees.

## COUNT II
### Aiding and Abetting/Knowing Participation in Breaches of Fiduciary Duty
### (Against Georgeson)

49.    Plaintiff repeats and realleges Paragraphs 1 through 48, as if fully set forth herein.

50.    Because AT&T, as well as each Issuing Company, was a fiduciary of that company and its shareholders, AT&T and the Issuing Companies owed duties of due care, undivided loyalty, good faith, and full and fair disclosure to their shareholders.

51.    AT&T and the Issuing companies violated and breached these duties.

52.    With the knowledge, approval, and participation of AT&T and the Issuing Companies, as alleged herein, Defendant Georgeson was able to, and in fact did, knowingly

16

participate as a principal and profited from its participation in AT&T's and the Issuing

Companies' breaches of fiduciary duty.

    53.    As a direct and proximate result of Georgeson's participation in the Issuing

Companies' breaches of fiduciary duty, Plaintiff and class members have sustained substantial

harm.

## COUNT III
## Violation of Racketeer and Corrupt Organizations Act (RICO)
### (Against Georgeson)

    54.    Plaintiff repeats and realleges Paragraphs 1 through 41, as if fully set forth herein.

    55.    At all relevant times hereto, the Racketeer and Corrupt Organizations ("RICO")

Act; 18 U.S.C. § 1961, et seq., was in full force and effect.

    56.    Defendant Georgeson is a "person" within the meaning of 18 U.S.C. § 1961(3).

    57.    AT&T Corp. and each of the other issuers who engaged Georgeson is an

"enterprise" as defined by 18 U.S.C. § 1961(4).

    58.    Defendant Georgeson conducted Defendant AT&T's business, and the business of

each company issuer Georgeson contracted with under the PostMerger Cleanup[sm] service, by a

pattern of racketeering activity.

    59.    *Acts of Racketeering Activity:*

    (i)    *Mail Fraud.* Defendant Georgeson violated 18 U.S.C. § 1341 by

knowingly causing the use of the mails for the purpose of executing the scheme to

defraud Plaintiff and class members described in detail herein. Specifically, mails were a

critical part of the fraudulent PostMerger Cleanup[sm] scheme, used to (a) send the

misleading notice to Plaintiff and class members, and (b) receive the certificates from

17

certificate holders, and (c) distribute the issued certificates and cash, after exacting its per-share fee.

(ii)    *Wire Fraud*.  Defendant Georgeson knowingly caused the use of interstate telephone systems for the purpose of executing the schemes to defraud Plaintiff and class members described in detail herein, in violation of 18 U.S.C. § 1343.  Specifically, wire was a critical part and used to transmit the collection of the fraudulently-obtained per-share fee from Plaintiff and class members, and since the letters all funneled inquiries to Georgeson's New York call center, interstate telephone lines were and are a critical component in the deception – misleading holders to believe they have no other alternative.

60.    Each such use of the mails or wire in furtherance of schemes constitutes mail fraud, in violation of 18 U.S.C. § 1341, and in turn is a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Many hundreds of these calls and thousands of mailings all occurred within ten years before or after the filing of the original complaint.

61.    Georgeson's acts of racketeering activity, constituting at least in the continuing mailings to and from thousands of holders of unexchanged certificates of US West common stock, including both the Plaintiff and class members, constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

62.    Each set of exchanges (i.e., the thousands of exchanges for each engagement) constitutes a closed-end pattern of a transaction affected by many fraudulent mailings.

63.    Georgeson's PostMerger Cleanup[sm] service, in which Georgeson solicits, by mails or wire, holders of unexchanged stock certificates for other issuers in a similar manner as holders of U.S. West constitutes an open-ended "pattern of racketeering activity" within the meaning of

18

18 U.S.C. § 1961(5) in that (a) a specific threat of Georgeson using its PostMerger Cleanup<sup>sm</sup> service to repeatedly perpetuate fraud on unexchanged certificate holders, and (b) Georgeson's PostMerger Cleanup<sup>sm</sup> service is a business service Georgeson regularly employs as a legitimate business.

64.     Defendant Georgeson is engaged in, and its PostMerger Cleanup<sup>sm</sup> service certainly affects, interstate commerce, within the meaning of 18 U.S.C. § 1962(c).

65.     Defendant Georgeson committed the foregoing predicate offenses knowingly and with intent to defraud or deceive Plaintiff and class members.

66.     Plaintiff and class members have been injured in their businesses, property or both, by the foregoing violations of 18 U.S.C. § 1962(c). Specifically, Georgeson conducted and conducts issuers' enterprises by patterns of racketeering activity that fraudulently induce Plaintiff and class members into paying an unreasonable and unnecessary per-share fee for redeeming their unexchanged stock certificates.

## COUNT IV
## Violation of New York General Business Law § 349

67.     Plaintiff repeats and realleges Paragraphs 1 through 41, as if fully set forth herein.

68.     At all relevant times hereto, New York General Business Law § 349 ("GBL § 349" or the "Act") was in full force and effect.

69.     Defendant Georgeson conducts its primary place of business from New York State.

70.     Through the PostMerger Cleanup<sup>sm</sup> service, Georgeson contacted Plaintiff and all members of both classes from its U.S. headquarters situs, in New York State.

71.     Defendant AT&T contracted with Georgeson for the PostMerger Cleanup<sup>sm</sup> service in New York State.

72.    Defendant AT&T permitted Georgeson to contact certificate holders of U.S. West, using AT&T letterhead, from New York State.

73.    Defendant Georgeson's PostMerger Cleanup$^{sm}$ service is engaging in "business," "trade" or "commerce" within the meaning of the GBL § 349.

74.    GBL § 349 prohibits unfair and deceptive practices in business, trade and commerce.

75.    In executing the offer to exchange scheme described herein, Defendants misrepresented and/or failed to disclose material facts as described herein.

76.    The conduct of Defendants in connection with the offer to exchange scheme described herein constitutes an unfair or deceptive act or practice within the meaning of the Act. As intended by Defendants, Plaintiff and other members of the class were induced to exchange their old certificates for shares from the Issuing Company for commercially unreasonable and unnecessary fees.

77.    Plaintiff and class members are "any person who has been injured by reason of any violation of this section," and may therefore "bring an action in [her] own name to enjoin such unlawful act or practice. GBL § 349(h).

78.    As a direct and proximate result of the foregoing, Plaintiff and the other members of the Class have suffered damages in an amount to be determined at trial.

## COUNT V
## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### (For Illinois The Illinois Sub-Class)

79.    Plaintiff repeats and realleges Paragraphs 1 through 41, as if fully set forth herein.

20

80.    At all relevant times hereto, there was in full force and effect an act known as the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505 et seq.) (the "Act").

81.    Plaintiff and members of the Illinois Sub-Class are "consumers" within the meaning of the Act (815 ILCS 505/2).

82.    Defendants' exchange, including the offer to exchange, the U.S. West certificates held by Plaintiff and members of the Illinois Sub-Class for certificates or shares of AT&T and cash is engaging in "trade" or "commerce" within the meaning of the Act (815 ILCS 505/1(f)).

83.    The Act prohibits unfair and deceptive practices in trade and commerce. The Act places the following prohibitions, *inter alia*, on Defendants:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 in the conduct of any trade or commerce are hereby declared unlawful whether any person had in fact been misled, deceived or damaged thereby. In constituting this section consideration shall be given to the interpretations of the Federal Trade Commission and federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

84.    In executing the offer to exchange scheme described herein, Defendants misrepresented and/or failed to disclose material facts as described herein.

85.    The conduct of Defendants in connection with the offer to exchange scheme described herein constitutes an unfair or deceptive act or practice within the meaning of the Act. As intended by Defendants, Plaintiff and other members of the Illinois Sub-Class class were

induced to exchange their old certificates for shares from the Issuing Company for commercially unreasonable and unnecessary fees.

86.    As a direct and proximate result the foregoing, Plaintiff and the other members of the Illinois Sub-Class have suffered damages in an amount to be determined at trial.

## COUNT V
## Fraud

87.    Plaintiff repeats and realleges Paragraphs 1 through 41, as if fully set forth herein.

89.    Defendants, through the uniform offer to exchange stock certificates described herein, knowingly, falsely and fraudulently misstated material facts to Plaintiff and other class members, as described more fully herein.

90.    Notwithstanding their duty to disclose such information, Defendants also knowingly, falsely and fraudulently concealed and/or intentionally omitted material facts that Plaintiff and class members could not have discovered on their own, and which were necessary for Plaintiff and other class members to make an informed decision regarding the exchange of stock certificates.

91.    The false and misleading statements and omissions described in detail herein were both material and false in the context of inducing Plaintiff and other class members to exchange their stock certificates for a commercially unreasonable and unnecessary fee.  The omitted facts, set forth in detail herein, were necessary to disclose that Defendants' offer to exchange the certificates was materially false or misleading.

92.    These false statements and/or omissions of material fact were known by Defendants to be false when made and were made with the intent that Plaintiff and other class members would rely on them.

22

93.     The omissions were known by Defendants to be necessary to make other representations not materially false or misleading, and were not disclosed with the intent that Plaintiff and other class members would tender their certificates for the charge required by Georgeson.

94.     As a direct result of the misrepresentations and/or omissions of material facts, Plaintiff and other class members were charged commercially unreasonable and unnecessary fees under the guise that an exchange must be made without delay in order to prevent their shares from escheating to the State

95.     Plaintiff and other class members, unaware of the falsity of Defendants' statements and representations and/or the omission or suppression of material facts, reasonably relied upon the offer to exchange old stock certificates.  Had Plaintiff and other class members known the true facts, they would not have exchanged their shares.

96.     By reason of the foregoing, Plaintiff and other class members have suffered damages in an amount to be determined at trial on this action.

VIII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, demands judgment against Defendants Georgeson Shareholder Communications, Inc., AT&T Corp. and the Issuing Companies, as follows:

A.     Determine that this action may proceed as a proper class action, under applicable Court rules, certify the case to proceed on the above claims (i) for the requested plaintiff Class, and appointing Plaintiff as Class representative and her counsel as counsel for the Class; and (ii) against Georgeson and AT&T, for themselves and as class representatives for the requested defendant class of Issuing Companies;

23

B.    Awarding Plaintiff and other class members their damages, trebled under the

RICO Act, and/or punitive damages, under the other counts, for the wrongful acts complained of

in an amount to be determined at trial;

C.    Awarding Plaintiff and class members their costs and disbursements incurred in

connection with this action, including reasonable attorneys' fees, expert witness fees and other

costs; and

D.    Granting such other and further relief as this Court deems just and proper.


IX.    **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 2, 2007                    Respectfully submitted,

                                        LILA T. GAVIN


                            By: _____
                                        One of Her Attorneys

Clinton A. Krislov
M. Reas Bowman
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207
Firm ID No.: 91198

*Attorneys for Plaintiff*


*Of Counsel:*

John T. Burke
55 West Van Buren Street, Suite 520
Chicago, Illinois 60605
Tel.: (312) 566-0900
Fax: (312) 360-0725
Atty ID No.: 01701


24

 **AT&T**

## IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF
## U S WEST MEDIA GROUP COMMON STOCK

December 15, 2000

Dear Stockholder:

Our records show that you still hold shares of U S WEST MEDIA GROUP. There is no longer a market for these shares as a result of the 1998 split off from U S WEST and exchange into MediaOne Group, Inc. Each share of U S WEST Media Group was exchangeable into MediaOne on a one-for-one basis. Subsequently, in June 2000, MediaOne merged with AT&T Corp. Following the merger, you are now due 0.95 of a share of AT&T and a cash payment of $36.27 for every U S WEST Media Group share you hold, plus all accrued dividends paid on these shares. Based on AT&T's $22 price per share on December 14, 2000, each share of U S WEST Media Group would receive merger consideration of approximately $59. Both the number of U S WEST Media Group shares you own and the AT&T shares and cash payment due you is indicated on the attached Claim Card.

We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per U S WEST Media Group share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. Even if you do not have your U S WEST Media Group certificate(s), you may still participate in this voluntary program.

Please read the enclosed materials carefully. There is no benefit in continuing to hold your old shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws. Georgeson Shareholder Communications Inc. is being permitted to administer this voluntary program through January 23, 2001. If you have questions after reading this material, please call GSC's toll-free number, at 1 (888) 352-4639 for assistance.

Sincerely,

AT&T Corp

✂ Detach along perforation

---

### CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF US WEST MEDIA GROUP
### SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY
C/O GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11TH FLOOR, NEW YORK, NY 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from AT&T Corp., dated December 15, 2000. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a processing fee of $7 per AT&T share due is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the cost of assisting me with this special exchange effort.

FORM W-9 BELOW: By entering my social security number below and signing this card, I certify that the following Tax Identification Number is accurate and that I am not subject to backup withholding.

Enter
Social Security #    ___ — ___ — ___

CHECK ONE ➔   ☐ SELL ALL MY AT&T SHARES

☐ RECEIVE MY AT&T SHARES

SIGN ➔   X _____
SIGNATURE OF OWNER

X _____
SIGNATURE OF CO-OWNER, IF ANY

NOTE: If a certificate(s) for your shares is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions of the Statement/Affidavit described on the back of this card.

MY DAYTIME PHONE NUMBER IS ( ___ ) _____

## QUESTIONS AND ANSWERS

**1. Why do I have to send in my U S WEST Media Group ("Media Group") stock certificate(s)?**

In 1998, Media Group was split off from U S WEST, Inc. and exchanged into MediaOne on a one-for-one basis. Subsequently, in June 2000, AT&T Corp. acquired MediaOne. As a result, your old shares are no longer traded. You now need to send in your "old" Media Group certificate(s) for the AT&T shares due you, plus cash payment and back dividends. If you do not claim your AT&T stock and cash, eventually they will be turned over to state authorities under the abandoned property laws.

**2. How much will I receive if I have my AT&T shares sold?**

If you choose to sell your AT&T shares, they will be sold on the New York Stock Exchange and all participating stockholders will receive the same weighted average price per share based on all shares sold from January 2, 2001 to January 23, 2001 as part of this program. Additionally, you will receive a cash payment of $36.27 per Media Group share you hold. AT&T closed at $22 per share on December 14, 2000. The $7 per AT&T share processing fee will be deducted from the additional cash payment of $36.27 per Media Group share you are due. You will be sent your cash payment approximately 4 weeks after the January 23, 2001 expiration date. We can make no recommendation as to whether or not you should sell your shares.

**3. What if I don't have my Media Group certificate(s)?**

Complete the Claim Card and your shares will be replaced for the purpose of exchange, as provided for in the Statement/Affidavit on the back of the Claim Card.

**4. What happens if I choose to receive my AT&T shares?**

If you choose to receive your AT&T shares, you will be sent your shares and cash approximately 4 weeks after the expiration date found on the front of this notification. The $7 per AT&T share processing fee will be deducted from the additional cash payment you are due.

**5. How do I complete the Claim Card?**

Simply mark one box indicating your choice of action and sign exactly as your name is listed on the card. If more than one name is listed, both parties must sign. If the name of the owner has changed, enclose a copy of legal documents, such as a death certificate or marriage license. Your signed Claim Card must be received in good order no later than JANUARY 23, 2001. If you have any further questions, please call 1 (888) 352-4639.

**6. What are the tax consequences of the exchange and this program?**

In accordance with the merger agreement, any cash consideration payable as a result of the merger is subject to tax for the year 2000. If you choose to sell your AT&T shares due you, the sale will take place after January 2, 2001 and will therefore be a 2001 taxable event. If you have questions after reading this material, call GSC's toll-free number, at 1 (888) 352-4639 for assistance.

If you need assistance, please call:

## GEORGESON SHAREHOLDER
COMMUNICATIONS INC.
**Toll-Free Nationwide 1 (888) 352-4639**

---

## STATEMENT/AFFIDAVIT FOR LOST STOCK CERTIFICATES OF U S WEST MEDIA GROUP

By signing the front of this Claim Card, I agree to the following: I am the lawful owner of the shares described on the front of this card. My missing certificate(s) has not been endorsed, cashed, negotiated, transferred, assigned or otherwise disposed of. I have made a diligent search for the certificate(s) and have been unable to find it (them) and I make this Statement/Affidavit for the purpose of exchanging or inducing the liquidation of the certificate(s) without surrender of the certificate(s), and the exchange or sale of the shares represented thereby, and hereby agree to surrender the certificate(s) for cancellation should I, at any time, find the certificate(s). I, hereby agree, for myself, my heirs, assigns and personal representatives, that in consideration of the exchange or the proceeds of the exchange and sale of the shares represented by the certificate(s) to completely indemnify, protect and hold harmless SAFECO Surety Company, AT&T Corp., EquiServe Trust Company, BankBoston, N.A., MediaOne Group, Inc., Georgeson Shareholder Communications Inc., Georgeson Shareholder Securities Corporation, and any other party to the transaction (the "Obligees"), from and against all losses, costs and damages, including court costs and attorneys' fees, which they may be subject to or liable for in respect of the cancellation and replacement of the certificate(s). The rights accruing to the Obligees under the preceding sentence shall not be limited by the negligence, inadvertence, accident, oversight or breach of any duty or obligation on the part of the Obligees or their respective officers, employees and agents or their failure to inquire into, contest, or litigate any claim, whenever such negligence, inadvertence, accident, oversight, breach or failure may occur or have occurred. Surety protection for the Obligees is provided under Bond# 5926165 issued by SAFECO Surety Company.

For value received the undersigned sells, assigns and transfers unto Donaldson, Lufkin & Jenrette Securities Corporation the number of shares indicated below of AT&T Corp. and hereby appoints Georgeson Shareholder Secrities Corporation the attorney of the undersigned to transfer the said cash and securities on the books of the said corporation with full powers of substitution in this matter.

## PLEASE SIGN THE FRONT OF THIS CARD

©2000 GEORGESON SHAREHOLDER SECURITIES CORPORATION



**"Anderson, Patrick L, CFCMA" <patrickanderson@att.com>**

**01/09/2001 12:12 PM**

To: Karen Glazer/SCCORP@SCCORP.COM
cc: "Holcombe, Claudia J, CFCMA" <cjholcombe@att.com>, Bryan Butvick/SCCORP@SCCORP.COM
Subject: RE: Updated Status

Karen,
Thanks for the update.
I'm glad the program is going well.
We have received several (10 or so) complaint letters about the high fees.
We are simply advising the complainers that they may still exchange for free

through the transfer agent if they wish to do the work themselves.
Please insure that if people call to complain to GSC that they are provided
with the toll free number at EquiServe so they may handle the work on their
own.
We do not expect GSC to do the exchange for complainers and waive the fee
but
that is up to GSC.
Many people are not taking into consideration the cash portion and
thinking of the $7 fee as a high (35%) portion of the assets instead of
the more reasonable 12% of the assets including the cash.
I talked to your husband about this in comparison to the plan
handled by my old company. The fee there was $2 or about 5% of the assets.
He said GSC almost broke even on the SBC program.
We want to make sure GSC makes a reasonable profit on the program
while keeping the cost as low as possible.
In my opinion, based on the experience at the old company, the program
could still be profitable to GSC for a smaller per share fee (say $5 instead
of $7).
At the end of the program, we want to discuss the financial results with you
to make
sure the program was profitable for GSC while still keeping the fee as low
as possible
for future programs.
I told your husband that we appreciate GSC's willingness to discuss the
detailed financial
results of the programs so that future programs can be designed to be both
profitable and
shareowner friendly. This is what makes for a good ongoing relationship
between GSC and AT&T.
Thanks.

By the way, in comparison to the cold weather (5 below actual temp and much
colder
wind chill) I experienced in Kansas over the holidays, the weather in NJ is
beautiful.

Patrick Anderson
Director - Shareowner Services

AT&T Corp.
295 N. Maple Avenue, Room 3355C1
Basking Ridge, NJ 07920
908-221-2068 office
908-221-7307 fax
908-672-4432 cell
patrickanderson@att.com

-----Original Message-----
From: Karen Glazer [mailto:kglazer@sccorp.com]
Sent: Tuesday, January 09, 2001 11:14 AM
To: Holcombe, Claudia J, CFCMA
Cc: Anderson, Patrick L, CFCMA; Bryan Burvick
Subject: Updated Status

Hello Claudia & Patrick!  I figured that it was time to send you both a new
updated status report (which is attached below).

As you can see there has been a large increase in the response since the last
report you received.  We are extremely happy with the results so far.  We have
reached a response from over 11% of the Media Group holders and almost 20% of
the MediaOne holders.  Today alone we received approximately an additional 2,500
pieces of mail.  (This is not included on the report below.)

We have our Canadian based research team working on locating the Canadian
shareholders on both lists and our London based research team working on all of
the other foreign accounts.  Our research team here has also been hard at work.

As always, please feel free to call me (or Bryan) with any questions you may
have.

Claudia - I hope that you are all recovered and feeling better!

Patrick - How is the New Jersey weather treating you?

(See attached file: AT&T Media Client.xls)

Looking forward to speaking to you both soon!

Karen

G 0031

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

02 CV          8921

---

ALLAN H. STARR, as Executor of the
Estate of Elizabeth (Betty) Sampson,
individually and on behalf of all others
similarly situated,

                             Plaintiff,

           v.

GEORGESON SHAREHOLDER, INC.,
GEORGESON SHAREHOLDER
COMMUNICATIONS, INC.,
GEORGESON SHAREHOLDER
SECURITIES CORP., AND VODAFONE
GROUP, PLC,

                        Defendants.

Civil Action No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

JUDGE STANTON

---

Plaintiff, by his attorneys, individually and on behalf of all other persons similarly

situated, for his Complaint against the defendants, alleges as follows:

## NATURE OF THE ACTION

1.     This class action is based on federal securities law and New York (and/or other

states') statutory and common law, and is brought against defendants Georgeson Shareholder, Inc.

("Georgeson Shareholder"); its wholly-owned subsidiaries Georgeson Shareholder Communications,

Inc. ("Georgeson Communications") and Georgeson Shareholder Securities Corp. ("GSSC")

(collectively, "Georgeson"), and Vodafone Group, PLC ("Vodafone"). This suit involves

defendants' post-merger conduct during a share exchange pursuant to a July, 1999 merger between

Vodafone and AirTouch Communications, Inc. ("AirTouch"). The proposed Class consists of all

securityholders who, from July 2000 through the present, participated in a share exchange

administered by Georgeson, whereby they exchanged their old shares of AirTouch for shares of



ENTERED ON DOCKET
DATE 11/25/02 BY

Vodafone and a cash payment of $9.00 per share pursuant to the merger between the two companies, and were damaged thereby (the "Class").

2.      Vodafone authorized Georgeson to engage in a "post-merger clean-up," whereby Georgeson would send notices to shareholders who had not exchanged their shares a year after the Vodafone-AirTouch merger, to induce them to exchange their shares. The notice on its face appeared to have been sent jointly by Georgeson and Vodafone. The notice materially misled the shareholders into believing that they had no alternative but to exchange their shares through Georgeson, or else to forfeit all value of the shares. Georgeson charged an exorbitant "processing fee" for this service, which amounted to nine percent (9 %) of the value of each shareholder's stock. In reality, however, shareholders could have exchanged their shares directly through the issuer's transfer agent at no cost, or else contacted other brokers to exchange the shares at a much lower cost. Had the shareholders not been misled by Georgeson and Vodafone's notice -- or alternatively, had Vodafone properly discharged its obligations with respect to finding and notifying holders of unexchanged shares -- they would have exchanged their shares through other means and saved themselves the cost of Georgeson's unreasonable "processing fee."

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Securities Exchange Act of 1934 as amended (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and also 28 U.S.C. §§ 1332 and 1367. The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act, §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

4.      Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. §1391(a), (b), (c), and (d). Many of the acts and transactions giving rise to the violations of law alleged herein occurred in this District. Georgeson maintains its principal place of business in this District and regularly conducted business in this District throughout the Class Period. Moreover, Vodafone is a foreign corporation, and thus may be sued in any district.

5.      In connection with the wrongful conduct alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## THE PARTIES

6.      Plaintiff Allan H. Starr, currently residing in Philadelphia, Pennsylvania, was, at all times material hereto, the duly authorized agent of Elizabeth (Betty) Sampson pursuant to a Power of Attorney executed by Ms. Sampson on January 18, 1990. At the time, Ms. Sampson was 83 years of age and resided in Trenton, New Jersey. On June 10, 2002, Ms. Sampson passed away, and Mr. Starr became the duly appointed Executor of Ms. Sampson's Estate pursuant to her written will. Prior to the July 1999 merger, Ms. Sampson was the registered owner of 232 and 684 shares of AirTouch common stock (pursuant to Certificate numbers ZQ062981 and ZQ062982, respectively). In reliance upon Georgeson's and Vodafone's misleading solicitation Notice, Mr. Starr, on behalf of Ms. Sampson, exchanged the AirTouch shares belonging to Ms. Sampson through Georgeson during the Class Period, and as a result, she was charged an excessive "processing fee."

7.      Defendant Georgeson Shareholder is the parent company of a group of companies offering a variety of services relating to communications with shareholders, such as proxy

3

solicitation, broker dealer services, and consulting services to issuers. Georgeson Shareholder's headquarters and principal place of business is at 17 State Street, 28th Floor, New York, NY 10004.

8.    Defendant Georgeson Communications is a wholly-owned subsidiary of Georgeson Shareholder. Georgeson Communications handles direct communications with shareholders. Georgeson Communications has its principal place of business at 17 State Street, New York, NY 10004.

9.    Defendant GSSC is a wholly-owned subsidiary of Georgeson Shareholder. GSSC works to execute claims processing and communications with shareholders, and is a registered broker dealer. GSSC has its principal place of business at 17 State Street, 28th Floor, New York, NY 10004.

10.    Defendant Vodafone is an international mobile telecommunications company based in the United Kingdom. In 1999, Vodafone merged with AirTouch, a San Francisco-based international mobile telecommunications company. Pursuant to the merger, AirTouch became a subsidiary of Vodafone.

## CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action individually and as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf all persons who, during the Class Period of July, 2000 through the present, exchanged their AirTouch common stock for Vodafone using Georgeson as the exchange agent (the "Class"). Excluded from the Class are the defendants herein and any entity in which any of the defendants has or had a controlling interest, any person or entity affiliated with any of the defendants, and the legal representatives, heirs, successors or assigns of any of the defendants.

4

12.     The Class is so numerous that joinder of all members is impracticable. At the time of the merger, AirTouch had approximately 496,417 shareholders of record. While the exact number of Class members is presently unknown and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds, perhaps even thousands, of Class members located throughout the United States who similarly exchanged their AirTouch shares through Georgeson during the Class Period.

13.     Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class. Among the common questions of law and fact are:

a.     whether Georgeson violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder;

b.     whether Vodafone violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder;

c.     whether Georgeson violated New York and/or other states' similarly applicable consumer protection laws;

d.     whether Georgeson was unjustly enriched by its conduct in handling the post-merger clean-up,

e.     whether defendants acted with scienter in pursuing the acts alleged herein;

f.     whether defendants participated in the course of conduct complained of herein; and

g.     whether plaintiff and the other members of the Class sustained damages because of defendants' conduct, and the appropriate measure of damages.

14.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other Class members have sustained damages that arise from, and were caused by, defendants' wrongful acts alleged herein.  Plaintiff does not have interests antagonistic to, or in conflict with, the other members of the Class.

15.    Plaintiff will fairly and adequately protect the interests of the other members of the Class and has retained competent counsel experienced in class action and securities litigation.

16.    Defendants have acted on grounds applicable to the entire Class, thereby making final relief appropriate with respect to the Class as a whole.

17.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Furthermore, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class to seek redress individually for the wrongs they have suffered.

## SCIENTER

18.    Georgeson and Vodafone were aware of or recklessly disregarded the fact that their Notices to shareholders were materially misleading, giving shareholders the false impression that they had no choice but to exchange their AirTouch shares through Georgeson and pay Georgeson's excessive fee. Georgeson had a strong motive to create this false impression because its "processing fee," amounting to 9 % of the gross value of the shares and cash that the AirTouch shareholders were entitled to receive, was much higher than the amount charged by other brokers for such a transaction. Moreover, the shareholders could have contacted the issuer's transfer agent directly and exchanged

6

their shares for free. Georgeson knew this information and was fully aware that a reasonable shareholder, when clearly apprised of these alternative means to exchange shares, would have acted to avail herself of either these free or less expensive options. Thus, it was in Georgeson's self-interest that the shareholders not inquire about any of these cheaper alternative ways to exchange their shares-- a result Georgeson achieved through its misleading Notices. Likewise, it was in Vodafone's interest to mislead shareholders into exchanging their shares through Georgeson; otherwise, Vodafone would have had to pay for Georgeson's services, rather than passing its fees along to unsuspecting shareholders. Additionally, the fact that numerous shareholders chose to redeem their shares through Georgeson should have alerted both Georgeson and Vodafone that the shareholders were being misled into believing they had no choice but to exchange their shares through Georgeson.

19.     Georgeson created a prime opportunity to extract this abusive "processing fee" from shareholders by setting up its "post-merger clean-up" service, and by actually sending the Notices to shareholders. The client contracting for this "post-merger clean-up" service (*i.e.* the stock issuer) is not the person who ultimately pays for the service. As a result, Georgeson can charge essentially whatever it wants, as long as the shareholders do not question the fee or compare rates. Vodafone gave Georgeson the opportunity to materially mislead the AirTouch stockholders by hiring Georgeson for the "post-merger clean-up," and by approving the form of the Notice (which bears Vodafone's corporate logo, see Exhibit "A".)

20.     As discussed in more detail below, the misleading nature of the Notice is apparent on its face. See paragraph 34 and passim. Therefore, both Georgeson and Vodafone should have been aware that the Notice would mislead shareholders.

7

21.     Georgeson (especially GSSC, a registered broker-dealer) was on notice of the deceptive and wrongful nature of its conduct by virtue of various NASD rules of conduct for brokers. NASD Rule 2430 requires that "[c]harges, if any, for services performed, including miscellaneous services such as collection of moneys due for principal, dividends, or interest; exchange or transfer of securities; appraisals, safe-keeping or custody of securities, and other services, shall be reasonable and not unfairly discriminatory between customers." Additionally, NASD Rule 2440 sets forth the Association's "5 % Policy", which holds that mark-ups on securities transactions should generally not exceed 5 % of the value of the stock.   Therefore, Georgeson should have known that a "processing fee" amounting to 9 % of the value of a shareholder's stock can hardly be considered reasonable.

## SUBSTANTIVE ALLEGATIONS

### The Vodafone-AirTouch Merger

22.     Vodafone is a publicly held telecommunications company organized under the laws of the United Kingdom.

23.     AirTouch was a publicly held telecommunications company incorporated in Delaware and with its principal place of business in San Francisco, California.

24.     Vodafone and AirTouch officially merged on July 30, 1999.   Pursuant to the terms of the merger, shareholders of AirTouch were to receive, for each share of AirTouch common stock, five (5) "ordinary" Vodafone shares (to be delivered in the form of .5 of a Vodafone ADS, one ADS being equal to 10 ordinary shares), plus a cash payment of $9.00.

25.     On September 30, 1999, Vodafone declared a capitalization issue of stock, such that for each Vodafone ordinary share, shareholders would receive four (4) additional Vodafone ordinary

shares. As a result, the AirTouch shareholders were entitled to receive 25 ordinary shares (in the form of 2.5 Vodafone ADSs), plus the $9 in cash, for each AirTouch share.

26.    After the merger, because AirTouch had ceased to exist, AirTouch stock was no longer publicly traded. Holders of electronic (or "street name") shares in brokerage accounts had their stock automatically converted into the Vodafone ADSs and cash as set forth in the merger agreement. However, there remained a substantial number of holders of paper shares. According to the terms of the merger agreement, they would be required to tender their shares to the transfer agent in order to receive the Vodafone ADSs and cash payment.

**Initial Notices to Shareholders**

27.    After the merger, but before Georgeson became involved, Vodafone, through its transfer agent, Equiserve, sent notices to holders of AirTouch paper shares informing them that they needed to tender their shares in order to receive their Vodafone ADSs and cash.

28.    Plaintiff's attorneys' investigation indicates that the shareholders who exchanged their shares through Equiserve during this time were probably not charged a processing fee.

29.    It is unknown whether the Equiserve notices informed shareholders that there was a deadline, after which they could no longer exchange their shares at no cost.

30.    One year after the merger, there still remained shareholders who had not exchanged their shares. Equiserve kept a record of the shareholders who did not respond to its notices.

**Vodafone Hires Georgeson for "PostMerger Clean-Up"**

31.    A "post-merger clean-up," according to Georgeson's web site, involves tracking down missing shareholders and soliciting them to exchange their shares. Essentially, Georgeson touts its services as a way for companies to outsource their task of communicating with shareholders. The

9

purpose of a post-merger clean-up is to reduce the issuer's costs of sending mailings, maintaining inactive shareholder accounts, and compliance with escheatment laws.

32.    Approximately one year after the merger, Vodafone retained Georgeson as its agent for purposes of this post-merger clean-up; that is, to contact shareholders who had not responded to previous notification to exchange their shares following the merger. Vodafone approved the form of the Notice sent to shareholders, as evidenced by its corporate logo at the top of the Notice.

## Georgeson's Notices to Shareholders

33.    For a period of time believed to be July 2000 through the present, Georgeson sent Notices to the remaining AirTouch shareholders to solicit them to exchange their shares. These Notices bore various titles, such as "Third Notice" or "Final Notice," but the contents of all the Notices were the same.

34.    The standard Notice consisted of a cover letter, plus a form that contained, on one side, a generic "Dear Shareholder" section laying out the basics of the share exchange; and on the other side, a "Questions and Answers" section. At the bottom of the Notice was a perforated "Claim Card" that shareholders were required to detach, fill out, sign, and return to Continental Stock Transfer & Trust Company c/o Georgeson.

35.    The Notice requires shareholders to tender their old AirTouch stock in order to receive the Vodafone ADSs and cash payment to which they were entitled under the terms of the merger. In addition, the Notice states that Georgeson would deduct a "processing fee" of $3.50 per Vodafone ADS that the shareholder was entitled to receive.

36.    The Notice is highly misleading, giving shareholders the intended impression that they have no alternative but to promptly exchange their shares through Georgeson, either because

10

the shares will escheat to the state as abandoned property, or, because the shares will have no worth unless tendered to Georgeson through its notification program. A copy of the Notice is attached hereto as Exhibit "A." The misleading statements and omissions are as follows:

a.    The Notice implies that Georgeson is the official means for exchanging one's shares (and thus, by implication, there is no alternative way to exchange the shares). It begins by stating: "Our records show that you still have shares of AirTouch Communications, Inc. ('AirTouch')." Also, it says "Georgeson [ ] has now been retained to assist you in claiming your Vodafone ADSs and cash payment." Even though the cover letter and the Notice refer to the shareholder claim process as being "voluntary," the Notice states that "[t]here is no longer a market for these shares," while the "Question and Answer" section asks "Why must I exchange my AirTouch Communications, Inc. stock certificate(s)?" (emphasis added). The Notice also states that "Georgeson [ ] is being permitted to administer this notification program from the date of this letter until **February 19, 2001**" (bold type in original). These statements give the impression that Vodafone appointed Georgeson as its official, and therefore exclusive, exchange agent, and further that failure to act will result in loss of all possible value of the "old" AirTouch stock since those shares "are no longer traded."

b.    The Notice also implies that the shareholders are too late to participate in the "regular" (free) share exchange, and that Georgeson has been given responsibility by Vodafone for administering a "special" exchange for delinquent shareholders, using statements such as: "[a]t various times, you have been notified to send in your stock

11

certificate(s) . . .Georgeson Shareholder Communications, Inc. has now been retained to assist you . . ."

c.      The Notice is also designed to create false urgency to act, citing past Notices that were sent, and warning that "**[T]here is no benefit in continuing to hold your old shares.**" (bold type in original).  At the same time, the Notice cautions that "if you continue to do nothing, your assets will be turned over to state authorities under the abandoned property laws;" and, on the reverse side, again the Notice warns that "*[i]f you do not claim your Vodafone ADSs and cash consideration, eventually they will be turned over to state authorities under the abandoned property laws*" (italics in original).

d.      Furthermore, the Notice claims that the "processing fee of $3.50 per Vodafone ADS due you" exists "to defray the cost of providing you this service."

e.      In conjunction with these deceptive statements, material information was deliberately omitted from the Notice that was necessary to make the Notice not misleading.

i.      The shareholders were not given sufficiently detailed information about the so-called "processing fee," as it would be applied specifically to them, to make an informed decision about whether or not to exchange their shares through Georgeson.  Because the Notice did not illustrate this computation, or specifically disclose the actual percentage of Georgeson's fee relative to the overall exchange, each shareholder would have to perform a complicated mathematical exercise in order to determine their total fee, or the percentage of their property that was being forfeited to pay that fee.  Instead, the Notice confusingly reads as follows, after stating the $3.50 processing fee: "As a result of the merger, you are entitled to five

12

ordinary shares of Vodafone (in the form of American Depository Shares each Vodafone American Depository Share ("Vodafone ADSs) representing ten Vodafone ordinary shares listed on the New York Stock Exchange as an ADR) plus a cash payment of $9.00 for each AirTouch share you hold. Additionally, on September 30, 1999, Vodafone declared a capitalization issue which was made on the basis of four new shares for every one share held."

      ii.     Nowhere does the Notice inform the shareholders that they could altogether avoid any Georgeson fee by exchanging their shares for free by sending them directly to the issuer's transfer agent, or, in the alternative, that the shareholders could pay a minimal fee far less than Georgeson's by merely paying a broker to liquidate their old AirTouch stock.

37.     All of these misstatements and omissions, viewed together, gave the impression that AirTouch shareholders had no choice but to exchange their shares through Georgeson, and that the processing fee was both necessary to cover Georgeson's valid expenses and unavoidable if they wanted to reclaim any value for their stockholdings before escheatment.

38.     However, this impression was completely false. First, Georgeson was not the exclusive means for shareholders to exchange their shares. The shareholders could have contacted the exchange agent, Equiserve, and exchanged their shares for free. Alternatively, any broker could have processed this share exchange, and at a much lower cost than $ 3.50 per Vodafone ADS.

39.     Furthermore, the "processing fee" bears no legitimate relation whatsoever to Georgeson's actual costs in administering the share exchange. Although in some cases Georgeson may have had to perform some research to track down missing shareholders, the cost of this service,

13

plus the mailings and administrative costs, were far less than $3.50 per Vodafone ADS. For example, a "locator service," which performs similar searches to find absent class members in class action cases, charges on average $3 for each search, and around $15 to $20 for each successful search. In reality, Georgeson's fee was an unconscionable contingency fee, with a built-in multiplier based purely on the amount of shares to be received by each individual, despite the fact that the same amount of effort went into searching for a shareholder entitled to receive 10 shares, as for a shareholder entitled to receive 1000 shares.

### Allan H. Starr Exchanges AirTouch Shares In Response to Georgeson's Mailing

40.    Allan H. Starr, as agent for Elizabeth Sampson pursuant to her Power of Attorney, submitted two groups of AirTouch stock on her behalf. Ms. Sampson received a "Third Notice" dated November 8, 2000, and a "Final Notice," dated January 8, 2001, for each of the two registered stock certificates she held (each in the amount of 232 and 684 shares, respectively). Believing that Georgeson was the exclusive exchange agent for Vodafone, and that she had no choice but to pay the processing fee if she had any chance of recouping economic value for stock which was no longer traded, Starr, acting on behalf of Ms. Sampson, responded to Georgeson's Notices and tendered Ms. Sampson's shares to Continental on January 2, 2001.

41.    Ms. Sampson held a total of 916 AirTouch shares. According to the terms of the merger, Ms. Sampson should have received 2290 Vodafone ordinary shares, plus $8,264 in cash.

42.    However, Georgeson deducted its "processing fee" of $3.50 per Vodafone ADS from that cash payment. The total amount of the processing fee paid by Ms. Sampson came to **$ 8,015, or 9.07 % of the value of her stock.**

14

43.     Mr. Starr, on behalf of Ms. Sampson, received this cash payment in January 2001. On January 16, 2002, he wrote to Karen Glazer, who was listed as Georgeson's Senior Account Executive in the Notice, inquiring about the shortfall in Ms. Sampson's expected remuneration from the exchanged shares.  He received a response dated January 28, 2002 from Richard Walter, Compliance Supervisor, stating: "No additional monies are due."

44.     Mr. Starr and the other Class Members relied on, and were deliberately mislead by, the material misrepresentations and omissions in the Notice.  The shareholders were tricked into believing that they had only two choices: pay Georgeson the exorbitant processing fee to receive at least some of the value of their shares before it would be too late, or else forfeit their shares to the state under the abandoned property laws.  In reliance on this misleading Notice, and as a direct result of the material information omitted therefrom, plaintiff and the Class were convinced that Georgeson was the sole, official agent of Vodafone for the exchange, and they did not look for either less expensive or even free means to exchange their shares.  Had the Class known that they could have exchanged their shares for free by contacting the exchange agent directly, or could have paid a nominal amount by merely contacting another broker, they would have done so, and thereby saved substantial amounts of money.

## COUNT I

### Against the Georgeson Defendants and Vodafone for Violation of Section 10(b) of the Exchange Act and Rule 10b-5

45.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

46.     Defendants Georgeson Shareholder, Georgeson Communications, GSSC, and Vodafone employed a manipulative and deceptive device, scheme or artifice to defraud in violation

15

of SEC Rule 10b-5(a); omitted to disclose material facts necessary to make statements they made, in the light of the circumstances under which they were made, not misleading, in violation of SEC Rule 10b-5(b); and engaged in an act, practice or course of business which operated as a fraud or deceit in violation of SEC Rule 10b-5(c), in connection with Georgeson's processing of the AirTouch share exchange for plaintiff and members of the Class during the Class Period. Defendants' manipulative and deceptive devices and practices included, *inter alia*, sending a false and misleading Notice to AirTouch shareholders as part of a "post-merger clean-up", deceiving the Class into thinking that Georgeson was the exclusive agent by which they could exchange their AirTouch shares, and deliberately neglecting to inform shareholders that they could exchange their shares directly through the transfer agent at no cost, so that Georgeson could extract an exorbitant processing fee for carrying out the share exchange and Vodafone could avoid paying the cost for this "post-merger" cleanup service.

47.     As a result of defendants' manipulative and deceptive devices and practices alleged herein, plaintiff and the other persons who exchanged their shares during the class period paid an unreasonable and excessive processing fee for the share exchange. Among other things, that fee was based on the number of shares to be received by each shareholder, and not the number of AirTouch shares already held. Moreover, defendants' misleading Notice dissuaded these shareholders from searching out alternative means to exchange their shares, which did in fact exist and were substantially cheaper than Georgeson. Plaintiff and the other shareholders who exchanged their shares through Georgeson during the class period were injured by defendants' deceptive and manipulative practices because they paid more for the exchange than they would have absent the misleading Notice.

16

48.     The specific misleading and deceptive statements relied upon by plaintiff and the Class were all contained in the various Notices that Georgeson Communications, together with Vodafone, sent to AirTouch shareholders during the Class Period.  Although the Notices were sent on various dates within the Class Period, the contents of every Notice was the same.  The misleading nature of the Notices is as follows:

a.     The Notice misleads the average investor into believing that Georgeson was the sole means for exchanging one's shares.  This impression was created by Georgeson's implication that it was the "official" exchange agent, and its phrasing of the shareholders' choices as twofold: either exchange through Georgeson to receive economic entitlements for old AirTouch stock which were not available elsewhere, or, allow the shares to escheat to the state.  The Notice begins by stating: "Our records show that you still have shares of AirTouch Communications, Inc. ('AirTouch')."  Also, it says "Georgeson [ ] has now been retained to assist you in claiming your Vodafone ADSs and cash payment." (emphasis added).

b.     The Notice also misleads the average shareholder by implying that the shareholders are too late to participate in the "regular" share exchange, and that Georgeson was responsible for administering a "special" exchange for delinquent shareholders, using statements such as: "[a]t various times, you have been notified to send in your stock certificate(s) . . . Georgeson Shareholder Communications, Inc. has now been retained to assist you . . ."  "Georgeson [ ] is being permitted to administer this notification program from the date of this letter until (deadline) . . ."

17

I

c.    The Notice also misleads the average investor through its urgent tone. The Notice refers to past Notices that were sent, and warns that "if you continue to do nothing, your assets will be turned over to state authorities under the abandoned property laws;" and, **"There is no benefit in continuing to hold your old shares."** (boldface type in original). On the reverse side, again the Notice warns that "*[i]f you do not claim your Vodafone ADSs and cash consideration, eventually they will be turned over to state authorities under the abandoned property laws*" (italics in original).

d.    Furthermore, the Notice misleads the reasonable shareholder into believing that the fee of $ 3.50 per Vodafone ADS was related to the actual costs of the share exchange, and was necessary and justified because Georgeson had made a special effort to reach the missing shareholders (and/or taken together with other statements in the Notice, that the shareholders were too late to participate in the normal exchange and were lucky to be getting anything at all). The Notice consistently calls this fee a "processing fee", and states that the fee exists "to defray the cost of providing you this service" – immediately after the paragraph stating that several attempts had been made to reach the shareholder, and that (because of the delay) Georgeson has now been called in to carry out the exchange.

49.    Due to the misleading nature of the above statements, Georgeson and Vodafone had a duty to disclose the material facts necessary to permit the shareholders to make an informed decision about whether or not to exchange their shares through Georgeson.

18

50.     In connection with their manipulative and deceptive devices and practices alleged herein, defendants used the means or instrumentalities of interstate commerce and the mails.

51.     By virtue of the foregoing, defendants have violated section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c).

52.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the proposed Class incurred damages in an amount to be proven at trial.

53.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing or historical facts, conditions, or opinions, and therefore were not forward-looking statements.

## COUNT II

### Against Georgeson for Violation of Section 10(b) of the Exchange Act And Rule 10b-5(b):  Excessive Markup

54.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

55.     In connection with the wrongful practices alleged herein, Georgeson made untrue statements of material fact, and omitted to disclose material facts necessary to make statements they made, in light of the circumstances under which they were made, not misleading in violation of SEC Rule 10b-5(b).  Defendants' material misrepresentations and omissions contained in Georgeson's Notice to Shareholders concerned, *inter alia*, the suggestion that Georgeson was the exclusive means for shareholders to exchange their shares; the statement that the "processing fee" was reasonably related to the actual cost of administering the exchange; Georgeson's failure to inform shareholders that they could have exchanged their stock directly through the transfer agent at no cost, or through

19

other brokers at a much lower cost; and the unclear and misleading nature of setting forth the processing fee, which did not clearly inform shareholders of their total processing fee they would have to pay or the percentage of their stock that would be forfeited through the processing fee; all as alleged more fully herein.

56.    Georgeson had a duty to disclose all material information that a reasonable shareholder would need to make an informed decision about whether or not to engage in this transaction with Georgeson. When a broker-dealer such as Georgeson charges an excessive markup on the price of stock, the broker-dealer has a duty to disclose the markup and any other material information needed to permit the customer to make an informed judgment upon whether or not he will complete the transaction.

57.    Georgeson breached this duty by failing to inform plaintiff and the Class that its markup (i.e. the "processing fee") bore no reasonable relation to its actual transaction costs and/or the actual price of exchanging Vodafone stock elsewhere in the market, and by misleading plaintiff and the Class into believing that they had no choice but to exchange their shares through Georgeson and pay the exorbitant fee (which was based on the number of shares to be received, not the number of AirTouch shares actually held).

58.    Georgeson knew or recklessly ignored that it had breached its duty, and that its statements were thereby false and misleading at the time they were made. Facts demonstrating Georgeson's knowledge or recklessness are more fully set forth in the preceding paragraphs.

59.    As a result of Georgeson's materially false and misleading statements and omissions, plaintiff and the Class paid an excessive markup on the cost of the AirTouch-Vodafone share exchange and were damaged thereby. Had plaintiff and the other Class members known that

20

Georgeson's fee was unrelated to the actual cost of administering the share exchange, that they could have exchanged their shares directly through the transfer agent at no cost, and/or the actual amount of the fee as a basis for comparison shopping, plaintiff and the Class members would have exchanged their shares through the transfer agent or through a broker other than Georgeson, at either no cost or a lower cost.

60.    As a direct and proximate result of defendants' wrongful conduct alleged herein, plaintiff and the other members of the proposed Class suffered damages in an amount to be proven at trial.

61.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing or historical facts, conditions, or opinions, and therefore were not forward-looking statements.

### COUNT III

**Against Georgeson for Violation of New York**
**General Business Law § 349 and/or Other States' Consumer Protection Laws**

62.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

63.    Georgeson engaged in a consumer-oriented practice that was materially deceptive or misleading in a material respect: namely, sending its Notice to Shareholders, which as alleged in more detail above, misled shareholders into believing that they had no alternative but to exchange their shares through Georgeson and pay their unreasonable processing fees.

64.    Georgeson's Notice to AirTouch shareholders was a "consumer-oriented practice" under the Act because it had an impact on the public at large: specifically, holders of unexchanged

21

AirTouch shares. In addition, Georgeson uses substantially similar notices and practices in administering its "Post-Merger CleanUp" service for other companies, so this practice has a wider impact on the public as a whole.

65.     As a result of Georgeson's materially false and misleading statements and omissions contained in its Notice, plaintiff and the Class paid an excessive "processing fee" for the AirTouch-Vodafone share exchange and were damaged thereby. Had plaintiff and the other Class members known that Georgeson's fee was unrelated to the actual cost of administering the share exchange, or that they could have exchanged their shares directly through the transfer agent at no cost, plaintiff and the Class members would not have exchanged their shares through Georgeson.

## COUNT IV

### Against Georgeson for
### Unjust Enrichment

66.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

67.     Georgeson was enriched, and plaintiff and the Class were impoverished, by Georgeson's solicitation of AirTouch shareholders for the share exchange, which included Georgeson's charging plaintiff and the Class an exorbitant "processing fee" per exchange.

68.     There was no justification for Georgeson's enrichment, and the circumstances are such that in equity and good conscience Georgeson should return the money to plaintiff and the Class. Georgeson's enrichment was unjust because, inter alia:

a.      AirTouch, in its proxy materials and the merger agreement, had assured plaintiff and the Class that they would be able to exchange their shares for free, and Vodafone's retention of Georgeson allowed Vodafone to renege on this promise;

22

b.    Georgeson's "processing fee" bore no reasonable relation to the actual cost of conducting the searches and processing the share exchange;

c.    Georgeson's "processing fee" was exorbitant, divesting shareholders of nine percent of the value of their stock;

d.    Georgeson's Notice to the AirTouch shareholders was highly misleading, as alleged in more detail above.

69.    Plaintiff and the Class paid Georgeson the "processing fee" under duress, since they were misled into believing they had no alternative but to exchange their shares through Georgeson.

70.    There is no adequate remedy at law for plaintiff's and the Class' injury.

## BASIS OF ALLEGATIONS

Plaintiff makes the foregoing allegations on investigation by, and advise of, counsel, except those pertaining to Georgeson's and Vodafone's Third and Final Notice to AirTouch shareholders which are based upon plaintiff's personal knowledge.  Plaintiff's information is based upon the investigation conducted by, and advise of, his attorneys, which included, *inter alia*, a review of various SEC filings, conversations with experts on mergers and "post-merger clean-ups," and information posted on Georgeson's web site, www.georgeson.com.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

23

B.      Certifying plaintiff as the representative of the Class and his counsel as counsel for the Class;

C.      Awarding compensatory damages against all defendants, jointly and severally, in favor of plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

D.      Awarding plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

E.      Awarding plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated:   November 8, 2002

COHEN, MILSTEIN,
HAUSFELD & TOLL, PLLC

Linda P. Nussbaum (LN-9336)
825 Third Avenue, 30th Floor
New York, NY 10022
(212) 838-7797

– and –

H. Laddie Montague
Peter Kahana
Jenna MacNaughton-Wong
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103-6365
(215) 875-3000

*Counsel for Plaintiff*

24

## AIRTOUCH COMMUNICATIONS, INC. ("ATI")
## AND VODAFONE GROUP, PLC ("VOD")
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Allan H. Starr ("Plaintiff"), Executor of the Estate of Elizabeth "Betty" Sampson, duly swears and says, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a draft complaint to be filed on my behalf against Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc., Georgeson Shareholder Securities Corp., and Vodafone Group, PLC. I approve of its contents, and I authorize its filing. I authorize Berger & Montague, P.C. and Cohen, Milstein, Hausfeld & Toll, PLLC, to represent me in this action.

2.    I did not enter the transaction that is the subject of this case at the direction of my counsel or in order to participate in this private action.

3.    I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions on behalf of decedent Elizabeth Sampson in the securities of AirTouch Communications, Inc. and Vodafone Group, PLC  between and including July 1, 2000 through the present (the "Class Period") are as follows:

I exchanged Ms. Sampson's AirTouch stock for Vodafone stock pursuant to a merger between the two companies. By the terms of the merger, for each ordinary share of AirTouch common stock, Ms. Sampson was to receive 5 "ordinary" Vodafone shares (to be delivered in the form of .5 of a Vodafone ADS, one ADS being equal to 10 ordinary shares), plus a cash payment of $9.00. Additionally, Vodafone declared an added capitalization issue shortly after the merger, which entitled her to four extra Vodafone ordinary shares for every one ordinary share held. Therefore, the total compensation she should have received was 2.5 Vodafone ADSs, plus $9 cash, per share of AirTouch. However, Georgeson deducted a "processing fee" of $3.50 per Vodafone ADS from the cash proceeds. The dates and amounts of the stock exchanged are:

| AIRTOUCH SHARES TENDERED | DATE OF TENDER | CONSIDERATION RECEIVED PER AIRTOUCH SHARE |
|---|---|---|
| 684 | 01/02/2001 | 2.5 Vodafone ADSs plus $ 0.25 |
| 232 | 01/02/2001 | 2.5 Vodafone ADSs plus $ 0.25 |

5.    I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

1

6.    I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, as ordered or approved by the court, except for any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ___7___ day of _Nov_, 2002, at _Philadelphia PA_____ County.

By:    _____
       Alan H. Starr
       Executor of the Estate of Elizabeth Sampson

       Print Name:    _ALLAN H. STARR_

       Address:    Pier 5, No. 121
                   7 North Columbus Boulevard
                   Philadelphia, PA  19106

2



**GEORGESON SHAREHOLDER** COMMUNICATIONS INC.

January 8, 2001

Re: <u>**VODAFONE GROUP PLC**</u>

Dear Shareholder:

Enclosed, you will find materials relating to the exchange of your **AirTouch Communications, Inc. ("AirTouch")** shares for the **Vodafone Group Plc ("Vodafone")** ADS shares due you.

In the past several months, we have made numerous attempts to notify you of these unexchanged shares.

If you do not recall purchasing or being given AirTouch shares, you may have received these shares in 1994 as a spin-off from shares you held in Pacific Telesis Group. Pacific Telesis Group was part of the big break up of AT&T Corp. in 1984.

To participate in this exchange program, please read the materials provided, sign the enclosed claim card and return it to us, along with your AirTouch Communications, Inc. certificates. Even if you have lost your stock certificate(s), you may still participate in this voluntary program.

If you have any questions, feel free to call us, toll free, at **1 (800) 678-9606** and we will be happy to assist you.

Sincerely,

Karen Glazer
Senior Account Executive

# FOR ASSISTANCE, PLEASE CALL:
# 1(800) 678-9606


**GEORGESON SHAREHOLDER COMMUNICATIONS INC.**


**vodafone**

## FINAL NOTICE FOR HOLDERS OF
## AIRTOUCH COMMUNICATIONS, INC. COMMON STOCK

January 8, 2001

Dear Shareholder,

Our records show that you still have shares of **AirTouch Communications, Inc. ("AirTouch").** There is no longer a market for these shares as a result of the merger with **Vodafone Group Plc ("Vodafone")** in July 1999. As a result of the merger you are entitled to five ordinary shares of Vodafone (in the form of American Depositary Shares each Vodafone American Depositary Share ("Vodafone ADSs") representing ten Vodafone ordinary shares listed on the New York Stock Exchange as an ADR) plus a cash payment of $9.00 for each **AirTouch** share you hold. Additionally, on September 30, 1999 Vodafone declared a capitalization issue which was made on a basis of four new shares for every one share held. On January 3, 2001, Vodafone ADSs traded on the New York Stock Exchange at approximately $34 per ADS. Both the number of AirTouch shares you own and Vodafone ADSs plus your cash entitlement are indicated on the attached Claim Card.

At various times, you have been notified to send in your stock certificates(s) in exchange for Vodafone ADSs and the cash distribution. Georgeson Shareholder Communications Inc. has now been retained to assist you in claiming your Vodafone ADSs and cash payment. To claim your Vodafone ADSs, you may complete the Claim Card below and return it along with your stock certificate(s) in the envelope provided. *Even if you have lost your certificate(s), you may still participate in this voluntary program.*

*You may choose to receive your Vodafone ADSs or have them sold on the New York Stock Exchange and receive their cash value.* In order to defray the cost of providing you this service, a processing fee of $3.50 per **Vodafone ADS** due you will be deducted from your proceeds and paid to Georgeson Shareholder Securities Corporation, a registered broker dealer. The Vodafone ADSs and cash to which you are entitled cannot be sent to you until you surrender your old certificate(s). Eventually, if you continue to do nothing, your assets will be turned over to state authorities under the abandoned property laws.

Please read the enclosed material carefully. **There is no benefit in continuing to hold your old shares.** Georgeson Shareholder Communications Inc. is being permitted to administer this notification program from the date of this letter until **February 19, 2001.** If you have questions after reading this material, call **Georgeson Shareholder Communications Inc.,** toll-free, at 1 (800) 678-9606 for assistance.

Yours faithfully,

| PIN:   95463    DATABASE: AIRTOUCH |
|---|

Georgeson Shareholder Communications Inc.

-- ✂ Detach along perforation ----------------------------------------------------- ✂ --

## CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF AIRTOUCH COMMUNICATIONS, INC.
## SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY
C/O: GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11TH FLOOR, NEW YORK, 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from Vodafone Group Plc, dated January 8, 2001. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a $3.50 per Vodafone ADS processing fee is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the costs of assisting me with this special exchange effort.

For W-9 purposes, you must insert your social security number (or TAX ID number) in the box below. By signing this card, I certify that the following Tax identification number is accurate and that I am not subject to back up withholding.

Enter
Social Security # :

AIRTOUCH SHARES:   232.0000
VODAFONE SHARES:   580.0000
CASH DUE:  $ 2088.00

DATABASE: AIRTOUCH
PIN:   95463    ACCT#:  09000371601

10665    BETTY SAMPSON
C/O ALLAN H STARR
910 SUMNEYTOWN PIKE
HARLEYSVILLE PA 19438-1239

**CHECK ONE**

☐ SELL ALL MY VODAFONE ADSs

☐ RECEIVE MOST VODAFONE ADSs (SELL ONLY ENOUGH, IF ANY, NECESSARY TO COVER THE PROCESSING FEE AND, IF APPLICABLE, LOST SHARE FEE)

**SIGN**

X _____
SIGNATURE OF OWNER

X _____
SIGNATURE OF CO-OWNER, IF ANY

NOTE: If a certificate(s) for your shares is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions of the Statement/Affidavit described on the back of this card.

MY DAYTIME PHONE NUMBER IS (        )_____

## QUESTIONS AND ANSWERS

**1. Why must I exchange my AirTouch Communications, Inc. stock certificates(s)?**

In July 1999, Vodafone Group Plc merged with AirTouch Communications, Inc. As a result, your old shares are no longer traded. You now need to send in your "old" AirTouch certificate(s) for the Vodafone ADSs and cash payment due to you, plus any unclaimed dividend. *If you do not claim your Vodafone ADSs and cash consideration, eventually they will be turned over to state authorities under the abandoned property laws.*

**2. What will I receive if I sell my Vodafone ADSs?**

If you choose to sell your **Vodafone** ADSs, they will be sold on the New York Stock Exchange and all participating shareholders will receive the same weighted average price per share based on all shares sold as part of the program. **Vodafone** ADSs recently traded at approximately **$34** per Vodafone ADS. You will be sent the proceeds of the sale of your Vodafone ADSs plus the cash payment due to you approximately 3-to-4 weeks after the expiration date found on the front of this notification. The **$3.50** per **Vodafone** ADS processing fee and, if applicable, **$1** per lost **Vodafone** ADS fee, will be deducted from the cash consideration you would otherwise be entitled to and, if necessary, from proceeds of the sale. *We can make no recommendation as to whether or not you should sell your Vodafone ADSs.*

**3. What if I choose to receive my Vodafone ADSs?**

If you choose to receive your **Vodafone** ADSs, and if the cash consideration you would otherwise be entitled to receive is insufficient to cover the **$3.50** per **Vodafone** ADS processing fee, only enough of your ADSs will be sold to cover any remaining portion of the **$3.50** per **Vodafone** ADS and, if applicable, **$1** per lost **Vodafone** ADS. You will be sent the remainder of your Vodafone ADSs along with the cash due to you approximately 3-to-4 weeks after the expiration date found on the front of this notification.

**4. What if I don't have my AirTouch certificate(s)?**

Complete the Claim Card and your shares will be replaced for the purpose of exchange, subject to an **additional $1 per lost Vodafone ADS** deduction from proceeds, as provided for by the Statement/Affidavit on the back of Claim Card below.

**5. How do I complete the Claim Card?**

Simply mark one box indicating your choice of action and sign exactly as your name is listed on the card. If more than one name is listed, both parties must sign. If the name of the owner has changed, enclose a copy of legal documents, such as a death certificate, marriage license or, to prove your age, a driver's license. Your signed Claim Card must be received in good order no later than **February 19, 2001.** Any further questions, please call 1 (800) 678-9606.

If you need assistance, please call:

## GEORGESON SHAREHOLDER
COMMUNICATIONS INC.

**Toll Free Nationwide 1 (800) 678-9606**

---

### STATEMENT/AFFIDAVIT FOR LOST STOCK CERTIFICATES OF AIRTOUCH COMMUNICATIONS, INC.

By signing the front of this Claim Card, I agree to the following: I am the lawful owner of the shares described on the front of this card. My missing certificate(s) has not been endorsed, cashed, negotiated, transferred, assigned or otherwise disposed of. I have made a diligent search for the certificate(s) and have been unable to find it (them) and I make this Statement/Affidavit for the purpose of exchanging or inducing the liquidation of the certificate(s) without surrender of the certificate(s), and the exchange or sale of the shares represented thereby, and hereby agree to surrender the certificate(s) for cancellation should I, at any time, find the certificate(s). I, hereby agree, for myself, my heirs, assigns and personal representatives, that in consideration of the exchange or of the proceeds of the exchange and sale of the shares represented by the certificate(s) to completely indemnify, protect and hold harmless Vodafone Group Plc, EquiServe Llc., Georgeson Shareholder Communications Inc., Georgeson Shareholder Securities Corporation, Travelers Casualty and Surety Company of America and any other party to the transaction (the "Obligees"), from and against all losses, costs and damages, including court costs and attorneys' fees, which they may be subject to or liable for in respect of the cancellation and replacement of the certificate(s). The rights accruing to the Obligees under the preceding sentence shall not be limited by the negligence, inadvertence, accident, oversight or breach of any duty or obligation on the part of the Obligees or their respective officers, employees and agents or their failure to inquire into, contest, or litigate any claim, whenever such negligence, inadvertence, accident, oversight, breach or failure may occur or have occurred. I acknowledge that a $1 per 'lost' Vodafone ADS fee is to be deducted from my proceeds, in addition to the processing fee equal to $3.50 per Vodafone ADS share as discussed elsewhere in these documents, in consideration of replacing any missing shares. Surety protection for the Obligees is provided under Bond# 001S101123628BCM issued by Travelers Casualty and Surety Company of America.

### PLEASE SIGN THE FRONT OF THIS CARD
© 2001 GEORGESON SHAREHOLDER COMMUNICATIONS INC.
GEORGESON SHAREHOLDER SECURITIES CORPORATION
Member NASD/SIPC




# FINAL NOTICE FOR HOLDERS OF
## AIRTOUCH COMMUNICATIONS, INC. COMMON STOCK

January 8, 2001

Dear Shareholder,

Our records show that you still have shares of **AirTouch Communications, Inc.** ("**AirTouch**"). There is no longer a market for these shares as a result of the merger with **Vodafone Group Plc** ("**Vodafone**") in July 1999. As a result of the merger you are entitled to five ordinary shares of Vodafone (in the form of American Depositary Shares each Vodafone American Depositary Share ("**Vodafone ADSs**") representing ten Vodafone ordinary shares listed on the New York Stock Exchange as an ADR) plus a cash payment of $9.00 for each **AirTouch** share you hold. Additionally, on September 30, 1999 Vodafone declared a capitalization issue which was made on a basis of four new shares for every one share held. On January 3, 2001, **Vodafone ADSs** traded on the New York Stock Exchange at approximately $34 per ADS. Both the number of **AirTouch** shares you own and **Vodafone ADSs** plus your cash entitlement are indicated on the attached Claim Card.

At various times, you have been notified to send in your stock certificates(s) in exchange for Vodafone ADSs and the cash distribution. Georgeson Shareholder Communications Inc. has now been retained to assist you in claiming your Vodafone ADSs and cash payment. To claim your Vodafone ADSs, you may complete the Claim Card below and return it along with your stock certificate(s) in the envelope provided. *Even if you have lost your certificate(s), you may still participate in this voluntary program.*

*You may choose to receive your Vodafone ADSs or have them sold on the New York Stock Exchange and receive their cash value.* In order to defray the cost of providing this service, a processing fee of $3.50 per **Vodafone ADS** due you will be deducted from your proceeds and paid to Georgeson Shareholder Securities Corporation, a registered broker dealer. The Vodafone ADSs and cash to which you are entitled cannot be sent to you until you surrender your old certificate(s). Eventually, if you continue to do nothing, your assets will be turned over to state authorities under the abandoned property laws.

Please read the enclosed material carefully. There is no benefit in continuing to hold your old shares. Georgeson Shareholder Communications Inc. is being permitted to administer this notification program from the date of this letter until **February 19, 2001**. If you have questions after reading this material, call **Georgeson Shareholder Communications Inc.**, toll-free, at 1 (800) 678-9606 for assistance.

Yours faithfully,

| PIN: 95477 DATABASE: AIRTOUCH |
|---|

Georgeson Shareholder Communications Inc.

✂ **Detach along perforation** - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂

## CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF AIRTOUCH COMMUNICATIONS, INC.
### SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY
C/O: GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11TH FLOOR, NEW YORK, 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from Vodafone Group Plc, dated January 8, 2001. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a $3.50 per Vodafone ADS processing fee is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the costs of assisting me with this special exchange effort.

For W-9 purposes, you must insert your social security number (or TAX ID number) in the box below. By signing this card, I certify that the following Tax Identification number is accurate and that I am not subject to back up withholding.

| Enter Social Security # : | __ __ - __ __ - __ __ __ __ |
|---|---|

**AIRTOUCH SHARES:** 684.0000
**VODAFONE SHARES:** 1710.0000
**CASH DUE: $ 6156.00**

**DATABASE: AIRTOUCH**
PIN: 95477 ACCT#: 09000371650

10669 ELIZABETH SAMPSONB
C/O ALLAN H STARR
910 SUMNEYTOWN PIKE
HARLEYSVILLE PA 19438-1239

**CHECK ONE**

☐ SELL ALL MY VODAFONE ADSs

☐ RECEIVE MOST VODAFONE ADSs (SELL ONLY ENOUGH, IF ANY, NECESSARY TO COVER THE PROCESSING FEE AND, IF APPLICABLE, LOST SHARE FEE)

**SIGN** ➤ X _____
SIGNATURE OF OWNER

X _____
SIGNATURE OF CO-OWNER, IF ANY

NOTE: If a certificate(s) for your shares is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions of the Statement/Affidavit described on the back of this card.

MY DAYTIME PHONE NUMBER IS ( )

# QUESTIONS AND ANSWERS

**1. Why must I exchange my AirTouch Communications, Inc. stock certificates(s)?**

In July 1999, **Vodafone Group Plc** merged with **AirTouch Communications, Inc.** As a result, your old shares are no longer traded. You now need to send in your "old" **AirTouch** certificate(s) for the **Vodafone ADSs** and cash payment due to you, plus any unclaimed dividend. *If you do not claim your Vodafone ADSs and cash consideration, eventually they will be turned over to state authorities under the abandoned property laws.*

**2. What will I receive if I sell my Vodafone ADSs?**

If you choose to sell your **Vodafone ADSs**, they will be sold on the New York Stock Exchange and all participating shareholders will receive the same weighted average price per share based on all shares sold as part of the program. **Vodafone ADSs** recently traded at approximately $34 per **Vodafone ADS.** You will be sent the proceeds of the sale of your **Vodafone ADSs** plus the cash payment due to you approximately 3-to-4 weeks after the expiration date found on the front of this notification. The $3.50 per **Vodafone ADS** processing fee and, if applicable, $1 per lost **Vodafone ADS** fee, will be deducted from the cash consideration you would otherwise be entitled to and, if necessary, from proceeds of the sale. *We can make no recommendation as to whether or not you should sell your Vodafone ADSs.*

**3. What if I choose to receive my Vodafone ADSs?**

If you choose to receive your **Vodafone ADSs,** and if the cash consideration you would otherwise be entitled to receive is insufficient to cover the $3.50 per **Vodafone ADS** processing fee, only enough of your ADSs will be sold to cover any remaining portion of the $3.50 per **Vodafone ADS** and, if applicable, $1 per lost **Vodafone ADS.** You will be sent the remainder of your Vodafone ADSs along with the cash due to you approximately 3-to-4 weeks after the expiration date found on the front of this notification.

**4. What if I don't have my AirTouch certificate(s)?**

Complete the Claim Card and your shares will be replaced for the purpose of exchange, subject to an **additional $1 per lost Vodafone ADS** deduction from proceeds, as provided for by the Statement/Affidavit on the back of Claim Card below.

**5. How do I complete the Claim Card?**

Simply mark one box indicating your choice of action and sign exactly as your name is listed on the card. If more than one name is listed, both parties must sign. If the name of the owner has changed, enclose a copy of legal documents, such as a death certificate, marriage license or, to prove your age, a driver's license. Your signed Claim Card must be received in good order no later than **February 19, 2001.** Any further questions, please call 1 (800) 678-9606.

If you need assistance, please call:

## *GEORGESON SHAREHOLDER*
### COMMUNICATIONS INC.

**Toll Free Nationwide 1 (800) 678-9606**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### STATEMENT/AFFIDAVIT FOR LOST STOCK CERTIFICATES OF AIRTOUCH COMMUNICATIONS, INC.

By signing the front of this Claim Card, I agree to the following: I am the lawful owner of the shares described on the front of this card. My missing certificate(s) has not been endorsed, cashed, negotiated, transferred, assigned or otherwise disposed of. I have made a diligent search for the certificate(s) and have been unable to find it (them) and I make this Statement/Affidavit for the purpose of exchanging or inducing the liquidation of the certificate(s) without surrender of the certificate(s), and the exchange or sale of the shares represented thereby, and hereby agree to surrender the certificate(s) for cancellation should I, at any time, find the certificate(s). I, hereby agree, for myself, my heirs, assigns and personal representatives, that in consideration of the exchange or of the proceeds of the exchange and sale of the shares represented by the certificate(s) to completely indemnify, protect and hold harmless Vodafone Group Plc, EquiServe Llc., Georgeson Shareholder Communications Inc., Georgeson Shareholder Securities Corporation, Travelers Casualty and Surety Company of America and any other party to the transaction (the "Obligees"), from and against all losses, costs and damages, including court costs and attorneys' fees, which they may be subject to or liable for in respect of the cancellation and replacement of the certificate(s). The rights accruing to the Obligees under the preceding sentence shall not be limited by the negligence, inadvertence, accident, oversight or breach of any duty or obligation on the part of the Obligees or their respective officers, employees and agents or their failure to inquire into, contest, or litigate any claim, whenever such negligence, inadvertence, accident, oversight, breach or failure may occur or have occurred. I acknowledge that a $1 per 'lost' Vodafone ADS fee is to be deducted from my proceeds, in addition to the processing fee equal to $3.50 per Vodafone ADS share as discussed elsewhere in these documents, in consideration of replacing any missing shares. Surety protection for the Obligees is provided under Bond# 001S101123628BCM issued by Travelers Casualty and Surety Company of America.

### PLEASE SIGN THE FRONT OF THIS CARD
© 2001 GEORGESON SHAREHOLDER COMMUNICATIONS INC.
GEORGESON SHAREHOLDER SECURITIES CORPORATION
Member NASD/SIPC

# EXHIBIT F



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ALLAN H. STARR,** Executor of the Estate of Elizabeth Sampson, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | **03 CV    1163** |
| v. | **CLASS ACTION COMPLAINT** |
| **GEORGESON SHAREHOLDER, INC., GEORGESON SHAREHOLDER COMMUNICATIONS, INC., GEORGESON SHAREHOLDER SECURITIES CORP.,** and **AT&T CORP.,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, by his attorneys, individually and on behalf of all other persons similarly situated, for his Complaint against the defendants, alleges as follows:

## NATURE OF THE ACTION

1.      This is a class action based on federal securities law and New York statutory and common law brought against defendants Georgeson Shareholder, Inc. ("GS"); its wholly-owned subsidiaries Georgeson Shareholder Communications, Inc. ("Georgeson Communications") and Georgeson Shareholder Securities Corp. ("GSSC") (collectively, "Georgeson"); and AT&T Corp. ("AT&T"). This suit involves defendants' post-merger conduct during a share exchange pursuant to a June 2000 merger between MediaOne Corp. ("MediaOne") and AT&T. The proposed Class consists of all securityholders who, from December of 2000 through the present, participated in a share exchange administered by Georgeson whereby they exchanged their shares of MediaOne for shares of AT&T pursuant to a merger between the two companies, and were damaged thereby (the "Class").

ENTERED ON DOCKET

DATE 2/26/03  BY

2.      AT&T authorized Georgeson to engage in a "post-merger clean-up," whereby Georgeson would send notices to shareholders who had not exchanged their shares six months after the AT&T-MediaOne merger, to convince them to exchange their shares. The notice on its face appeared to have been sent jointly by Georgeson and AT&T. The notice materially misled the shareholders into believing that they had no alternative but to exchange their shares through Georgeson, or else to forfeit all value of the shares. Georgeson charged an exorbitant "processing fee" for this service, which amounted to nearly 12 % of the gross value of the shares and cash that the MediaOne shareholders were entitled to receive. In reality, however, shareholders could have exchanged their shares directly through the transfer agent at no cost, or else contacted other brokers to exchange the shares at a much lower cost. Had the shareholders not been misled by the notice, they would have exchanged their shares through other means and saved themselves the cost of the "processing fee."

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Securities Exchange Act of 1934 as amended (the "Exchange Act"), as codified 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and also 28 U.S.C. §§ 1332 and 1367. The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act, §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

4.      Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. §1391(a), (b), and (c). Many of the acts and transactions giving rise to the violations of law alleged herein occurred in this District. Georgeson maintains its principal place of business in this District and regularly conducted business in this District throughout the Class

Period. AT&T maintains its principal place of business in this District and regularly conducted business in this District throughout the Class Period.

5. In connection with the wrongful conduct alleged in this Complaint, the Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## THE PARTIES

### Plaintiff

6. Plaintiff Allan H. Starr, currently residing in Philadelphia, Pennsylvania, was, at all times material hereto, the duly authorized agent of Elizabeth (Betty) Sampson pursuant to a Power of Attorney executed by Ms. Sampson on January 18, 1990. At the time, Ms. Sampson was 83 years of age and resided in Trenton, New Jersey. On June 10, 2002, Ms. Sampson passed away, and Mr. Starr became the duly appointed Executor of Ms. Sampson's Estate pursuant to her written will. Prior to the June 2000 merger, Ms. Sampson was the registered owner of 232 and 684 shares of MediaOne common stock (pursuant to Certificate numbers M0351305 and M0358022, respectively). In reliance upon defendants' misleading solicitation Notice, Mr. Starr exchanged the MediaOne shares belonging to Ms. Sampson through Georgeson during the Class Period, and as a result, was charged an excessive "processing fee."

### Defendants

7. Defendant Georgeson Shareholder ("GS") is the parent company of a group of companies offering a variety of services relating to communications with shareholders, such as proxy solicitation, broker dealer services, and consulting services to issuers. Georgeson

3

Shareholder's headquarters and principal place of business is at 17 State Street, 28th Floor, New York, NY 10004, phone number 212-805-7000.

      8.      Defendant Georgeson Shareholder Communications, Inc. ("Georgeson Communications") is a wholly-owned subsidiary of GS. Georgeson Communications handles direct communications with shareholders. Georgeson Communications has its principal place of business at 17 State Street, New York, NY 10004, phone number 212-440-9800.

      9.      Defendant Georgeson Shareholder Securities Corp. ("GSSC") is a wholly-owned subsidiary of GS. GSSC works to execute claims processing and communications with shareholders, and is a registered broker dealer. GSSC has its principal place of business at 17 State Street, 28th Floor, New York, NY 10004, phone number 212-440-9800.

      10.      Defendant AT&T Corp. ("AT&T") is a New York telecommunications corporation, doing business at 32 Avenue of the Americas, New York, NY, 10013, and headquartered at Bedminister, New Jersey, 07921.

## CLASS ACTION ALLEGATIONS

      11.      Plaintiff brings this action individually and as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf all persons who, during the Class Period of December, 2000 through the present, exchanged their MediaOne common stock for AT&T using Georgeson as the exchange agent (the "Class"). Excluded from the Class are the Defendants herein and any entity in which any of the Defendants has or had a controlling interest, any person or entity affiliated with any of the Defendants, and the legal representatives, heirs, successors or assigns of any of the Defendants.

12.    The Class is so numerous that joinder of all members is impracticable.  At the time of the merger, MediaOne had approximately 500,000 shareholders of record.  While the exact number of Class members is presently unknown and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, perhaps even thousands, of Class members located throughout the United States who similarly exchanged their MediaOne shares through Georgeson during the Class Period.

13.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Among the common questions of law and fact are:

(a)    whether Georgeson violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder;

(b)    whether AT&T  violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder;

(c)    whether Georgeson violated New York's and/or other states' similarly applicable consumer protection laws;

(d)    whether Georgeson was unjustly enriched by its conduct in handling the post-merger clean-up,

(e)    whether Georgeson and AT&T acted with scienter in pursuing the acts alleged herein;

(f)    whether Georgeson and AT&T participated in the course of conduct complained of herein; and

(g)     whether Plaintiff and the other members of the Class sustained damages because of Defendants' conduct, and the appropriate measure of damages.

14.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other Class members have sustained damages that arise from, and were caused by, Defendants' wrongful acts alleged herein.  Plaintiff does not have interests antagonistic to, or in conflict with, the other members of the Class.

15.     Plaintiff will fairly and adequately protect the interests of the other members of the Class and has retained competent counsel experienced in class action and securities litigation.

16.     Defendants have acted on grounds applicable to the entire Class, thereby making final relief appropriate with respect to the Class as a whole.

17.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  Furthermore, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class to seek redress individually for the wrongs they have suffered.

## SCIENTER

18.     Georgeson and AT&T were aware of or recklessly disregarded the fact that their Notices to shareholders were materially misleading, giving shareholders the false impression that they had no other choice but to exchange their MediaOne shares through Georgeson and pay Georgeson's excessive fee.  Georgeson had a strong motive to create this false impression because its "processing fee," amounting to nearly 12 % of the gross value of the shares and cash

6

that the MediaOne shareholders were entitled to receive, was much higher than the amount

charged by other brokers for such a transaction. Moreover, the shareholders could have

contacted the issuer's transfer agent directly and exchanged their shares for free. Georgeson

knew this information and was fully aware that reasonable shareholders, when clearly apprised of

these alternative means to exchange shares, would have acted to avail themselves of either these

free or less expensive options. Thus, it was in Georgeson's self-interest that the shareholders not

inquire about any of these cheaper alternative ways to exchange their shares-- a result Georgeson

achieved through its misleading Notices. Likewise, it was in AT&T's interest to mislead

shareholders into exchanging their shares through Georgeson; otherwise, AT&T would have had

to pay for Georgeson's services, rather than passing the bill along to unsuspecting shareholders.

Additionally, the fact that so many shareholders chose to redeem their shares through Georgeson

should have alerted both Georgeson and AT&T that the shareholders likely were misled into

believing they had no choice but to exchange their shares through Georgeson.

    19.    Georgeson created a prime opportunity to extract this abusive "processing fee"

from shareholders by setting up its "post-merger clean-up" service, and by actually sending the

Notice to shareholders.   The client contracting for this "post-merger clean-up" service (*i.e.* the

stock issuer) is not the person who ultimately pays for the service. As a result, Georgeson can

charge essentially whatever it wants, as long as the shareholders do not question the fee or

compare rates. AT&T gave Georgeson the opportunity to materially mislead the MediaOne

stockholders by hiring Georgeson for the "post-merger clean-up," and by approving the form of

the Notice (which bears AT&T's corporate logo, see Exhibit "A".)

20.     As discussed in more detail below, the misleading nature of the Notice is apparent on its face. See paragraph 34 and passim. Therefore, both Georgeson and AT&T should have been aware that the Notice would mislead shareholders.

21.     Georgeson (especially GSSC, a registered broker-dealer) was on notice of the deceptive and wrongful nature of its conduct by virtue of various NASD rules of conduct for brokers. NASD Rule 2430 requires that "[c]harges, if any, for services performed, including miscellaneous services such as collection of moneys due for principal, dividends, or interest; exchange or transfer of securities; appraisals, safe-keeping or custody of securities, and other services, shall be reasonable and not unfairly discriminatory between customers." Additionally, the NASD Rule 2440 sets forth the Association's "5% Policy", which holds that mark-ups on securities transactions generally should not exceed 5% of the value of the stock. Therefore, Georgeson should have know that a "processing fee" amounting to nearly 12% of the gross value of a shareholder's stock and cash can hardly be considered reasonable.

## SUBSTANTIVE ALLEGATIONS

### The AT&T-MediaOne Merger

22.     AT&T is a publicly held telecommunications company incorporated in New York and with its principal place of business in New Jersey.

23.     MediaOne was a publicly held telecommunications company incorporated in Delaware and with its principal place of business in Englewood, Colorado.

24.     AT&T and MediaOne officially merged in or about June, 2000. Pursuant to the terms of the merger, MediaOne shareholders could choose one of three ways to exchange their stock, through which they would recieve either all cash, all stock, or a mixture of stock and cash.

8

25.     After the merger, because MediaOne had ceased to exist, MediaOne stock was no longer publicly traded and held no value.  Holders of electronic  (or "street name") shares in brokerage accounts had their stock automatically converted into AT&T stock and cash as set forth in the merger agreement.  However, there remained a substantial number of holders of paper shares.  On June 15, 2000, AT&T sent a notice (attached as Exhibit "B") to holders of MediaOne stock certificates informing them of their right to exchange their stock for one of the three elections.  The notice stated that if shareholders did not return the election form by July 14, 2000, they would automatically be deemed to have chosen the "standard election."  The standard election consisted of 0.95 of a share of AT&T common stock, $30.85 in cash, and a cash "top-up" payment of $5.42, amounting to a total of $36.27 in cash.  See Exhibit "B."  According to the election form, they would be required to tender their shares to AT&T's transfer agent, EquiServe Trust Company, in order to receive their elected form of compensation.

26.     On August 1, 2000, AT&T sent a second notice (attached as Exhibit "C") to MediaOne shareholders informing them that, since the deadline for electing one of the three alternatives for exchanging their shares had passed, the shareholders would be receiving the standard election.  The notice stated that, in order for AT&T to send the stock and cash payment, the shareholders would be required to tender their stock certificates.  Although the notice stated that "it is important that you return your certificates promptly," it did not set forth a deadline or warn shareholders that a "processing fee" may be charged at some time in the future.

27.     On information and belief, the shareholders who exchanged their shares through Equiserve during this time were not charged a processing fee.

9

28.     Six months after the merger, there still remained a number of shareholders who had not exchanged their shares.  Equiserve kept a record of the shareholders who did not respond to its notices.

**AT&T Hires Georgeson for "PostMerger Clean-Up"**

29.     A "post-merger clean-up," according to Georgeson's web site, involves tracking down missing shareholders and soliciting them to exchange their shares.  Essentially, Georgeson touts its services as a way for companies to outsource their task of communicating with shareholders.  The purpose of a post-merger clean-up is to reduce the issuer's costs of sending mailings, maintaining inactive shareholder accounts, and compliance with escheatment laws.

30.     Approximately six months after the merger, AT&T retained Georgeson as its agent for purposes of this post-merger clean-up; that is, to contact shareholders who had allegedly not responded to previous notification to exchange their shares following the merger.

**Georgeson's Notices to Shareholders**

31.     For a period of time believed to be December 2000 through the present, Georgeson sent notices to the remaining MediaOne shareholders to solicit them to exchange their shares.

32.     The Notice consisted of a form that contained, on one side, a generic "Dear Stockholder" section laying out the basics of the share exchange; and on the other side, a list of instructions for filling out the "Claim Card" which is located at the bottom of the form. Shareholders were required to detach the Claim Card, fill it out, sign it, and return it to the Continental Stock Transfer & Trust Company c/o Georgeson.

33.    The Notice requires shareholders to tender their old MediaOne stock in order to receive the AT&T stock and cash payment to which they were entitled under the terms of the merger.  In addition, the Notice states that Georgeson would deduct a "processing fee" of $7 per AT&T share.

34.    The Notice is highly misleading, giving shareholders the intended impression that they have no alternative but to promptly exchange their shares through Georgeson, either because the shares will escheat to the state as abandoned property, or, because the shares will have no worth unless tendered to Georgeson through its notification program.   A copy of the notice is attached hereto as Exhibit "A."  The misleading statements and omissions are as follows:

(a)    The Notice implies that Georgeson is the official means for exchanging one's shares (and thus, by implication, there is no alternative way to exchange the shares). The notice is printed on AT&T letterhead (not Georgeson's), and the "Dear Stockholder" letter is signed "AT&T Corp."  The Notice begins by stating: "Our records show that you still have shares of MediaOne Group, Inc."  Also, it says "We have retained Georgeson [ ] to assist you in claiming your shares and cash."  Even though the cover letter and the Notice refer to the shareholder claim process as being "voluntary," the Notice states that "[t]here is no longer a market for these shares."  These statements give the impression that the notice was sent by AT&T, and that AT&T has appointed Georgeson as its official, and therefore exclusive, exchange agent, and that failure to act will result in loss of all possible value of the "old" MediaOne stock since those shares are no longer traded.

(b)    The Notice also implies that the shareholders are too late to participate in the "regular" (free) share exchange, and that AT&T had given Georgeson responsibility

11

for administering a "special" exchange for delinquent shareholders. The Notice terms itself "IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC. COMMON STOCK" (capital letters in original). The Claim Card contains a provision stating that the undersigned shareholder agrees to the terms and conditions set forth in the notice, and that the $7 per share fee would be deducted "to defray the cost of assisting me with this special exchange effort." The Notice would mislead the reasonable shareholder into believing that the fee of $7 per AT&T share was related to the actual costs of the share exchange, and was necessary and justified because Georgeson had made a special effort to reach the missing shareholders (and/or taken together with other statements in the Notice, that the shareholders were too late to participate in the normal exchange and were lucky to be getting anything at all).

(c)     The Notice is also designed to create false urgency to act, stating that "We urge you to claim these shares now"; "Georgeson [ ] is being permitted to administer this voluntary program through **JANUARY 23, 2001**";[1]  "**There is no benefit in continuing to hold your MediaOne shares**"; and, "**if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.**" (bold type in original).

(d)     Furthermore, the notice claims that the "processing fee" exists "to defray the cost of providing you this service."

---

[1] It is unknown whether different notices to other members of the class contained different deadlines.

12

(e)     In conjunction with these deceptive statements, material information was deliberately omitted from the Notice that was necessary to make the Notice not misleading.

i)     The shareholders were not given sufficiently detailed information about the so-called "processing fee," as it would be applied specifically to them, to make an informed decision about whether or not to exchange their shares through Georgeson. Because the Notice did not illustrate this computation, or specifically disclose the actual percentage of Georgeson's fee relative to the overall exchange, each shareholder would have to perform a complicated mathematical exercise in order to determine their total fee, or the percentage of their property that was being forfeited to pay that fee. Instead, the Notice confusingly reads as follows: "Following the merger, you are now due 0.95 of a share of AT&T and a cash payment of $36.27 for every MediaOne share you hold . . . Based on AT&T's $22 price per share on December 14, 2000, each share of MediaOne would receive merger consideration of approximately $59"; then, in a separate paragraph, the Notice sets forth the processing fee of "$7 per AT&T share due."

ii)     Nowhere does the Notice inform the shareholders that they could altogether avoid any Georgeson fee by exchanging their shares for free by sending their shares directly to the issuer's transfer agent, or, in the alternative, that the shareholders could pay a minimal fee far less than Georgeson's by merely paying a broker to liquidate their old MediaOne stock.

13

35.    All of these misstatements and omissions, viewed together, create a total impression that MediaOne shareholders had no choice but to exchange their shares through Georgeson, and that the processing fee was both necessary to cover Georgeson's valid expenses and unavoidable if they wanted to reclaim any value for their stockholdings before escheatment.

36.    However, this impression was completely false. First, Georgeson was not the exclusive means for shareholders to exchange their shares. The shareholders could have contacted the exchange agent, Continental, and exchanged their shares for free. Alternatively, on information and belief, any broker could have processed this share exchange, and at a much lower cost than $ 7.00 per AT&T share.

37.    Furthermore, the "processing fee" bore no relation whatsoever to Georgeson's actual costs in administering the share exchange. Although in some cases Georgeson may have had to perform some research to track down missing shareholders, the cost of this service, plus the mailings and administrative costs, were far less than $ 7 per AT&T share. For example, a "locator service," which performs similar searches to find absent class members in class action cases, charge on average $3 for each search, and around $15 to $20 for each successful search. In reality, Georgeson's fee was a contingency fee, with a built-in multiplier based purely on the amount of shares held by each individual, despite the fact that the same amount of effort went into searching for a shareholder with 10 shares, as for a shareholder with 1000 shares.

### Alan Starr Exchanges MediaOne Shares In Response to Georgeson's Mailing

38.    Elizabeth Sampson held two groups of MediaOne stock. Ms. Sampson received two Notices from Georgeson dated December 15, 2000 for each of the two registered stock certificates she held (each in the amount of 232 and 684 shares, respectively). Allan H. Starr,

14

acting as Power of Attorney on Ms. Sampson's behalf, responded to Georgeson's notices and

tendered Ms. Sampson's shares to Continental on December 28, 2000. Mr. Starr tendered the

shares because the notices led him to believe that Georgeson was the exclusive exchange agent

for AT&T, and that he had no choice but to pay the processing fee if he had any chance of

recouping economic value for stock which was no longer traded.

39.    Ms. Sampson held a total of 916 MediaOne shares. According to the terms of the

merger, Ms. Sampson should have received 869 AT&T shares, plus $ 33,249.72 in cash (the

$33,223.32 cash payment due plus the value of the fractional .4 and .8 AT&T shares left over

from the exchange, which were equivalent to about $ 26.40, given the stated value of AT&T

stock at about $22 a share). Ms. Sampson opted to keep the AT&T shares rather than selling

them.

40.    However, Georgeson deducted its "processing fee" of $7 per AT&T share from

that cash payment. The total amount of the processing fee paid by Ms. Sampson came to **$6,083**,

or **nearly 12% of the total payment he was entitled to**.

41.    Ms. Sampson received this cash payment on or about February 27, 2001.

42.    Mr. Starr and the other Class Members relied on, and were deliberately mislead

by, the material misrepresentations and omissions in the Notice. The shareholders were tricked

into believing that they had only two choices: pay Georgeson the exorbitant processing fee to

receive at least some of the value of their shares before it would be too late, or else forfeit their

shares to the state under the abandoned property laws. In reliance on this misleading Notice, and

as a direct result of the material information omitted therefrom, Plaintiff and the Class were

convinced that Georgeson was the sole, official agent of AT&T for the exchange, and they did

not look for either less expensive or even free means to exchange their shares. Had the Class

known that they could have exchanged their shares for free by contacting the exchange agent

directly, or could have paid a nominal amount by merely contacting another broker, they would

have done so, and thereby saved a substantial amount of money.

## COUNT I

### Against All Defendants for Violation of
### Section 10(b) of the Exchange Act and Rule 10b-5

43.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

44.    Defendants Georgeson Shareholder, Georgeson Communications, GSSC, and

AT&T employed a manipulative and deceptive device, scheme or artifice to defraud in violation

of SEC Rule 10b-5(a); omitted to disclose material facts necessary to make  statements they made,

in the light of the circumstances under which they were made, not misleading, in violation of SEC

Rule 10b-5(b); and engaged in an act, practice or course of business which operated as a fraud or

deceit in violation of SEC Rule 10b-5(c), in connection with Defendants' processing of the

MediaOne share exchange for Plaintiff and members of the Class during the Class Period.

Defendants' manipulative and deceptive devices and practices included, *inter alia*, sending a

false and misleading notice to MediaOne shareholders as part of a "post-merger clean-up",

deceiving the Class into thinking that Georgeson was the exclusive agent by which they should

exchange their MediaOne shares, and deliberately neglecting to inform shareholders that they

could exchange their shares directly through the transfer agent at no cost, so that AT&T could

altogether avoid the costs associated with locating the owners of unexchanged MediaOne shares

and Georgeson could extract an exorbitant processing fee for carrying out the share exchange.

16

45.     As a result of Defendants' manipulative and deceptive devices and practices alleged herein, Plaintiff and the other persons who exchanged their shares during the Class Period paid an unreasonable and excessive processing fee for the share exchange. Moreover, Defendants' misleading notice dissuaded these shareholders from searching out alternative means to exchange their shares, which did in fact exist and were substantially cheaper than Georgeson. Plaintiff and the other shareholders who exchanged their shares through Georgeson during the Class Period were injured by Defendants' deceptive and manipulative practices because they paid more for the exchange than they would have absent the misleading notice.

46.     The specific misleading and deceptive statements relied upon by Plaintiff and the Class were all contained in the Notice that Georgeson, together with AT&T, sent to MediaOne shareholders during the Class Period. Although Notices may have been sent on various dates within the Class Period, the contents of every notice were the same. The misleading contents of the Notice is as follows:

(a)     The Notice misleads the average investor into believing that Georgeson was the sole means for exchanging one's shares. This impression was created by Georgeson's implication that it was the "official" exchange agent, and its phrasing of the shareholders' choices as twofold: either exchange through Georgeson to receive economic entitlements for old MediaOne stock which were not available elsewhere, or, allow the shares to escheat to the state. The Notice begins by stating: "Our records show that you still have shares of MediaOne Group, Inc." Also, it says "We have retained Georgeson [ ] to assist you in claiming your shares and cash."

17

(b)     The Notice also misleads the average shareholder by implying that the

shareholders are too late to participate in the "regular" share exchange, and that

Georgeson was responsible for administering a "special" exchange for delinquent

shareholders, through the title of the notice ("IMPORTANT NOTICE FOR HOLDERS

OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC. COMMON STOCK"

(caps in original)), and by using statements such as: "Georgeson [ ] is being permitted to

administer this notification program from the date of this letter until JANUARY 23, 2001

. . ." (emphasis in original); "[t]here is no longer a market for these shares"; and "a

processing fee of $7 per AT&T share due is to be paid . . . to defray the cost of assisting

me with this special exchange effort."

(c)     The Notice also misleads the average investor through its urgent tone.  The

Notice states, "We urge you to claim these shares now"; "Georgeson [ ] is being

permitted to administer this voluntary program through **JANUARY 23, 2001**";[2]  **"There**

**is no benefit in continuing to hold your MediaOne shares"; and, "if you continue to**

**do nothing, your stock and underlying assets will be turned over to certain state**

**authorities under the abandoned property laws."** (bold type in original).

(d)     Furthermore, the Notice misleads the reasonable shareholder into

believing that the fee of $7 per AT&T share was related to the actual costs of the share

exchange, and was necessary and justified because Georgeson had made a special effort

to reach the missing shareholders (and/or taken together with other statements in the

---

[2] Again, it is unknown whether different notices to other members of the class contained
different deadlines.

18

Notice, that the shareholders were too late to participate in the normal exchange and were lucky to be getting anything at all). The Notice consistently calls this fee a "processing fee", and states that the fee exists "to defray the cost of assisting me with this special exchange effort."

47.    Due to the misleading nature of the above statements, Georgeson and AT&T had a duty to disclose the material facts necessary to permit the shareholders to make an informed decision about whether or not to exchange their shares through Georgeson.

48.    In connection with their manipulative and deceptive devices and practices alleged herein, Defendants used the means or instrumentalities of interstate commerce and the mails.

49.    By virtue of the foregoing, Defendants have violated section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c).

50.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the proposed Class incurred damages in an amount to be proven at trial.

51.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing or historical facts, conditions, or opinions, and therefore were not forward-looking statements.

## COUNT II

### Against The Georgeson Defendants For Violation of
### Section 10(b) of the Exchange Act And Rule 10b-5(b):  Excessive Markup

52.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

19

53.     In connection with the wrongful practices alleged herein, Georgeson and AT&T made untrue statements of material fact, and omitted to disclose material facts necessary to make statements they made, in light of the circumstances under which they were made, not misleading in violation of SEC Rule 10b-5(b).  Defendants' material misrepresentations and omissions contained in the Notice to Shareholders concerned, *inter alia*: the suggestion that Georgeson was the exclusive means for shareholders to exchange their shares and that their "processing fee" was reasonably related to the actual cost of administering the exchange; Georgeson's failure to inform shareholders that they could have exchanged their stock directly through the transfer agent at no cost, or through other brokers at a much lower cost; and the unclear and misleading nature of setting forth the processing fee, which did not clearly inform shareholders of the total processing fee they would have to pay or the percentage of their stock that would be forfeited through the processing fee; all as alleged more fully herein.

54.     Georgeson had a duty to disclose all material information that a reasonable shareholder would need to make an informed decision whether or not to engage in this transaction with Georgeson.  When a broker-dealer such as Georgeson charges an excessive markup on the price of stock, the broker-dealer has a duty to disclose the markup and any other material information needed to permit the customer to make an informed judgment upon whether or not he will complete the transaction.

55.     Georgeson breached this duty by failing to inform Plaintiff and the Class that its markup (i.e. the "processing fee") bore no reasonable relation to its actual transaction costs and/or the actual price of exchanging AT&T stock elsewhere in the market, and by misleading

Plaintiff and the Class into believing that they had no choice but to exchange their shares through Georgeson and pay the exorbitant fee.

56.    Georgeson knew or recklessly ignored that it had breached its duty, and that its statements were thereby false and misleading at the time they were made.  Facts demonstrating Georgeson's knowledge or recklessness are more fully set forth in the preceding paragraphs.

57.    As a result of Georgeson's materially false and misleading statements and omissions, Plaintiff and the Class paid an excessive markup on the cost of the MediaOne-AT&T share exchange and were damaged thereby.  Had Plaintiff and the other Class members known that Georgeson's fee was unrelated to the actual cost of administering the share exchange, that they could have exchanged their shares directly through the transfer agent at no cost, and/or the actual amount of their total processing fee as a basis for comparison shopping, Plaintiff and the Class members would have exchanged their shares through the transfer agent or through a broker other than Georgeson, at either no cost or a lower cost.

58.    As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiff and the other members of the proposed Class suffered damages in an amount to be proven at trial.

59.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  The statements alleged to be false and misleading herein all relate to then-existing or historical facts, conditions, or opinions, and therefore were not forward-looking statements.

## COUNT III

### Against The Georgeson Defendants for Violation of
### New York General Business Law § 349 and/or Other States' Consumer Protection Laws

60.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

61.     Georgeson engaged in a consumer-oriented practice that was materially deceptive or misleading in a material respect: namely, sending the Notice to Shareholders, which as alleged in more detail above, misled shareholders into believing that they had no alternative but to exchange their shares through Georgeson and pay the unreasonable processing fee.

62.     The Notice to the MediaOne shareholders was a "consumer-oriented practice" under the Act because it had an impact on the public at large:  specifically, holders of unexchanged MediaOne shares.  In addition, Georgeson uses substantially similar notices and practices in administering its "Post-Merger CleanUp" service for other companies, so this practice has a wider impact on the public as a whole.

63.     As a result of Georgeson's materially false and misleading statements and omissions contained in the Notice, and plaintiff and the Class' justifiable reliance on the Notice, Plaintiff and the Class paid an excessive "processing fee" for the MediaOne-AT&T share exchange and were damaged thereby.  Had Plaintiff and the other Class members known that Georgeson's fee was unrelated to the actual cost of administering the share exchange, or that they could have exchanged their shares directly through the transfer agent at no cost, Plaintiff and the Class members would not have exchanged their shares through Georgeson.

22

## COUNT IV

### Against The Georgeson Defendants
### for Unjust Enrichment

64.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

65.    Georgeson was enriched, and Plaintiff and the Class were impoverished, by Georgeson's solicitation of missing MediaOne shareholders for the share exchange, which included Georgeson's charging Plaintiff and the Class an exorbitant "processing fee" per exchange.

66.    There was no justification for Georgeson's enrichment, and the circumstances are such that in equity and good conscience Georgeson should return the money to Plaintiff and the class.  Georgeson's enrichment was unjust because, inter alia:

(a)    Georgeson's "processing fee" bore no reasonable relation to the actual cost of conducting the searches and processing the share exchange;

(b)    Georgeson's "processing fee" was exorbitant, divesting shareholders of nearly 12% of the value of their stock and cash payment;

(c)    Georgeson's Notice to the MediaOne shareholders was highly misleading, as alleged in more detail above.

67.    Plaintiff and the Class paid Georgeson the "processing fee" under duress, since they were misled into believing they had no alternative but to exchange their shares through Georgeson.

68.    There is no adequate remedy at law for Plaintiff's and the Class' injury.

23

## BASIS OF ALLEGATIONS

Plaintiff makes the foregoing allegations based on Plaintiff's personal knowledge, which is derived from personal experience; the contents of Defendants' Notice to Shareholders; and the investigation conducted by his attorneys, which included, *inter alia*, a review of various SEC filings, conversations with experts on mergers and "post-merger clean-ups," and information posted on Georgeson's web site, www.georgeson.com.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the Defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Plaintiff as the representative of the Class and his counsel as counsel for the Class;

C.    Awarding compensatory damages against all Defendants, jointly and severally, in favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

D.    Awarding Plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

E.    Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.


Dated:  February 21, 2003

COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.

*Catherine Torell*

Linda P. Nussbaum (LN-9336)
Catherine A. Torell (CT-0905)
825 Third Avenue, 30th Floor
New York, NY 10022
(212) 838-7797

– and –

Steven J. Toll
Andrew N. Friedman
Elizabeth S. Finberg
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005
(202) 408-4600

H. Laddie Montague
Peter Kahana
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103-6365
(215) 875-3000

*Counsel for Plaintiff*

25

## MEDIAONE GROUP, INC. ("UMGI")
## AND AT&T CORP. ("T")
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Allan H. Starr ("Plaintiff"), Executor of the Estate of Elizabeth "Betty" Sampson, duly swears and says, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint to be filed on my behalf against Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc., Georgeson Shareholder Securities Corp., and AT&T Corp.  I approve of its contents, and I authorize its filing.  I authorize Berger & Montague, P.C. and Cohen, Milstein, Hausfeld & Toll, PLLC, to represent me in this action.

2.      I did not enter the transaction that is the subject of this case at the direction of my counsel or in order to participate in this private action.

3.      I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transactions on behalf of decedent Elizabeth Sampson in the securities of MediaOne Group and AT&T Corp. between and including December 1, 2000 through the present (the "Class Period") are as follows:

I exchanged Ms. Sampson's MediaOne stock for AT&T stock pursuant to a merger between the two companies.  By the terms of the merger, for each ordinary share of MediaOne common stock, Ms. Sampson was to receive 0.95 of a share of AT&T common stock and $36.27 in cash.  Fractional AT&T shares were to be converted into cash at the rate of $22.00 per AT&T share.  However, Georgeson deducted a "processing fee" of $7.00 per AT&T share from the cash proceeds.  The dates and amounts of the stock exchanged are:

| MEDIAONE SHARES TENDERED | DATE OF TENDER | CONSIDERATION RECEIVED PER MEDIAONE SHARE |
| --- | --- | --- |
| 684 | 12/28/2000 | 649 AT&T shares plus $20,265.68 |
| 232 | 12/28/2000 | 220 AT&T shares plus $6,874.64 |

5.      In the past three (3) years preceding the date on which this certification is signed, I have sought to serve as a class representative in the following action filed under the United States federal securities laws:

*Starr, Executor of the Estate of Sampson v. Georgeson Shareholder, Inc.*, no. 02-CV-8921 (S.D.N.Y. filed Nov. 8, 2002).

1

6.      I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, as ordered or approved by the court, except for any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this _11th_ day of _February_, 2003, at Philadelphia, Pennsylvania.

By:      _____

Allan H. Starr
Executor of the Estate of Elizabeth Sampson

Print Name:    _ALLAN H. STARR_

Address:        Pier 5, No. 121
                7 North Columbus Boulevard
                Philadelphia, PA  19106

2



**AT&T**

August 1, 2000

Dear MediaOne Shareowner:

Welcome to AT&T. This letter describes what you need to do in order to convert your MediaOne shares into AT&T shares.

In June, you received a mailing noting that the merger of our two companies was complete, and describing limited-time alternatives for converting your shares. The deadline has now passed for indicating that you wanted anything other than the "Standard Election." As a result, like many shareowners you will receive a combination of AT&T common stock and cash in exchange for your MediaOne shares.

There are just a few simple steps you need to take before we can distribute your AT&T shares to you:

• Complete and sign the enclosed "AT&T/MediaOne Exchange Form," per the instructions on the form.

• Return your MediaOne Group or US West Media stock certificate(s) along with the AT&T/MediaOne Exchange Form in the enclosed insured and pre-addressed envelope immediately. **DO NOT SIGN YOUR STOCK CERTIFICATE(S).**

**Note:** *The enclosed pre-addressed envelope is insured for a market value of $1,000,000 or less, if mailed within the United States, Puerto Rico, the U.S. Virgin Islands or Canada. AT&T is not responsible for loss of certificates mailed from any other countries or with a market value of more than $1,000,000. Place such certificates in a separate envelope, insure them for 2% of their market value as shown in Box A on the back of the AT&T/MediaOne Exchange Form and send them by registered mail or overnight courier to EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184.*

After completing these steps, you will be sent a statement detailing the total number of AT&T shares issued to you as a result of this merger. We are issuing your AT&T shares in an electronic form called "direct registration" which provides a safe and convenient form of stock ownership.

In addition, after we receive your shares you will receive a check for the amount of cash you are due under the Standard Election. Note that cash proceeds are taxable in the year 2000, even if you delay exchanging your shares.

Please remember that MediaOne Group common stock is no longer traded on any stock exchange, and until we receive your certificates and the AT&T/MediaOne Exchange Form you cannot receive any AT&T shares, cash payments, dividends, or be eligible to participate in future AT&T shareowner meetings.

If you have lost your certificates, please mark box [4] on the AT&T/MediaOne Exchange Form and read box [A] on the back of the form. If you have lost 1,000 shares or less, you are exempt from paying the insurance premium until June 15, 2001. If you have lost more than 1,000 shares or delay exchanging your shares of MediaOne Group, you will be required to pay an insurance premium based on 2% of the market value of the lost shares.

Thank you for your support of this merger, and again, welcome to the AT&T family.

Sincerely,

*Claudia Holcombe*

Claudia J. Holcombe
Executive Director of Shareowner Services

*PS. It is important that you return your certificates promptly. If you have questions about this procedure or anything related to this transaction, please call toll-free 1-877-816-5328, Monday through Friday, 8:00 a.m. to 6:00 p.m. Eastern time.*





June 15, 2000

Dear MediaOne Shareowner:

Welcome to AT&T. We have now completed the merger of our two companies.

We're excited about the opportunities created by the merger of these two dynamic communications companies, and we're ready to get down to business together.

As a current MediaOne shareowner, you are entitled, between now and July 14, 2000, to indicate how you want to exchange the MediaOne Group shares you hold. For each share of MediaOne Group common stock you currently own, you may elect one of the following alternatives:

- **Standard Election:** 0.95 of a share of AT&T common stock, $30.85 in cash, plus a cash "top-up" payment of $5.42.
- **Stock Election:** 1.4912 shares of AT&T common stock plus a cash "top-up" payment of $8.50.*
- **Cash Election:** $85.00 in cash.*

*Please note that the Stock Election and the Cash Election alternatives may be pro-rated; see the enclosed Information Guide for details.*

The Information Guide describes each of these alternatives, and answers additional questions about exchanging your shares. If after reading it you are uncertain about what to do, we encourage you to consult with a financial professional to help you make your final decision.

Please note that you must return your MediaOne Group stock certificate(s) along with the completed and signed Election Form using the enclosed insured and pre-addressed envelope. DO NOT SIGN YOUR STOCK CERTIFICATE(S).

**It is important that your stock certificates and Election Form be *received* by July 14, 2000, the deadline indicated on the Election Form. If not, you will automatically be deemed to have made the Standard Election and will receive a combination of AT&T Common Stock and cash.**

Thank you for your support of this merger, and again, welcome to the AT&T family.

Sincerely,

C. Michael Armstrong
Chairman and CEO

*P.S. Please review the enclosed materials and return your form and stock certificates as quickly as possible to ensure that they are received by July 14, 2000.*

orm C                    MediaOne Group, Inc. Election Form and Guide

**⸱⸱Please refer to the Enclosed Information Guide for an explanation of the terms of the election.**

E

Number of shares you own.

The Social Security Number or Tax ID Number as listed on your account. Please verify that this is your correct Social Security Number or Tax ID Number.

If the Social Security Number or Tax ID Number **is incorrect**, please print the correct number in the area provided.

**Choose one of the following Elections. (Boxes 4, 5 or 6)**
) If you mark this box, you will receive the Standard Election Consideration as described in the Q&A Number (3).

) If you mark this box, you will receive the Stock Election Consideration as described in the Q&A Number (3).

) If you mark this box, you will receive the Cash Election Consideration as described in the Q&A Number (3).

) Mark this box and complete the back of this form if you are unable to locate any (or all) of your stock certificates (complete Box A on the back), and/or would like to change the name on your shares (complete Box B on the back).

) Our records indicate that you are not an AT&T shareowner. If you would like information about our Dividend Reinvestment Plan mark the box and See Q&A Number (11).

) All registered owners, as shown on the Election Form, must sign below. **Do not sign stock certificates.**

) Please give us your daytime and/or evening telephone number should we need to contact you.

---

This election expires at 5:00 pm Eastern Time on   JULY 14, 2000     MO-0002 New 6/00
**Detach Form Before Mailing**

◀

 USW WSTMO 00257044790

## MEDIAONE GROUP, INC. ELECTION FORM
**THIS FORM MUST BE RETURNED WITH YOUR STOCK CERTIFICATES. DO NOT SIGN CERTIFICATES.**

) Total MediaOne Group shares you own   232.000

) Tax ID Number   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

By signing this form I certify under penalties of perjury, that my Tax ID Number listed is accurate for IRS W-9 purposes and that I am not and have not been notified by the IRS that I am subject to back-up withholding. If it is incorrect, please write the correct number below.

) Corrected Tax ID No. _____

④ ☐ Mark this box for the Standard Election Consideration (combination of stock and cash). See Q&A (3)
   OR
⑤ ☐ Mark this box for the Stock Election Consideration. See Q&A (3)
   OR
⑥ ☐ Mark this box for the Cash Election Consideration. See Q&A (3)

⑦ ☐ Mark this box for lost certificates (complete Box A on reverse) or to transfer ownership (complete Box B on reverse).

⑧ I am interested in the AT&T Dividend Reinvestment Plan. ☐

BETTY SAMPSON
108 PINE STREET
PHILADELPHIA PA   19106-4312

⑨ _____
                    Signature of Owner

_____
                Signature of Co-owner, if any

⑩ _____
   Daytime Telephone #        Evening Telephone #



AT&T

# AT&T–MediaOne Merger

## Information Guide

### For MediaOne Shareowners of Common Stock

AT&T

AT&T
32 Avenue of the Americas
New York, New York 10013-2412

© AT&T 2000

## Questions & Answers

# For MediaOne Shareowners of Common Stock

1. **What is the current status of the merger between MediaOne and AT&T?**

   We have completed the merger between MediaOne and AT&T. The companies are in the process of bringing together their business operations under the AT&T umbrella.

2. **How does this affect me as a MediaOne shareowner?**

   As a result of the merger, MediaOne Group common stock is no longer trading, and as a MediaOne shareowner you are entitled to receive a combination of cash and shares in AT&T. If you prefer, you may also request to only receive shares or only receive cash. Because these elections are subject to pro-ration, as described on page 2, you may receive a combination of cash and AT&T shares even if you request to receive only cash or only shares.

3. **What are my alternatives?**

   For a very limited time, you can elect how you want to exchange the MediaOne shares you hold. Indicate your preference and return the enclosed Election Form in the enclosed pre-addressed envelope to the Exchange Agent, EquiServe Trust Company, by the deadline specified on the Election Form. If you choose to use an overnight courier, send the documents to: EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184. If you do not return your Election Form or it is not received by the deadline indicated on the Election Form, you will automatically be deemed to have made the Standard Election, described on page 2, and will receive a combination of AT&T common stock and cash.

The number of AT&T shares or the amount of cash you receive depends upon which alternative you select (see *Question 4 regarding definition of "pro-ration"*):

| Election Alternatives | Shares or Cash to be Received Per MediaOne Share |
|---|---|
| **Standard Election** (Not subject to pro-ration) | 0.95 of a share of AT&T common stock, $30.85 in cash, plus a cash "top-up" payment of $5.42. |
| **Stock Election** (Subject to pro-ration) | 1.4912 shares of AT&T common stock plus a cash "top-up" payment of $8.50. |
| **Cash Election** (Subject to pro-ration) | $85.00 in cash. |

**PLEASE OBTAIN CURRENT MARKET QUOTATIONS BEFORE MAKING YOUR ELECTION.**

### 4. What does "Subject to pro-ration" mean?

When MediaOne agreed to merge, AT&T set aside a fixed number of shares and a fixed amount of cash to complete the merger.

It is possible that more people will choose the all-cash alternative, and the total amount could exceed the cash allocated for the merger by AT&T. If that happens, those people will receive some AT&T shares instead of receiving only cash.

It is also possible that more people will choose the all-stock alternative, exceeding the number of shares allocated by AT&T. If that happens, those people will receive some cash instead of only receiving AT&T shares.

Note that the Standard Election alternative is not subject to pro-ration, and therefore will definitely follow the formula described above.

### 5. Once I've made my choice, how do I exchange my MediaOne Group common stock certificate(s)?

To receive your AT&T shares and/or cash, you must return your MediaOne Group common stock certificate(s) along with the completed and signed Election Form. Do not sign your stock certificates.

The enclosed pre-addressed envelope is insured for a market value of $1,000,000 or less, if mailed within the United States, Puerto Rico, the U.S. Virgin Islands or Canada.

AT&T is not responsible for loss of certificates mailed from any other countries or with a market value of more than $1,000,000. Place such certificates in a separate envelope, insure them for 2% of their market value (as shown on the back of the Election Form in Box A) and send them by overnight courier to EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184. AT&T is not responsible for certificates mailed to any other address.

**IMPORTANT: DO NOT SIGN YOUR STOCK CERTIFICATE(S).**

### 6. What will happen if I don't return my stock certificate(s) or don't sign my Election Form?

All documents must be received on time and all paperwork must be completed and signed for you to qualify for either the Cash Election or Stock Election. However, you will still be entitled to receive the Standard Election if your election is not received by the deadline. *In any case - whether you're selecting "Standard," "Cash," or "Stock" — we strongly encourage you to return the necessary documents as soon as possible. If you do not send in your documents at this time, you will receive a future mailing in which you will be directed to return your stock certificates and an Exchange Form (which you will receive in that mailing) before you can receive any AT&T shares, cash payment, AT&T dividends, or be eligible to participate in future AT&T shareholder meetings. Be aware that MediaOne Group common stock will no longer be traded on any stock exchange so there is no benefit to holding your MediaOne certificates.*

### 7. What if I submit my MediaOne stock certificates and Election Form, and then later decide to change my decision?

You may change your decision any time prior to the Election Deadline by sending a revised Election Form, properly completed and signed, to the Exchange Agent. But time is very limited — we encourage you to carefully consider your choice before sending in your materials.

You may withdraw your decision any time prior to the Election Deadline by submitting written notice to the Exchange Agent. The Exchange Agent must receive this withdrawal notice by the close of business on the day prior to the election deadline. We recommend you send any changes or withdrawals to EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184.

8. **Will I be required to pay any taxes on the shares and cash I receive?**

You will generally be subject to tax on any cash you receive. Tax-related information can be found in the original proxy statement mailed to shareholders last year, which is available on the Internet at http://www.att.com/ir under the heading "SEC Documents." You should consult your own tax advisor regarding U.S. federal income tax consequences in light of your own personal circumstances as well as the consequences under other U.S., state, local, and foreign tax laws.

9. **How long will it take to receive my shares and/or cash after I send in my Election Form and stock certificate(s)?**

All election proceeds (AT&T common stock and cash) will be mailed to you approximately two weeks after the expiration of the Election period as indicated on the Election Form.

10. **I am already an AT&T shareowner. What do I need to do with my current AT&T shares? Will my new AT&T shares be credited to my existing AT&T account?**

You do not need to take any action with regard to the AT&T shares you already own. This merger affects only the MediaOne Group shares you currently own.

If "Current AT&T Account Number" followed by an account number is printed above your name and address on your Election Form, your new AT&T shares will be credited to your existing AT&T account. If there is no AT&T account number listed on the Election Form, your new AT&T shares will be deposited into a new account and you can arrange transfer later.

11. **What do I do if I am already an AT&T shareowner and I want to have my new shares included in the AT&T Dividend Reinvestment Plan?**

If you participate in the AT&T Dividend Reinvestment Plan your new shares will be automatically enrolled in the plan unless you mark box 8.

If you are currently an AT&T shareowner and do not participate in the AT&T Dividend Reinvestment Plan, you can check box 8 on the Election Form to enroll. A prospectus with respect to the AT&T Dividend Reinvestment Plan was previously sent to you.

12. **Can I keep my current MediaOne Group account and account number?**

No. Your current MediaOne Group account will be closed and a new account will be opened for your AT&T shares. Your new account number will appear on your statement.

13. **Will I receive any fraction of an AT&T share in the merger?**

No fraction of a share will be issued. Holders of MediaOne Group common stock will receive cash for any fraction of a share in an amount based on the market value of AT&T common stock on the last full trading day prior to the merger.

14. **Can I still make an election if I exercised appraisal rights under the Delaware General Corporation Law as described in the Proxy Statement?**

No. If you have exercised appraisal rights under Section 262 of the Delaware General Corporation Law, you may not make an election. Please read Appendix C of the Proxy for additional information.

15. **May I have my new AT&T shares issued in the name of a different person?**

Yes. Mark box 7 on the front of the Election Form and complete box B, "Change of Name on Account" on the back of the Election Form. All current registered owners must also sign the Election Form and obtain a "Medallion" signature guarantee. You can have your signature Medallion Guaranteed at a financial institution such as a commercial bank, a trust company, a national bank, a credit union, a brokerage firm or a savings association that participates in the "Medallion" Program. Please note that a Medallion Guaranteed signature is required for this request; a notary public is not sufficient.

16. **What if I lose my Election Form or need an additional one?**

You may call the Information Agent toll-free at 1-877-816-5328 and request that a duplicate Election Form be mailed to you. Keep in mind that the Exchange Agent must receive any changes by the Election Deadline.

5

**17. What should I do if my certificate(s) are lost, stolen, or destroyed?**

Please complete the Election Form, marking box 7 on the front of the form, and read box A on the back of the form, "Election of Lost MediaOne Group, Inc. Certificates." If you have lost certificates representing 1,000 shares or less, you are exempt from paying the insurance premium for one year from the closing date of the merger. If you have lost certificates representing more than 1,000 shares of MediaOne Group, you will be required to pay an insurance premium based on 2% of the market value of the lost shares. The value per share is listed on the back of the Election Form in box A.

**18. What should I do if my address or Social Security Number has changed or is incorrect?**

Correct the information on the front of the Election Form and the Exchange Agent will make the appropriate change(s).

**19. Who do I contact if I have additional questions concerning the merger or if I require assistance completing the Election Form?**

You may call the Information Agent toll-free at 1-877-816-5328. Service representatives are available Monday through Friday, 8:00 a.m. to 6:00 p.m. Eastern Time.

**20. Where are the shares of AT&T traded?**

AT&T common stock trades on the New York Stock Exchange under the symbol "T".

**Do you have additional questions that aren't answered here?**
Please call toll-free 1-877-816-5328
Monday through Friday, 8:00 a.m. to 6:00 p.m. ET.

**Return your form in the enclosed envelope to:**
AT&T/MediaOne Group Merger
c/o EquiServe
PO Box 9111
Boston, MA 02205-9111

**Return forms by overnight courier to:**
EquiServe Trust Company
40 Campanelli Drive
Braintree, MA 02184

NOTES


**AT&T**

## IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC. COMMON STOCK

December 15, 2000

Dear Stockholder:

Our records show that you still have shares of **MediaOne Group, Inc.** There is no longer a market for these shares as a result of the June 2000 merger between **AT&T Corp. and MediaOne Group.** Following the merger, you are now due 0.95 of a share of **AT&T** and a cash payment of **$36.27** for every **MediaOne** share you hold, plus all accrued dividends paid on these shares. Based on **AT&T's** $22 price per share on December 14, 2000, each share of **MediaOne** would receive merger consideration of approximately $59. Both the number of **MediaOne** shares you own and the **AT&T** shares and cash payment due you is indicated on the attached Claim Card.

We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per MediaOne share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. **Even if you do not have your MediaOne certificate(s), you may still participate in this voluntary program.**

Please read the enclosed materials carefully. **There is no benefit in continuing to hold your MediaOne shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.** Georgeson Shareholder Communications Inc. is being permitted to administer this voluntary program through **JANUARY 23, 2001.** If you have questions after reading this material, call GSC's toll-free number, at 1 (800) 962-6027 for assistance.

PIN:    39596

Sincerely,

AT&T Corp.

✂ Detach along perforation                                                                          ✂

--------------------------------------------------------------------------------

## CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC.
### SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY
C/O GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11ᵀᴴ FLOOR, NEW YORK, NY 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from AT&T Corp., dated December 15, 2000. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a processing fee of $7 per AT&T share due is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the cost of assisting me with this special exchange effort.

PIN:  39596   ACCT#:  000234641
MEDIAONE SHARES:    232.0000
AT&T SHARES:        220.0000
CASH DUE:         $8414.64

FORM W-9 BELOW: By entering my social security number below and signing this card, I certify that the following Tax Identification Number is accurate and that I am not subject to backup withholding.

Enter
Social Security #   **153 - 09 - 2688**

CHECK ONE ⇒  ☐ SELL ALL MY AT&T SHARES
             ☑ RECEIVE MY AT&T SHARES

SIGN ⇒  X *Betty Sampson by Allan Starr POA*
                SIGNATURE OF OWNER

        X _____
                SIGNATURE OF CO-OWNER, IF ANY

BETTY SAMPSON
108 PINE STREET
PHILADELPHIA    PA 19106 4312

NOTE: If a certificate is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions described on the back of this card.

MY DAYTIME PHONE NUMBER IS (215) 864 6223

# AT&T/MediaOne Merger Exchange Form and Guide

**Please refer to the Enclosed Questions and Answers (Q & A) for an explanation of the terms of the exchange.**

GUIDE

① Number of shares you own of MediaOne.

② The Social Security Number or Tax ID Number as listed on your MediaOne account.

③ Please verify that this is your correct Social Security Number or Tax ID Number. If it is **incorrect**, please print the correct Social Security Number or Tax ID in the area provided.

④ Confirm that your address is correct. If it is incorrect, cross it out and write the correct address directly below it.

⑤ Mark this box, if you are unable to locate all of your stock certificates; read the terms and conditions on the back of this form – Box A.

⑥ Mark this box if you want to change the ownership of your shares; complete the Change Of Name On Account section on the back of this form – Box B.

⑦ Our records indicate that you are currently an AT&T shareholder and have been mailed the AT&T Shareowner Dividend Reinvestment and Stock Purchase Plan ("The Plan") Prospectus. Mark box 7 if you would like to participate in the Plan.

⑧ Listed is your current AT&T account number.

⑨ All registered owners, as shown on the Exchange Form, must sign below. **Do not sign stock certificates.**

⑩ Please give us your daytime and/or evening telephone number.

Please clearly mark boxes with an "X" as shown
Use only a #2 pencil, blue or black ink. Do not use red ink.

⊠

**Detach Form Before Mailing**

AT-0121A New 7/0

4444235004700023464147000023200016

## AT&T/MEDIAONE EXCHANGE FORM

**506528**
**23-4641**

**THIS FORM MUST BE RETURNED WITH YOUR MEDIAONE STOCK CERTIFICATES. DO NOT SIGN CERTIFICATES.**

① MediaOne Group shares you own          232

② Tax ID Number      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

By signing this form I certify under penalties of perjury, that my Tax ID Number listed is accurate for IRS W-9 purposes and that I am not and have not been notified by the IRS that I am subject to back-up withholding. If it is incorrect, please write the correct number below.

③ Corrected Tax ID No. _____

⑤ ☐ Mark this box if some or all of your stock certificates have been lost, stolen or destroyed. (Complete Box A on the back of this form.)

⑥ ☐ Mark this box to transfer ownership. (Complete Box B on the back of this form.)

⑦ ☐ Enroll me in "The Plan" and reinvest the dividends on all of my AT&T shares.

⑧ AT&T Account #.      362096307

⑨ *Betty Sampson by Allan E Sten*
J 8 A
Signature of Owner

Signature of Co-owner, if any

④
**BETTY SAMPSON**
**108 PINE STREET**
**PHILADELPHIA PA 19106-4312**

⑩ *215 8696223*
Daytime Telephone #          Evening Telephone #

 **AT&T**

# IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC. COMMON STOCK

December 15, 2000

Dear Stockholder:

Our records show that you still have shares of **MediaOne Group, Inc.** There is no longer a market for these shares as a result of the June 2000 merger between **AT&T Corp. and MediaOne Group.** Following the merger, you are now due 0.95 of a share of **AT&T** and a cash payment of $36.27 for every **MediaOne** share you hold, plus all accrued dividends paid on these shares. Based on AT&T's $22 price per share on December 14, 2000, each share of **MediaOne** would receive merger consideration of approximately $59. Both the number of **MediaOne** shares you own and the **AT&T** shares and cash payment due you is indicated on the attached Claim Card.

We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per MediaOne share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. **Even if you do not have your MediaOne certificate(s), you may still participate in this voluntary program.**

Please read the enclosed materials carefully. **There is no benefit in continuing to hold your MediaOne shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.** Georgeson Shareholder Communications Inc. is being permitted to administer this voluntary program through **JANUARY 23, 2001.** If you have questions after reading this material, call GSC's toll-free number, at 1 (800) 962-6027 for assistance.

PIN:    39601

Sincerely,

AT&T Corp.

✂ **Detach along perforation**  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂ - - - - - -

# CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC.
## SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY
### C/O GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11ᵀᴴ FLOOR, NEW YORK, NY 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from AT&T Corp., dated December 15, 2000. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a processing fee of $7 per AT&T share due is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the cost of assisting me with this special exchange effort.

PIN:  39601     ACCT#:  000868835
MEDIAONE SHARES:    684.0000
AT&T SHARES:        649.0000
CASH DUE:           $24808.68

FORM W-9 BELOW: By entering my social security number below and signing this card, I certify that the following Tax Identification Number is accurate and that I am not subject to backup withholding.

Enter
Social Security #   153 - 09 - 2688

CHECK ONE ⇨  ☐ SELL ALL MY AT&T SHARES
             ☑ RECEIVE MY AT&T SHARES

SIGN ⇨  X _Elizabeth Sampson by Allan H Starr_
                        SIGNATURE OF OWNER   _POA_

X _____
                        SIGNATURE OF CO-OWNER, IF ANY

ELIZABETH SAMPSON
% ALLAN H STARR
108 PINE STREET
PHILADELPHIA     PA 19106 4312

MY DAYTIME PHONE NUMBER IS _215 , 864 6223_

NOTE: If a certificate(s) for your shares is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions of the Statement/Affidavit described on the back of this card.

## AT&T/MediaOne Merger Exchange Form and Guide

**Please refer to the Enclosed Questions and Answers (Q & A) for an explanation of the terms of the election.**

GUIDE

① Number of shares you own of MediaOne.

② The Social Security Number or Tax ID Number as listed on your MediaOne account.

③ Please verify that this is your correct Social Security Number or Tax ID Number. If it is **incorrect**, please print the correct Social Security Number or Tax ID in the area provided.

④ Confirm that your address is correct. If it is incorrect, cross it out and write the correct address directly below it.

⑤ Mark this box, if you are unable to locate all of your stock certificates; read the terms and conditions on the back of this form – Box A.

⑥ Mark this box if you want to change the ownership of your shares; complete the Change Of Name On Account section on the back of this form – Box B.

⑦ Please mark box 7 if you would like to participate in the AT&T Shareowner Dividend Reinvestment and Stock Purchase Plan ("The Plan"). Please refer to the enclosed Plan Prospectus for information on the Plan.

⑧ Listed is your new AT&T account number.

⑨ All registered owners, as shown on the Exchange Form, must sign below. **Do not sign stock certificates.**

⑩ Please give us your daytime and/or evening telephone number.

Please clearly mark boxes with an "X" as shown

Use only a #2 pencil, blue or black ink. Do not use red ink.

AT-0119A New 7/00

Detach Form Before Mailing

44442350047000868835470000684000010

622723
86-8835

### AT&T/MEDIAONE EXCHANGE FORM

**THIS FORM MUST BE RETURNED WITH YOUR MEDIAONE STOCK CERTIFICATES. DO NOT SIGN CERTIFICATES.**

① MediaOne Group shares you own          **684**

② Tax ID Number          **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**

By signing this form I certify under penalties of perjury, that my Tax ID Number listed is accurate for IRS W-9 purposes and that I am not and have not been notified by the IRS that I am subject to back-up withholding. If it is incorrect, please write the correct number below.

③ Corrected Tax ID No. _____

⑤ Mark this box if some or all of your stock certificates have been lost, stolen or destroyed. (Complete Box A on the back of this form.)

⑥ Mark this box to transfer ownership. (Complete Box B on the back of this form.)

⑦ Enroll me in "The Plan" and reinvest the dividends on all of my AT&T shares.

⑧ AT&T Account #.          **510354508**

⑨ *Elizabet C Sampson by Allan H Starr*
POA
Signature of Owner

Signature of Co-owner, if any

④
**ELIZABETH SAMPSON**
**% ALLAN H STARR**
**108 PINE STREET**
**PHILADELPHIA PA 19106-4312**

⑩ *215 8046223*
Daytime Telephone #          Evening Telephone #

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                         :
ALAN H. STARR, Executor of the Estate of                 :
ELIZABETH (BETTY) SAMPSON, individually                  :    03 Civ. 1163 (LLS)
and on behalf of all others similarly situated,          :
                                                         :
                                    Plaintiff,           :    CONSOLIDATED AMENDED
                          v.                             :    CLASS ACTION COMPLAINT
                                                         :
GEORGESON SHAREHOLDER, INC.,                             :    JURY TRIAL DEMANDED
GEORGESON SHAREHOLDER                                    :
COMMUNICATIONS, INC., GEORGESON                          :
 SHAREHOLDER SECURITIES CORP., and                       :
AT&T CORP.,                                              :
                                                         :
                                    Defendants.          :
-------------------------------------------------------x

         Lead Plaintiff Alan H. Starr, as Executor of the Estate of Elizabeth Sampson, by his

attorneys, individually and on behalf of all other persons similarly situated, for his Complaint against

the defendants, alleges as follows:

                                 **NATURE OF THE ACTION**

         1.       This is a class action based on federal securities law brought against defendants

Georgeson Shareholder, Inc. ("GS"); its wholly-owned subsidiaries Georgeson Shareholder

Communications, Inc. ("Georgeson Communications") and Georgeson Shareholder Securities Corp.

("GSSC") (collectively, "Georgeson"); and AT&T Corp. ("AT&T"). This suit involves defendants'

post-merger conduct during a share exchange pursuant to a June 2000 merger between MediaOne

Corp. ("MediaOne") and AT&T. The proposed Class consists of all securityholders who, from

December of 2000 through the present, participated in a share exchange administered by Georgeson

whereby they exchanged their shares of MediaOne for shares of AT&T pursuant to a merger between



ENTERED ON DOCKET
DATE 11|13|03 BY

the two companies, and were damaged thereby (the "Class").

2.    AT&T authorized Georgeson to engage in a "post-merger clean-up," whereby Georgeson would send notices to shareholders who had not exchanged their shares six months after the AT&T-MediaOne merger, to convince them to exchange their shares. The notice on its face appeared to have been sent jointly by Georgeson and AT&T. The notice materially misled the shareholders into believing that they had no alternative but to exchange their shares through Georgeson, or else to forfeit all value of the shares. Georgeson charged an exorbitant "processing fee" for this service, which amounted to nearly 12% of the gross value of the shares and cash that the MediaOne shareholders were entitled to receive. In reality, however, shareholders could have exchanged their shares directly through the transfer agent at no cost, or else contacted other brokers to exchange the shares at a much lower cost. Had the shareholders not been misled by the notice, they would have exchanged their shares through other means and saved themselves the cost of the "processing fee."

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Securities Exchange Act of 1934 as amended (the "Exchange Act"), as codified 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and also 28 U.S.C. §§ 1332 and 1367. The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act, §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

4.    Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. §1391(a), (b), and (c). Many of the acts and transactions giving rise to the violations of law alleged herein occurred in this District. Georgeson maintains its principal place of business in this

District and regularly conducted business in this District throughout the Class Period. AT&T maintains its principal place of business in this District and regularly conducted business in this District throughout the Class Period.

5.     In connection with the wrongful conduct alleged in this Complaint, the Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## PROCEDURAL HISTORY

6.     Plaintiff filed his initial Complaint before this Court on February 24, 2003. On August 11, 2003, the Judicial Panel on Multidistrict Litigation denied a motion filed by Plaintiff Lila T. Gavin to transfer and consolidate this and related cases to the Northern District of Illinois. On September 19, 2003, this Court granted Starr's motion to consolidate all related cases, appointed Starr as Lead Plaintiff for the Class, and approved Starr's counsel Berger & Montague, P.C., and Cohen Milstein Hausfeld & Toll, P.L.L.C., as lead counsel.

## THE PARTIES

7.     Lead Plaintiff Allan H. Starr, currently residing in Philadelphia, Pennsylvania, was, at all times material hereto, the duly authorized agent of Elizabeth (Betty) Sampson pursuant to a Power of Attorney executed by Ms. Sampson on January 18, 1990. At the time, Ms. Sampson was 83 years of age and resided in Trenton, New Jersey. On June 10, 2002, Ms. Sampson passed away, and Mr. Starr became the duly appointed Executor of Ms. Sampson's Estate pursuant to her written will. Prior to the June 2000 merger, Ms. Sampson was the registered owner of 232 and 684 shares of MediaOne common stock (pursuant to Certificate numbers M0351305 and M0358022, respectively). In reliance upon defendants' misleading solicitation Notice, Mr. Starr exchanged the

3

MediaOne shares belonging to Ms. Sampson through Georgeson during the Class Period, and as a result, was charged an excessive "processing fee."

8.      Defendant Georgeson Shareholder ("GS") is the parent company of a group of companies offering a variety of services relating to communications with shareholders, such as proxy solicitation, broker dealer services, and consulting services to issuers.  Georgeson Shareholder's headquarters and principal place of business is at 17 State Street, 28th Floor, New York, NY 10004, phone number 212-805-7000.

9.      Defendant    Georgeson    Shareholder    Communications,    Inc.    ("Georgeson Communications") is a wholly-owned subsidiary of GS. Georgeson Communications handles direct communications with shareholders.  Georgeson Communications has its principal place of business at 17 State Street, New York, NY 10004, phone number 212-440-9800.  During the share exchange at issue, Georgeson used the Continental Stock Transfer & Trust Company as its transfer agent.

10.     Defendant Georgeson Shareholder Securities Corp. ("GSSC") is a wholly-owned subsidiary of GS.  GSSC works to execute claims processing and communications with shareholders, and is a registered broker dealer.  GSSC has its principal place of business at 17 State Street, 28th Floor, New York, NY 10004, phone number 212-440-9800.

11.     Defendant AT&T Corp. ("AT&T") is a New York telecommunications corporation, doing business at 32 Avenue of the Americas, New York, NY, 10013, and headquartered at Bedminister, New Jersey, 07921.  During the share exchange at issue, AT&T used the EquiServe Trust Company as its transfer agent..

## CLASS ACTION ALLEGATIONS

12.     Plaintiff brings this action individually and as a class action pursuant to Rule 23(a)

4

and 23(b)(3) of the Federal Rules of Civil Procedure on behalf all persons who, during the Class

Period of December, 2000 through the present, exchanged their MediaOne common stock for AT&T

using Georgeson as the exchange agent (the "Class"). Excluded from the Class are the Defendants

herein and any entity in which any of the Defendants has or had a controlling interest, any person or

entity affiliated with any of the Defendants, and the legal representatives, heirs, successors or assigns

of any of the Defendants.

13.    The Class is so numerous that joinder of all members is impracticable. At the time

of the merger, MediaOne had approximately 500,000 shareholders of record. While the exact

number of Class members is presently unknown and can be ascertained only through appropriate

discovery, Plaintiff believes that there are hundreds, perhaps even thousands, of Class members

located throughout the United States who similarly exchanged their MediaOne shares through

Georgeson during the Class Period.

14.    Common questions of law and fact exist as to all Class members and predominate

over any questions affecting only individual members of the Class. Among the common questions

of law and fact are:

a.    whether Georgeson violated Section 10(b) of the Exchange Act and SEC Rule 10b-5

promulgated thereunder;

b.    whether AT&T violated Section 10(b) of the Exchange Act and SEC Rule 10b-5

promulgated thereunder;

c.    whether Georgeson and AT&T acted with scienter in pursuing the acts alleged herein;

d.    whether Georgeson and AT&T participated in the course of conduct complained of

herein; and

5

e.    whether Plaintiff and the other members of the Class sustained damages because of

Defendants' conduct, and the appropriate measure of damages.

15.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff

and the other Class members have sustained damages that arise from, and were caused by,

Defendants' wrongful acts alleged herein.  Plaintiff does not have interests antagonistic to, or in

conflict with, the other members of the Class.

16.    Plaintiff will fairly and adequately protect the interests of the other members of the

Class and has retained competent counsel experienced in class action and securities litigation.

17.    Defendants have acted on grounds applicable to the entire Class, thereby making final

relief appropriate with respect to the Class as a whole.

18.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the

management of this action that would preclude its maintenance as a class action.  Furthermore, since

the damages suffered by individual members of the Class may be relatively small, the expense and

burden of individual litigation make it impracticable for the members of the Class to seek redress

individually for the wrongs they have suffered.

## SCIENTER

19.    Georgeson and AT&T were aware of or recklessly disregarded the fact that their joint

Notice to shareholders (Exhibit "A") were materially misleading, giving shareholders the false

impression that they had no other choice but to exchange their MediaOne shares through Georgeson

and pay Georgeson's excessive fee.  Georgeson had a strong motive to create this false impression

because its "processing fee," amounting to nearly 12 % of the gross value of the shares and cash that

the MediaOne shareholders were entitled to receive, was much higher than the amount charged by other brokers for such a transaction. Moreover, the shareholders could have contacted AT&T's transfer agent, Equiserve, directly and exchanged their shares for free. Georgeson knew this information and was fully aware that reasonable shareholders, when clearly apprised of these alternative means to exchange shares, would have acted to avail themselves of either these free or less expensive options. Thus, it was in Georgeson's self-interest that the shareholders not inquire about any of these cheaper alternative ways to exchange their shares-- a result Georgeson achieved through its misleading Notices. Likewise, it was in AT&T's interest to mislead shareholders into exchanging their shares through Georgeson; otherwise, AT&T would have had to pay for Georgeson's services, rather than passing the bill along to unsuspecting shareholders. Additionally, the fact that so many shareholders chose to redeem their shares through Georgeson should have alerted both Georgeson and AT&T that the shareholders likely were misled into believing they had no choice but to exchange their shares through Georgeson.

20.    Georgeson created a prime opportunity to extract this abusive "processing fee" from shareholders by setting up its "post-merger clean-up" service, and by actually sending the Notice to shareholders. The client contracting for this "post-merger clean-up" service (*i.e.* the stock issuer) is not the person who ultimately pays for the service. As a result, Georgeson can charge essentially whatever it wants, as long as the shareholders do not question the fee or compare rates. AT&T gave Georgeson the opportunity to materially mislead the MediaOne stockholders by hiring Georgeson for the "post-merger clean-up," and by approving the form of the Notice (which bears AT&T's corporate logo, see Exhibit "A".)

21.    As discussed in more detail below, the misleading nature of the Notice is apparent

7

on its face. <u>See</u> paragraph 35 and <u>passim</u>. Therefore, both Georgeson and AT&T should have been aware that the Notice would mislead shareholders.

22.     Georgeson (especially GSSC, a registered broker-dealer) was on notice of the deceptive and wrongful nature of its conduct by virtue of various NASD rules of conduct for brokers. NASD Rule 2430 requires that "[c]harges, if any, for services performed, including miscellaneous services such as collection of moneys due for principal, dividends, or interest; exchange or transfer of securities; appraisals, safe-keeping or custody of securities, and other services, shall be reasonable and not unfairly discriminatory between customers." Additionally, the NASD Rule 2440 sets forth the Association's "5% Policy", which holds that mark-ups on securities transactions generally should not exceed 5% of the value of the stock. Therefore, Georgeson should have known that a "processing fee" amounting to nearly 12% of the gross value of a shareholder's stock and cash can hardly be considered reasonable.

## SUBSTANTIVE ALLEGATIONS

### The AT&T-MediaOne Merger

23.     AT&T is a publicly held telecommunications company incorporated in New York and with its principal place of business in New Jersey.

24.     MediaOne was a publicly held telecommunications company incorporated in Delaware and with its principal place of business in Englewood, Colorado.

25.     AT&T and MediaOne officially merged in or around June of 2000. Pursuant to the terms of the merger, MediaOne shareholders could choose one of three ways to exchange their stock, through which they would receive either all cash, all stock, or a mixture of stock and cash. The proxy statement for the AT&T - MediaOne merger made no mention of any fee to be charged for the

8

share exchange; neither did the proxy statement inform shareholders that they could, at any time, exchange their shares for free through AT&T's transfer agent.

26.    After the merger, because MediaOne had ceased to exist, MediaOne stock was no longer publicly traded. Holders of electronic (or "street name") shares in brokerage accounts had their stock automatically converted into AT&T stock and cash as set forth in the merger agreement. However, there remained a substantial number of holders of paper shares. On June 15, 2000, AT&T sent a notice (attached as Exhibit "B") to holders of MediaOne stock certificates informing them of their right to exchange their stock for one of the three elections. The notice stated that if shareholders did not return the election form by July 14, 2000, they would automatically be deemed to have chosen the "standard election." The standard election consisted of 0.95 of a share of AT&T common stock, $30.85 in cash, and a cash "top-up" payment of $5.42, amounting to a total of $36.27 in cash. See Exhibit "B." According to the election form, they would be required to tender their shares to AT&T's transfer agent, EquiServe Trust Company, in order to receive their elected form of compensation. Like the proxy statement, AT&T's first notice was silent regarding whether a fee would be charged for the share exchange and the fact that shareholders could, at any time, exchange their shares for free through AT&T's transfer agent, Equiserve.

27.    On August 1, 2000, AT&T sent a second notice (attached as Exhibit "C") to MediaOne shareholders informing them that, since the deadline for electing one of the three alternatives for exchanging their shares had passed, the shareholders would be receiving the standard election. The notice stated that, in order for AT&T to send the stock and cash payment, the shareholders would be required to tender their stock certificates. Although the notice stated that "it is important that you return your certificates promptly," it did not set forth a deadline or warn

9

shareholders that a "processing fee" may be charged at some time in the future. Like AT&T's prior communication (Exhibit "B"), this second AT&T notice did not mention any fee, nor that the shareholders could exchange their shares through Equiserve for free at any time.

28.     On information and belief, the shareholders who exchanged their shares through Equiserve during this time were not charged a processing fee.

29.     Six months after the merger, there still remained a number of shareholders who had not exchanged their shares. Equiserve kept a record of the shareholders who did not respond to its notices.

### AT&T Hires Georgeson for "PostMerger Clean-Up"

30.     A "post-merger clean-up," according to Georgeson's web site, involves tracking down missing shareholders and soliciting them to exchange their shares. Essentially, Georgeson touts its services as a way for companies to outsource their task of communicating with shareholders. The purpose of a post-merger clean-up is to reduce the issuer's costs of sending mailings, maintaining inactive shareholder accounts, and compliance with escheatment laws.

31.     Approximately six months after the merger, AT&T retained Georgeson as its agent for purposes of this post-merger clean-up; that is, to track down and contact shareholders who were "lost"; that is, shareholders who, due to MediaOne's faulty records of their addresses, illness or infirmity, or other reasons, had not responded to AT&T's previous communications.

### Georgeson's Notices to Shareholders

32.     For a period of time believed to be December 2000 through the present, Georgeson sent notices to the remaining MediaOne shareholders to solicit them to exchange their shares.

33.     The Notice consisted of a form that contained, on one side, a generic "Dear

Stockholder" section laying out the basics of the share exchange; and on the other side, a list of instructions for filling out the "Claim Card" which is located at the bottom of the form. Shareholders were required to detach the Claim Card, fill it out, sign it, and return it to the Continental Stock Transfer & Trust Company c/o Georgeson.

34.　The Notice requires shareholders to tender their old MediaOne stock in order to receive the AT&T stock and cash payment to which they were entitled under the terms of the merger. In addition, the Notice states that Georgeson would deduct a "processing fee" of $7 per AT&T share.

35.　The Notice is highly misleading, giving shareholders the intended impression that they have no alternative but to promptly exchange their shares through Georgeson, either because the shares will escheat to the state as abandoned property, or because the shares (which were no longer publicly traded) have no worth unless tendered to Georgeson through its notification program. A copy of the notice is attached hereto as Exhibit "A." The misleading statements and omissions are as follows:

　　a.　The Notice implies that Georgeson is the official means for exchanging one's shares (and thus, by implication, there is no alternative way to exchange the shares). The notice is printed on AT&T letterhead (not Georgeson's), and the "Dear Stockholder" letter is signed "AT&T Corp." The Notice begins by stating: "Our records show that you still have shares of MediaOne Group, Inc." The Notice also states, "We have retained Georgeson [ ] to assist you in claiming your shares and cash." Even though the cover letter and the Notice refer to the shareholder claim process as being "voluntary," the Notice states that "[t]here is no longer a market for these shares." These statements give the impression that the notice was sent by AT&T, and that AT&T had appointed Georgeson as its official, and therefore

11

exclusive, exchange agent, and that failure to act would result in the loss of all possible value of the "old" MediaOne stock since those shares are no longer traded.

     b.     The Notice also implies that the shareholders were too late to participate in the "regular" (free) share exchange, and that AT&T had given Georgeson responsibility for administering a "special" exchange for lost securityholders. The Notice terms itself "IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC. COMMON STOCK" (capital letters in original). The Claim Card contains a provision stating that the undersigned shareholder agrees to the terms and conditions set forth in the notice, and that the $7 per share fee would be deducted "to defray the cost of assisting me with this special exchange effort." The Notice would mislead the reasonable shareholder into believing that the fee of $7 per AT&T share was related to the actual costs of the share exchange, and was necessary and justified because Georgeson had made a special effort to reach the missing shareholders (and/or taken together with other statements in the Notice, that the shareholders were too late to participate in the normal exchange and were lucky to be getting anything at all).

     c.     The Notice is also designed to create false urgency to act, stating that "We urge you to claim these shares now"; "Georgeson [ ] is being permitted to administer this voluntary program through **JANUARY 23, 2001**"; "**There is no benefit in continuing to hold your MediaOne shares**"; and, "**if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.**" (bold type in original).

     d.     Furthermore, the Notice claims that the "processing fee" exists "to defray the

12

cost of providing you this service."

      e.    In conjunction with these deceptive statements, material information was deliberately omitted from the Notice that was necessary to make the Notice not misleading.

      I.    The shareholders were not given sufficiently detailed information about the so-called "processing fee," as it would be applied specifically to them, to make an informed decision about whether or not to exchange their shares through Georgeson. Because the Notice did not illustrate this computation, or specifically disclose the actual percentage of Georgeson's fee relative to the overall exchange, each shareholder would have to perform a complicated mathematical exercise in order to determine their total fee, or the percentage of their property that was being forfeited to pay that fee. Instead, the Notice confusingly reads as follows: "Following the merger, you are now due 0.95 of a share of AT&T and a cash payment of $36.27 for every MediaOne share you hold . . . Based on AT&T's $22 price per share on December 14, 2000, each share of MediaOne would receive merger consideration of approximately $59"; then, in a separate paragraph, the Notice sets forth the processing fee of "$7 per AT&T share due."

      ii.    Nowhere does the Notice inform the shareholders that they could altogether avoid any Georgeson fee by exchanging their shares for free by sending their shares directly to the issuer's transfer agent, or, in the alternative, that the shareholders could pay a minimal fee far less than Georgeson's by merely paying a broker to liquidate their old MediaOne stock.

36.    All of these misstatements and omissions, viewed together, create a total impression

that MediaOne shareholders had no choice but to exchange their shares through Georgeson, and that the processing fee was both necessary to cover Georgeson's valid expenses and unavoidable if they wanted to reclaim any value for their stockholdings before escheatment.

37.    However, this impression was completely false. First, Georgeson was not the exclusive means for shareholders to exchange their shares. The shareholders could have contacted AT&T's original exchange agent, Equiserve, and exchanged their shares for free. Alternatively, on information and belief, any broker could have processed this share exchange, and at a much lower cost than $7.00 per AT&T share.

38.    Furthermore, the "processing fee" bore no relation whatsoever to Georgeson's actual costs in administering the share exchange. Although in some cases Georgeson may have had to perform some research to track down missing shareholders, the cost of this service, plus the mailings and administrative costs, was far less than $ 7 per AT&T share. For example, a "locator service," which performs similar searches to find absent class members in class action cases, charge on average $3 for each search, and around $15 to $20 for each successful search. In reality, Georgeson's fee was a contingency fee, with a built-in multiplier based purely on the amount of shares held by each individual, despite the fact that the same amount of effort went into searching for a shareholder with 10 shares, as for a shareholder with 1000 shares.

39.    Neither AT&T, MediaOne, nor Georgeson took any steps to inform the shareholders that they could exchange their shares at no cost through Equiserve. *In fact, on information and belief, there was no information in the public domain to inform the shareholders that they could have exchanged their shares through Equiserve after the "regular" exchange had ended.*

**Alan Starr Exchanges MediaOne Shares In Response to Georgeson's Mailing**

14

40.    Elizabeth Sampson held two groups of MediaOne stock. Ms. Sampson received two Notices from Georgeson dated December 15, 2000 for each of the two registered stock certificates she held (each in the amount of 232 and 684 shares, respectively). Allan H. Starr, acting as Power of Attorney on Ms. Sampson's behalf, responded to Georgeson's notices and tendered Ms. Sampson's shares to Continental, Georgeson's transfer agent, on December 28, 2000. Mr. Starr tendered the shares because the Notices led him to believe that Georgeson was the exclusive exchange agent for AT&T, and that he had no choice but to pay the processing fee if he had any chance of recouping economic value for stock which was no longer traded.

41.    Ms. Sampson held a total of 916 MediaOne shares. According to the terms of the merger, Ms. Sampson should have received 869 AT&T shares, plus $33,249.72 in cash (the $33,223.32 cash payment due plus the value of the fractional .4 and .8 AT&T shares left over from the exchange, which were equivalent to about $26.40, given the stated value of AT&T stock at about $22 a share). Mr. Starr opted to keep the AT&T shares rather than selling them.

42.    However, Georgeson deducted its "processing fee" of $7 per AT&T share from that cash payment. The total amount of the processing fee paid by Ms. Sampson came to **$6,083**, or **nearly 12% of the total payment the Sampson Estate was entitled to.**

43.    Ms. Sampson received this cash payment on or about February 27, 2001.

44.    Mr. Starr and the other Class Members relied on, and were deliberately mislead by, the material misrepresentations and omissions in the Notice. The shareholders were tricked into believing that they had only two choices: pay Georgeson the exorbitant processing fee to receive at least some of the value of their shares before it would be too late, or else forfeit their shares to the state under the abandoned property laws. In reliance on this misleading Notice, and as a direct result

15

of the material information omitted therefrom, Plaintiff and the Class were convinced that Georgeson

was the sole, official agent of AT&T for the exchange, and they did not look for either less expensive

or even free means to exchange their shares. Had the Class known that they could have exchanged

their shares for free by contacting the exchange agent directly, or could have paid a nominal amount

by merely contacting another broker, they would have done so, and thereby saved a substantial

amount of money.

### COUNT I

#### Against All Defendants for Violation of
#### Section 10(b) of the Exchange Act and Rule 10b-5

45.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

46.    Defendants Georgeson Shareholder, Georgeson Communications, GSSC, and AT&T

employed a manipulative and deceptive device, scheme or artifice to defraud in violation of SEC

Rule 10b-5(a); omitted to disclose material facts necessary to make statements they made, in the

light of the circumstances under which they were made, not misleading, in violation of SEC Rule

10b-5(b); and engaged in an act, practice or course of business which operated as a fraud or deceit

in violation of SEC Rule 10b-5(c), in connection with Defendants' processing of the MediaOne share

exchange for Plaintiff and members of the Class during the Class Period. Defendants' manipulative

and deceptive devices and practices included, *inter alia*, sending a false and misleading notice to

MediaOne shareholders as part of a "post-merger clean-up," deceiving the Class into thinking that

Georgeson was the exclusive agent by which they should exchange their MediaOne shares, and

deliberately neglecting to inform shareholders that they could exchange their shares directly through

the transfer agent at no cost, so that AT&T could altogether avoid the costs associated with locating

16

the owners of unexchanged MediaOne shares and Georgeson could extract an exorbitant processing fee for carrying out the share exchange. Moreover, Defendants knew that neither the AT&T proxy statements nor their earlier notices (Exhibits "B" & "C") revealed that shareholders could have exchanged their shares for free through Equiserve at any time.

47.    As a result of Defendants' manipulative and deceptive devices and practices alleged herein, Plaintiff and the other persons who exchanged their shares during the Class Period paid an unreasonable and excessive processing fee for the share exchange. Moreover, Defendants' misleading Notice (Exhibit "A") dissuaded these shareholders from searching out alternative means to exchange their shares, which did in fact exist and were substantially cheaper than Georgeson. Plaintiff and the other shareholders who exchanged their shares through Georgeson during the Class Period were injured by Defendants' deceptive and manipulative practices because they paid more for the exchange than they would have absent the misleading notice.

48.    The specific misleading and deceptive statements relied upon by Plaintiff and the Class were all contained in the Notice that Georgeson, together with AT&T, sent to MediaOne shareholders during the Class Period. Although Notices may have been sent on various dates within the Class Period, the contents of every notice were the same. The Notices were misleading for the reasons set forth in Paragraph 35, above.

49.    Due to the misleading nature of the above statements, Georgeson and AT&T had a duty to disclose the material facts necessary to permit the shareholders to make an informed decision about whether or not to exchange their shares through Georgeson.

50.    By virtue of the foregoing, Defendants have violated section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c).

51.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the proposed Class incurred damages in an amount to be proven at trial.

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing or historical facts, conditions, or opinions, and therefore were not forward-looking statements.

## COUNT II

### Against The Georgeson Defendants For Violation of
### Section 10(b) of the Exchange Act And Rule 10b-5(b): Excessive Markup

53.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

54.    In connection with the wrongful practices alleged herein, Georgeson and AT&T made untrue statements of material fact, and omitted to disclose material facts necessary to make statements they made, in light of the circumstances under which they were made, not misleading in violation of SEC Rule 10b-5(b). Defendants' material misrepresentations and omissions contained in the Notice to Shareholders concerned, *inter alia*: the suggestion that Georgeson was the exclusive means for shareholders to exchange their shares and that their "processing fee" was reasonably related to the actual cost of administering the exchange; Georgeson's failure to inform shareholders that they could have exchanged their stock directly through the transfer agent at no cost, or through other brokers at a much lower cost; and the unclear and misleading nature of setting forth the processing fee, which did not clearly inform shareholders of the total processing fee they would have to pay or the percentage of their stock that would be forfeited through the processing fee; all as alleged more fully herein.

18

55.     Georgeson had a duty to disclose all material information that a reasonable shareholder would need to make an informed decision whether or not to engage in this transaction with Georgeson.  When a broker-dealer such as Georgeson charges an excessive markup on the price of stock, the broker-dealer has a duty to disclose the markup and any other material information needed to permit the customer to make an informed judgment upon whether or not he will complete the transaction.

56.     Georgeson breached this duty by failing to inform Plaintiff and the Class that its markup (i.e. the "processing fee") bore no reasonable relation to its actual transaction costs and/ or the actual price of exchanging AT&T stock elsewhere in the market, and by misleading Plaintiff and the Class into believing that they had no choice but to exchange their shares through Georgeson and pay the exorbitant fee.

57.     Georgeson knew or recklessly ignored that it had breached its duty, and that its statements were thereby false and misleading at the time they were made.  Facts demonstrating Georgeson's knowledge or recklessness are more fully set forth in the preceding paragraphs.

58.     As a result of Georgeson's materially false and misleading statements and omissions, Plaintiff and the Class paid an excessive markup on the cost of the MediaOne-AT&T share exchange and were damaged thereby.  Had Plaintiff and the other Class members known that Georgeson's fee was unrelated to the actual cost of administering the share exchange, that they could have exchanged their shares directly through the transfer agent at no cost, and/or the actual amount of their total processing fee as a basis for comparison shopping, Plaintiff and the Class members would have exchanged their shares through the transfer agent or through a broker other than Georgeson, at either no cost or a lower cost.

19

59.     As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiff and the other members of the proposed Class suffered damages in an amount to be proven at trial.

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. The statements alleged to be false and misleading herein all relate to then-existing or historical facts, conditions, or opinions, and therefore were not forward-looking statements.

## BASIS OF ALLEGATIONS

Plaintiff makes the foregoing allegations based on Plaintiff's personal knowledge, which is derived from personal experience; the contents of Defendants' Notice to Shareholders; and the investigation conducted by his attorneys, which included, *inter alia*, a review of various SEC filings, conversations with experts on mergers and "post-merger clean-ups," information posted on Georgeson's web site, www.georgeson.com.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the Defendants as follows:

A.     Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Certifying Plaintiff as the representative of the Class and his counsel as counsel for the Class;

C.     Awarding compensatory damages against all Defendants, jointly and severally, in

20

favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

      D.     Awarding Plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

      E.     Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

### JURY TRIAL DEMAND

      Plaintiff demands a trial by jury.

Dated: November 7, 2003          COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC

                        Linda P. Nussbaum (LN-9336)
                        150 East 52nd Street
                        Thirtieth Floor
                        New York, NY 10022
                        (212) 838-7797

                        Andrew N. Friedman
                        COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
                        1100 New York Avenue, N.W.
                        Suite 500, West Tower
                        Washington, D.C. 20005
                        (202) 408-4600

                              – and –

BERGER & MONTAGUE, P.C.
H. Laddie Montague
Peter Kahana
Jennifer MacNaughton-Wong
1622 Locust Street
Philadelphia, PA  19103-6365
(215) 875-3000

**Counsel for Plaintiff**

373147

22

## CERTIFICATE OF SERVICE

I certify that on this 7th day of November, 2003, I caused a copy of the Amended

Consolidated Complaint be served upon the parties listed below in the manner listed below.

| By Hand | Via UPS Overnight Mail |
|---|---|
| Eli R. Mattioli, Esq.<br>Robert Saville, Esq.<br>**Thelen Reid & Priest LLP**<br>875 Third Avenue<br>New York, NY 10022<br><br>*Counsel for Defendants Georgeson Shareholder Inc., Georgeson Shareholder Communications, Inc., and Georgeson Shareholder Securities Corp.* | M. Norman Goldberger, Esq.<br>Adam H. Cutler, Esq.<br>**Wolf, Block, Schorr & Solis-Cohen LLP**<br>1650 Arch Street, 23rd Floor<br>Philadelphia, PA 19103<br>215-977-2100<br><br>*Counsel for Defendant AT&T Corp.* |

Ingrid Falu

Exhibit A



**IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF
MEDIAONE GROUP, INC. COMMON STOCK**

December 15, 2000

Dear Stockholder:

Our records show that you still have shares of **MediaOne Group, Inc.** There is no longer a market for these shares as a result of the June 2000 merger between **AT&T Corp.** and **MediaOne Group.** Following the merger, you are now due 0.95 of a share of **AT&T** and a cash payment of **$36.27** for every **MediaOne** share you hold, plus all accrued dividends paid on these shares. Based on **AT&T's $22** price per share on December 14, 2000, each share of **MediaOne** would receive merger consideration of approximately **$59.** Both the number of **MediaOne** shares you own and the **AT&T** shares and cash payment due you is indicated on the attached Claim Card.

We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per MediaOne share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. **Even if you do not have your MediaOne certificate(s), you may still participate in this voluntary program.**

Please read the enclosed materials carefully. **There is no benefit in continuing to hold your MediaOne shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.** Georgeson Shareholder Communications Inc. is being permitted to administer this voluntary program through **JANUARY 23, 2001.** If you have questions after reading this material, call GSC's toll-free number, at 1 (800) 962-6027 for assistance.

PIN:    39596

Sincerely,

AT&T Corp.

✂ Detach along perforation                                                                          ✂

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC.
SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY**
C/O GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11ᵀᴴ FLOOR, NEW YORK, NY 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from AT&T Corp., dated December 15, 2000. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a processing fee of $7 per AT&T share due is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the cost of assisting me with this special exchange effort.

FORM W-9 BELOW: By entering my social security number below and signing this card, I certify that the following Tax Identification Number is accurate and that I am not subject to backup withholding.

Enter
Social Security #   *153 - 09 - 2688*

PIN:    39596    ACCT#:    000234641
MEDIAONE SHARES:        232.0000
AT&T SHARES:            220.0000
CASH DUE:           $8414.64

CHECK
ONE
☐ SELL ALL MY AT&T SHARES
☑ RECEIVE MY AT&T SHARES

SIGN ➡

X *Betty Sampson by Allan Starr POA*
SIGNATURE OF OWNER

X _____
SIGNATURE OF CO-OWNER, IF ANY

BETTY SAMPSON
108 PINE STREET
PHILADELPHIA    PA 19106 4312

MY DAYTIME PHONE NUMBER IS ( *215* ) *864 6223*

NOTE: If a certificate(s) for your shares is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions of the Statement/Affidavit described on the back of this card.

## AT&T/MediaOne Merger Exchange Form and Guide

**Please refer to the Enclosed Questions and Answers (Q & A) for an explanation of the terms of the exchange.**

GUIDE

1) Number of shares you own of MediaOne.

2) The Social Security Number or Tax ID Number as listed on your MediaOne account.

3) Please verify that this is your correct Social Security Number or Tax ID Number. If it is **incorrect**, please print the correct Social Security Number or Tax ID in the area provided.

4) Confirm that your address is correct. If it is incorrect, cross it out and write the correct address directly below it.

5) Mark this box, if you are unable to locate all of your stock certificates; read the terms and conditions on the back of this form – Box A.

6) Mark this box if you want to change the ownership of your shares; complete the Change Of Name On Account section on the back of this form – Box B.

7) Our records indicate that you are currently an AT&T shareholder and have been mailed the AT&T Shareowner Dividend Reinvestment and Stock Purchase Plan ("The Plan") Prospectus. Mark box 7 if you would like to participate in the Plan.

8) Listed is your current AT&T account number.

9) All registered owners, as shown on the Exchange Form, must sign below. **Do not sign stock certificates.**

10) Please give us your daytime and/or evening telephone number.

Please clearly mark boxes with an "X" as shown

Use only a #2 pencil, blue or black ink. Do not use red ink.

**Detach Form Before Mailing**

AT-0121A  New 7/0

4444235004700023464147000023200016

506528
23-4641

## AT&T/MEDIAONE EXCHANGE FORM

**THIS FORM MUST BE RETURNED WITH YOUR MEDIAONE STOCK CERTIFICATES. DO NOT SIGN CERTIFICATES.**

① MediaOne Group shares you own          232

② Tax ID Number          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

By signing this form I certify under penalties of perjury, that my Tax ID Number listed is accurate for IRS W-9 purposes and that I am not and have not been notified by the IRS that I am subject to back-up withholding. If it is incorrect, please write the correct number below.

③ Corrected Tax ID No. _____

⑤ ☐ Mark this box if some or all of your stock certificates have been lost, stolen or destroyed. (Complete Box A on the back of this form.)

⑥ ☐ Mark this box to transfer ownership. (Complete Box B on the back of this form.)

⑦ ☐ Enroll me in "The Plan" and reinvest the dividends on all of my AT&T shares.

BETTY SAMPSON
108 PINE STREET
PHILADELPHIA PA 19106-4312

④

⑧ AT&T Account #.          362096307

⑨ *Betty Sampson by Allan Stein*
                              Signature of Owner
                              POA

_____
Signature of Co-owner, if any

⑩ 215 846 2 23
Daytime Telephone #          Evening Telephone #

 **AT&T**

## IMPORTANT NOTICE FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC. COMMON STOCK

December 15, 2000

Dear Stockholder:

Our records show that you still have shares of **MediaOne Group, Inc.** There is no longer a market for these shares as a result of the June 2000 merger between **AT&T Corp.** and **MediaOne Group.** Following the merger, you are now due 0.95 of a share of **AT&T** and a cash payment of $36.27 for every **MediaOne** share you hold, plus all accrued dividends paid on these shares. Based on **AT&T's** $22 price per share on December 14, 2000, each share of **MediaOne** would receive merger consideration of approximately $59. Both the number of **MediaOne** shares you own and the **AT&T** shares and cash payment due you is indicated on the attached Claim Card.

We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per MediaOne share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. **Even if you do not have your MediaOne certificate(s), you may still participate in this voluntary program.**

Please read the enclosed materials carefully. **There is no benefit in continuing to hold your MediaOne shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.** Georgeson Shareholder Communications Inc. is being permitted to administer this voluntary program through JANUARY 23, 2001. If you have questions after reading this material, call GSC's toll-free number, at 1 (800) 962-6027 for assistance.

PIN:    39601

Sincerely,

AT&T Corp.

✄ Detach along perforation                                                                                  ✄

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### CLAIM CARD FOR HOLDERS OF UNEXCHANGED SHARES OF MEDIAONE GROUP, INC.
### SEND TO: CONTINENTAL STOCK TRANSFER & TRUST COMPANY
C/O GEORGESON SHAREHOLDER SECURITIES CORPORATION, 110 WALL STREET, 11ᵀᴴ FLOOR, NEW YORK, NY 10005

I, the undersigned, agree to the terms and conditions described in the Letter and Questions and Answers from AT&T Corp., dated December 15, 2000. I hereby remove all stops previously placed on my certificate(s) and acknowledge that a processing fee of $7 per AT&T share due is to be paid to Georgeson Shareholder Securities Corporation by means of a deduction from my proceeds to defray the cost of assisting me with this special exchange effort.

PIN:    39601    ACCT#:    000868835
MEDIAONE SHARES:    684.0000
AT&T SHARES:    649.0000
CASH DUE:    $24808.68

FORM W-9 BELOW: By entering my social security number below and signing this card, I certify that the following Tax Identification Number is accurate and that I am not subject to backup withholding.

Enter Social Security #    153 - 09 - 2688

CHECK ONE ⇒    ☐ SELL ALL MY AT&T SHARES
            ☑ RECEIVE MY AT&T SHARES

SIGN ⇒    X *Elizabeth Sampson by Allan H Starr POA*
                SIGNATURE OF OWNER

        X
                SIGNATURE OF CO-OWNER. IF ANY

ELIZABETH SAMPSON
% ALLAN H STARR
108 PINE STREET
PHILADELPHIA    PA 19106 4312

MY DAYTIME PHONE NUMBER IS 215, 864 6223

NOTE: If a certificate(s) for your shares is not presented along with this signed Claim Card, the unpresented shares will be deemed lost and your signature will acknowledge that you agree to the terms and conditions of the Statement/Affidavit described on the back of this card.

## AT&T/MediaOne Merger Exchange Form and Guide

Please refer to the Enclosed Questions and Answers (Q & A) for an explanation of the terms of the election.

IDE

) Number of shares you own of MediaOne.

) The Social Security Number or Tax ID Number as listed on your MediaOne account.

) Please verify that this is your correct Social Security Number or Tax ID Number. If it is **incorrect**, please print the correct Social Security Number or Tax ID in the area provided.

) Confirm that your address is correct. If it is incorrect, cross it out and write the correct address directly below it.

) Mark this box, if you are unable to locate all of your stock certificates; read the terms and conditions on the back of this form – Box A.

) Mark this box if you want to change the ownership of your shares; complete the Change Of Name On Account section on the back of this form – Box B.

) Please mark box 7 if you would like to participate in the AT&T Shareowner Dividend Reinvestment and Stock Purchase Plan ("The Plan"). Please refer to the enclosed Plan Prospectus for information on the the Plan.

) Listed is your new AT&T account number.

) All registered owners, as shown on the Exchange Form, must sign below. **Do not sign stock certificates.**

) Please give us your daytime and/or evening telephone number.

Please clearly mark boxes with an "X" as shown

Use only a #2 pencil, blue or black ink. Do not use red ink.

AT-0119A  New 7/0X

**Detach Form Before Mailing**

4444235004700086883547000684000010

622723
86-8835

## AT&T/MEDIAONE EXCHANGE FORM

**THIS FORM MUST BE RETURNED WITH YOUR MEDIAONE STOCK CERTIFICATES. DO NOT SIGN CERTIFICATES.**

① MediaOne Group shares you own          684

② Tax ID Number          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

By signing this form I certify under penalties of perjury, that my Tax ID Number listed is accurate for IRS W-9 purposes and that I am not and have not been notified by the IRS that I am subject to back-up withholding. If it is incorrect, please write the correct number below.

③ Corrected Tax ID No. _____

⑤ [ ] Mark this box if some or all of your stock certificates have been lost, stolen or destroyed. (Complete Box A on the back of this form.)

⑥ [ ] Mark this box to transfer ownership. (Complete Box B on the back of this form.)

⑦ [ ] Enroll me in "The Plan" and reinvest the dividends on all of my AT&T shares.

⑧ AT&T Account #.          510354508

④
ELIZABETH SAMPSON
% ALLAN H STARR
108 PINE STREET
PHILADELPHIA PA 19106-4312

⑨ _Elizabeth E Sampson by Allan H Starr_
POA
Signature of Owner

Signature of Co-owner, if any

⑩ 215 8446223
Daytime Telephone #          Evening Telephone #

Exhibit B



AT&T–MediaOne Merger

Information Guide

For MediaOne Shareowners of Common Stock


AT&T

AT&T
32 Avenue of the Americas
New York, New York 10013-2412





June 15, 2000

Dear MediaOne Shareowner:

Welcome to AT&T. We have now completed the merger of our two companies.

We're excited about the opportunities created by the merger of these two dynamic communications companies, and we're ready to get down to business together.

As a current MediaOne shareowner, you are entitled, between now and July 14, 2000, to indicate how you want to exchange the MediaOne Group shares you hold. For each share of MediaOne Group common stock you currently own, you may elect one of the following alternatives:

- **Standard Election:** 0.95 of a share of AT&T common stock, $30.85 in cash, plus a cash "top-up" payment of $5.42.
- **Stock Election:** 1.4912 shares of AT&T common stock plus a cash "top-up" payment of $8.50.*
- **Cash Election:** $85.00 in cash.*

*\* Please note that the Stock Election and the Cash Election alternatives may be pro-rated; see the enclosed Information Guide for details.*

The Information Guide describes each of these alternatives, and answers additional questions about exchanging your shares. If after reading it you are uncertain about what to do, we encourage you to consult with a financial professional to help you make your final decision.

Please note that you must return your MediaOne Group stock certificate(s) along with the completed and signed Election Form using the enclosed insured and pre-addressed envelope.
DO NOT SIGN YOUR STOCK CERTIFICATE(S).

**It is important that your stock certificates and Election Form be *received* by July 14, 2000, the deadline indicated on the Election Form. If not, you will automatically be deemed to have made the Standard Election and will receive a combination of AT&T Common Stock and cash.**

Thank you for your support of this merger, and again, welcome to the AT&T family.

Sincerely,

C. Michael Armstrong
Chairman and CEO

*P.S. Please review the enclosed materials and return your form and stock certificates as quickly as possible to ensure that they are received by July 14, 2000.*

m C    **MediaOne Group, inc. Election Form and Guide**

·    **Please refer to the Enclosed I..rmation Guide for an explanation of the ter.. of the election.**

Number of shares you own.

The Social Security Number or Tax ID Number as listed on your account. Please verify that this is your correct Social Security Number or Tax ID Number.

f the Social Security Number or Tax ID Number **is incorrect,** please print the correct number in the area provided.

Choose one of the following Elections. (Boxes 4, 5 or 6)

If you mark this box, you will receive the Standard Election Consideration as described in the Q&A Number (3).

If you mark this box, you will receive the Stock Election Consideration as described in the Q&A Number (3).

If you mark this box, you will receive the Cash Election Consideration as described in the Q&A Number (3).

Mark this box and complete the back of this form if you are unable to locate any (or all) of your stock certificates (complete Box A on the back), and/or would like to change the name on your shares (complete Box B on the back).

Our records indicate that you are not an AT&T shareowner. If you would like information about our Dividend Reinvestment Plan mark the box and See Q&A Number (11).

All registered owners, as shown on the Election Form, must sign below. **Do not sign stock certificates.**

Please give us your daytime and/or evening telephone number should we need to contact you.

---

## This election expires at 5:00 pm Eastern Time on  JULY 14, 2000
### Detach Form Before Mailing

MO-0002 New 6/00

▶                 USW WSTMO 00257044790

## MEDIAONE GROUP, INC. ELECTION FORM
### THIS FORM MUST BE RETURNED WITH YOUR STOCK CERTIFICATES. DO NOT SIGN CERTIFICATES.

Total MediaOne Group shares you own    232.000

Tax ID Number    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

By signing this form I certify under penalties of perjury, that my Tax ID
Number listed is accurate for IRS W-9 purposes and that I am not and
have not been notified by the IRS that I am subject to back-up
withholding. If it is incorrect, please write the correct number below.

Corrected Tax ID No. _____

④ ☐ Mark this box for the Standard Election Consideration (combination of stock and cash). See Q&A (3)
OR
⑤ ☐ Mark this box for the Stock Election Consideration. See Q&A (3)
OR
⑥ ☐ Mark this box for the Cash Election Consideration. See Q&A (3)

⑦ ☐ Mark this box for lost certificates (complete Box A on reverse) or to transfer ownership (complete Box B on reverse).

BETTY SAMPSON
108 PINE STREET
PHILADELPHIA PA    19106-4312

⑧    I am interested in the AT&T Dividend Reinvestment Plan.  ☐

⑨ _____
Signature of Owner

_____
Signature of Co-owner, if any

⑩ _____
Daytime Telephone #          Evening Telephone #

## Questions & Answers

# For MediaOne Shareowners of Common Stock

**1.   What is the current status of the merger between MediaOne and AT&T?**

We have completed the merger between MediaOne and AT&T. The companies are in the process of bringing together their business operations under the AT&T umbrella.

**2.   How does this affect me as a MediaOne shareowner?**

As a result of the merger, MediaOne Group common stock is no longer trading and as a MediaOne shareowner you are entitled to receive a combination of cash and shares in AT&T. If you prefer, you may also request to only receive shares or only receive cash. Because these elections are subject to pro-ration, as described on page 2, you may receive a combination of cash and AT&T shares even if you request to receive only cash or only shares.

**3.   What are my alternatives?**

For a very limited time, you can elect how you want to exchange the MediaOne shares you hold. Indicate your preference and return the enclosed Election Form in the enclosed pre-addressed envelope to the Exchange Agent, EquiServe Trust Company, by the deadline specified on the Election Form. If you choose to use an overnight courier, send the documents to: EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184. If you do not return your Election Form or it is not received by the deadline indicated on the Election Form, you will automatically be deemed to have made the Standard Election, described on page 2, and will receive a combination of AT&T common stock and cash.

The number of AT&T shares or the amount of cash you receive depends upon which alternative you select (see Question 4 regarding definition of "pro-ration"):

| Election Alternatives | Shares or Cash to be Received Per MediaOne Share |
| --- | --- |
| Standard Election (Not subject to pro-ration) | 0.95 of a share of AT&T common stock, $30.85 in cash, plus a cash "top-up" payment of $5.42. |
| Stock Election (Subject to pro-ration) | 1.4912 shares of AT&T common stock plus a cash "top-up" payment of $8.50. |
| Cash Election (...ject to pro-ration) | $85.00 in cash. |

**PLEASE OBTAIN CURRENT MARKET QUOTATIONS BEFORE MAKING YOUR ELECTION.**

**4. What does "Subject to pro-ration" mean?**

When MediaOne agreed to merge, AT&T set aside a fixed number of shares and a fixed amount of cash to complete the merger.

It is possible that more people will choose the all-cash alternative, and the total amount could exceed the cash allocated for the merger by AT&T. If that happens, those people will receive some AT&T shares instead of receiving only cash.

It is also possible that more people will choose the all-stock alternative, exceeding the number of shares allocated by AT&T. If that happens, those people will receive some cash instead of only receiving AT&T shares.

Note that the Standard Election alternative is not subject to pro-ration, and therefore will definitely follow the formula described above.

**5. Once I've made my choice, how do I exchange my MediaOne Group common stock certificate(s)?**

To receive your AT&T shares and/or cash, you must return your MediaOne Group common stock certificate(s) along with the completed and signed Election Form. Do not sign your stock certificates.

The enclosed pre-addressed envelope is insured for a market value of $1,000,000 or less, if mailed within the United States, Puerto Rico, the U.S. Virgin Islands or Canada.

AT&T is not responsible for loss of certificates mailed from any other countries or with a market value of more than $1,000,000. Place such certificates in a separate envelope, insure them for 2% of their market value (as shown on the back of the Election Form in Box A) and send them by overnight courier to EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184. AT&T is not responsible for certificates mailed to any other address.

**IMPORTANT: DO NOT SIGN YOUR STOCK CERTIFICATE(S).**

**6. What will happen if I don't return my stock certificate(s) or don't sign my Election Form?**

All documents must be received on time and all paperwork must be completed and signed for you to qualify for either the Cash Election or Stock Election. However, you will still be entitled to receive the Standard Election if your completed Election Form is not received by the deadline. In any case — whether you're selecting "Standard," "Cash," or "Stock" — we strongly encourage you to return the necessary documents as soon as possible. If you do not send in your documents at this time, you will receive a future mailing in which you will be directed to return your stock certificates and an Exchange Form (which you will receive in that mailing) before you can receive any AT&T shares, cash payment, AT&T dividends, or be eligible to participate in future AT&T shareholder meetings. Be aware that MediaOne Group common stock will no longer be traded on any stock exchange so there is no benefit to holding your MediaOne certificates.

**7. What if I submit my MediaOne stock certificates and Election Form, and then later decide to change my decision?**

You may change your decision any time prior to the Election Deadline by sending a revised Election Form, properly completed and signed, to the Exchange Agent. But time is very limited — we encourage you to carefully consider your choice before sending in your materials.

You may withdraw your decision any time prior to the Election Deadline by submitting written notice to the Exchange Agent. The Exchange Agent must receive this withdrawal notice by the close of business on the day prior to the election deadline. We recommend you send any changes or withdrawals to EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184.

8. **Will I be required to pay any taxes on the shares and cash I receive?**

You will generally be subject to tax on any cash you receive. Tax-related information can be found in the original proxy statement mailed to shareholders last year, which is available on the Internet at http://www.att.com/ir under the heading "SEC Documents." You should consult your own tax advisor regarding U.S. federal income tax consequences in light of your own personal circumstances as well as the consequences under other U.S., state, local, and foreign tax laws.

9. **How long will it take to receive my shares and/or cash after I send in my Election Form and stock certificate(s)?**

All election proceeds (AT&T common stock and cash) will be mailed to you approximately two weeks after the expiration of the Election period as indicated on the Election Form.

10. **I am already an AT&T shareowner. What do I need to do with my current AT&T shares? Will my new AT&T shares be credited to my existing AT&T account?**

You do not need to take any action with regard to the AT&T shares you already own. This merger affects only the MediaOne Group shares you currently own.

If "Current AT&T Account Number" followed by an account number is printed above your name and address on your Election Form, your new AT&T shares will be credited to your existing AT&T account. If there is no AT&T account number listed on the Election Form, your new AT&T shares will be deposited into a new account and you can arrange transfer later.

11. **What do I do if I am already an AT&T shareowner and I want to have my new shares included in the AT&T Dividend Reinvestment Plan?**

If you participate in the AT&T Dividend Reinvestment Plan your new shares will be automatically enrolled in the plan unless you mark box 8.

If you are currently an AT&T shareowner and do not participate in the AT&T Dividend Reinvestment Plan, you can check box 8 on the Election Form to enroll. A prospectus with respect to the AT&T Dividend Reinvestment Plan was previously sent to you.

12. **Can I keep my current MediaOne Group account and account number?**

No. Your current MediaOne Group account will be closed and a new account will be opened for your AT&T shares. Your new account number will appear on your statement.

13. **Will I receive any fraction of an AT&T share in the merger?**

No fraction of a share will be issued. Holders of MediaOne Group common stock will receive cash for any fraction of a share in an amount based on the market value of AT&T common stock on the last full trading day prior to the merger.

14. **Can I still make an election if I exercised appraisal rights under the Delaware General Corporation Law as described in the Proxy Statement?**

No. If you have exercised appraisal rights under Section 262 of the Delaware General Corporation Law, you may not make an election. Please read Appendix C of the Proxy for additional information.

15. **May I have my new AT&T shares issued in the name of a different person?**

Yes. Mark box 7 on the front of the Election Form and complete box B, "Change of Name on Account" on the back of the Election Form. All current registered owners must also sign the Election Form and obtain a "Medallion" signature guarantee. You can have your signature Medallion Guaranteed at a financial institution such as a commercial bank, a trust company, a national bank, a credit union, a brokerage firm or a savings association that participates in the "Medallion" Program. Please note that a Medallion Guaranteed signature is required for this request; a notary public is not sufficient.

16. **What if I lose my Election Form or need an additional one?**

You may call the Information Agent toll-free at 1-877-816-5328 and request that a duplicate Election Form be mailed to you. Keep in mind that the Exchange Agent must receive any changes by the Election Deadline.

**17. What should I do if my certificate(s) are lost, stolen, or destroyed?**

Please complete the Election Form, marking box 7 on the front of the form, and read box A on the back of the form, "Election of Lost MediaOne Group, Inc. Certificates." If you have lost certificates representing 1,000 shares or less, you are exempt from paying the insurance premium for one year from the closing date of the merger. If you have lost certificates representing more than 1,000 shares of MediaOne Group, you will be required to pay an insurance premium based on 2% of the market value of the lost shares. The value per share is listed on the back of the Election Form in box A.

**18. What should I do if my address or Social Security Number has changed or is incorrect?**

Correct the information on the front of the Election Form and the Exchange Agent will make the appropriate change(s).

**19. Who do I contact if I have additional questions concerning the merger or if I require assistance completing the Election Form?**

You may call the Information Agent toll-free at 1-877-816-5328. Service representatives are available Monday through Friday, 8:00 a.m. to 6:00 p.m. Eastern Time.

**20. Where are the shares of AT&T traded?**

AT&T common stock trades on the New York Stock Exchange under the symbol "T."

Do you have additional questions that aren't answered here? Please call toll-free 1-877-816-5328 Monday through Friday, 8:00 a.m. to 6:00 p.m. ET.

Return your form in the enclosed envelope to:
AT&T/MediaOne Group Merger
c/o EquiServe
PO Box 9111
Boston, MA 02205-9111

Return forms by overnight courier to:
EquiServe Trust Company
40 Campanelli Drive
Braintree, MA 02184

NOTES

Exhibit C



August 1, 2000

Dear MediaOne Shareowner:

Welcome to AT&T. This letter describes what you need to do in order to convert your MediaOne shares into AT&T shares.

In June, you received a mailing noting that the merger of our two companies was complete, and describing limited-time alternatives for converting your shares. The deadline has now passed for indicating that you wanted anything other than the "Standard Election." As a result, like many shareowners you will receive a combination of AT&T common stock and cash in exchange for your MediaOne shares.

There are just a few simple steps you need to take before we can distribute your AT&T shares to you:

• Complete and sign the enclosed "AT&T/MediaOne Exchange Form," per the instructions on the form.

• Return your MediaOne Group or US West Media stock certificate(s) along with the AT&T/MediaOne Exchange Form in the enclosed insured and pre-addressed envelope immediately. DO NOT SIGN YOUR STOCK CERTIFICATE(S).

Note: *The enclosed pre-addressed envelope is insured for a market value of $1,000,000 or less, if mailed within the United States, Puerto Rico, the U.S. Virgin Islands or Canada. AT&T is not responsible for loss of certificates mailed from any other countries or with a market value of more than $1,000,000. Place such certificates in a separate envelope, insure them for 2% of their market value as shown in Box A on the back of the AT&T/MediaOne Exchange Form and send them by registered mail or overnight courier to EquiServe Trust Company, 40 Campanelli Drive, Braintree, MA 02184.*

After completing these steps, you will be sent a statement detailing the total number of AT&T shares issued to you as a result of this merger. We are issuing your AT&T shares in an electronic form called "direct registration" which provides a safe and convenient form of stock ownership.

In addition, after we receive your shares you will receive a check for the amount of cash you are due under the Standard Election. Note that cash proceeds are taxable in the year 2000, even if you delay exchanging your shares.

Please remember that MediaOne Group common stock is no longer traded on any stock exchange, and until we receive your certificates and the AT&T/MediaOne Exchange Form you cannot receive any AT&T shares, cash payments, dividends, or be eligible to participate in future AT&T shareowner meetings.

If you have lost your certificates, please mark box [4] on the AT&T/MediaOne Exchange Form and read box [A] on the back of the form. If you have lost 1,000 shares or less, you are exempt from paying the insurance premium until June 15, 2001. If you have lost more than 1,000 shares or delay exchanging your shares of MediaOne Group, you will be required to pay an insurance premium based on 2% of the market value of the lost shares.

Thank you for your support of this merger, and again, welcome to the AT&T family.

Sincerely,

*Claudia Holcombe*

Claudia J. Holcombe
Executive Director of Shareowner Services

PS. *It is important that you return your certificates promptly. If you have questions about this procedure or anything related to this transaction, please call toll-free 1-877-816-5328, Monday through Friday, 8:00 a.m. to 6:00 p.m. Eastern time.*